SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PRIORITY PAYMENT SYSTEMS LLC,

        Plaintiff,

        v.

REGEN MEDICAL MANAGEMENT LLC,
REGEN MEDICAL P.C., STEVEN VICTOR,
MD, NEW YORK STATE DEPARTMENT OF
LABOR, and DEPARTMENT OF THE
TREASURY,

        Defendants.

Index No.:_____

**SUMMONS**

**TO THE ABOVE NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** to answer the complaint filed by Priority Payment Systems LLC ("Plaintiff") in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint. Venue is proper in New York County pursuant to CPLR § 1006(a).

DATED:  New York, New York
         November 27, 2017

**LOWENSTEIN SANDLER LLP**

By: _____

Jeffrey J. Wild, Esq.
Frank T.M. Catalina, Esq.
1251 Avenue of the Americas

New York, NY 10020
T: (212) 262-6700
F: (212) 262-7402

- and –

**STANLEY ESREY & BUCKLEY, LLP**[1]

Greg Michell, Esq.
Garrett E. Land, Esq.
Promenade, Suite 2400
1230 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 835-6200
F: (404) 835-6221

*Co-Counsel for Plaintiff*

TO:     Steven Victor
        845 U.N. Plaza, Apt. 62C
        New York, New York 10017

        Regen Medical Management LLC
        c/o: CT Corporation System
        111 Eighth Avenue
        New York, New York 10011

        Regen Medical P.C.
        c/o:  Steven Victor
        Regen Medical PC
        460 Park Ave., 17th Floor
        New York, New York 10022

        New York State Department of Labor – Unemployment Insurance Division
        c/o: Roberta Reardon, Commissioner
        New York State Department of Labor
        Building 12, W.A. Harriman Campus
        Albany, New York 12240

        -and-

        Department of the Treasury – Internal Revenue Service
        c/o: Joon H. Kim

---

[1] Lowenstein Sandler LLP will make a motion for *pro hac vice* admission of Greg Michell, Esq. and/or other attorneys at the firm of Stanley Esrey & Buckley LLP once this case has been assigned an Index number by the Court.

United States Attorney's Office
1 St. Andrew's Plaza
New York, New York 10007

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| PRIORITY PAYMENT SYSTEMS LLC,<br><br>                    Plaintiff,<br><br><br>                    v.<br><br><br>REGEN MEDICAL MANAGEMENT LLC,<br>REGEN MEDICAL P.C., STEVEN VICTOR,<br>MD, NEW YORK STATE DEPARTMENT OF<br>LABOR, and DEPARTMENT OF THE<br>TREASURY,<br><br>                    Defendants. | Index No.:_____<br><br><br>**VERIFIED INTERPLEADER<br>COMPLAINT** |

Plaintiff Priority Payment Systems LLC, through its undersigned counsel, by way of

Verified Interpleader Complaint pursuant to CPLR § 1006, alleges and says as follows:

### Parties

1.      Plaintiff Priority Payment Systems LLC is a limited liability company organized

under the laws of Georgia having its principal office located at 2001 Westside Parkway, Suite

155, Alpharetta, Georgia 30004.  Plaintiff is a leading payment services provider, providing

credit-card and debit-card payment services to merchants of all kinds.  By reason of the facts

described below, Plaintiff is or may be exposed to multiple liability as the result of adverse

claims, and thus is a "stakeholder" within the meaning of CPLR § 1006(a).

2.      Defendant Steven Victor, MD ("Dr. Victor") is an individual resident of the State

of New York who resides, on information and belief, at 845 U.N. Plaza, Apt. 62C, New York,

New York 10017.  Upon information and belief, Dr. Victor is the principal officer and sole

partner/owner/member of both Region Medical Management LLC and Region Medical PC.  Dr.

Victor is or may be a "claimant" within the meaning of CPLR § 1006(a) against Plaintiff or the

funds at issue in this interpleader proceeding.

-- 1 --

3.     Defendant Regen Medical Management LLC ("Regen Medical LLC") is a limited liability company that on information and belief is organized under the laws of the State of Delaware and is authorized to do business in the State of New York.  Upon information and belief, Dr. Victor is the sole member of Region Medical LLC.  Regen Medical LLC does not list a principal executive office on the New York Department of State's website, but may be served with process through service on its registered agent, CT Corporation System, located at 111 Eighth Avenue, New York, New York 10011.  Regen Medical LLC is or may be a "claimant" within the meaning of CPLR § 1006(a) against Plaintiff or the funds at issue in this interpleader proceeding.

4.     Defendant Regen Medical P.C. ("Regen Medical PC") is a professional corporation organized under the laws of the State of New York. Upon information and belief, Dr. Victor is the sole partner/shareholder of Region Medical PC.  Regen Medical PC does not list a registered agent on the New York Department of State's website, but may be served with process through service on its Chief Executive Officer, Steven Victor, MD, at the principal executive office of Regen Medical PC at 460 Park Ave., 17th Floor, New York, New York 10022.  Regen Medical PC is or may be a "claimant" within the meaning of CPLR § 1006(a) against Plaintiff or the funds at issue in this interpleader proceeding.

5.     Defendant New York State Department of Labor – Unemployment Insurance Division ("DOL") is a New York state agency.  Pursuant to CPLR § 307, DOL may be served with process through service upon Roberta Reardon, Commissioner, New York State Department of Labor, Building 12, W.A. Harriman Campus, Albany, New York 12240 or any other agent designated for this purpose. DOL is or may be a "claimant" within the meaning of CPLR § 1006(a) against Plaintiff or the funds at issue in this interpleader proceeding.

- 2 -

6.      Defendant Department of the Treasury – Internal Revenue Service ("IRS") is or may also be a "claimant" within the meaning of CPLR § 1006(a) against Plaintiff or the funds at issue in this interpleader proceeding.  Pursuant to 28 U.S.C. § 2410(b), service upon the IRS may be made by serving a copy of the summons and Verified Interpleader Complaint upon the United States attorney for the district in which the action is brought or upon an assistant United States attorney or clerical employee designated by the United States attorney in writing filed with the clerk of the court in which the action is brought and by sending copies of the process and complaint, by registered mail, or by certified mail, to the Attorney General of the United States at Washington, District of Columbia.

### Jurisdiction and Venue

7.      This Court has jurisdiction over the subject matter of this action pursuant to CPLR § 1006.

8.      Defendants are subject to the personal or *in personam* jurisdiction of this Court.

9.      Pursuant to CPLR 7804(b) and 506(b), venue is proper in this Court because it the county within the judicial district where the material events took place where one or more Defendants reside.

### Background Facts

10.     Plaintiff is in the credit card processing business.  Plaintiff enters into agreements with merchants whereby Plaintiff funds credit card purchases made by a merchant's customers to the merchant in exchange for a processing fee.  Because of the services Plaintiff provides, merchants gain access to the funds from a customer's purchase even though the exchange of value with the customer and merchant may not be complete.

11.     On or about November 18, 2015, Regen Medical PC entered into a Merchant

- 3 -

Application and Processing Agreement with Plaintiff (the "Merchant Agreement"). A true and accurate copy of the Merchant Agreement, redacted to protect potentially confidential information, is attached hereto and incorporated herein as **Exhibit A**.

12.     Dr. Victor signed the Merchant Agreement in his capacity as CEO of Regen Medical PC and personally guaranteed Regen Medical PC's performance of its obligations under the Merchant Agreement.

13.     The Merchant Agreement required Regen Medical PC to designate a bank account into which it wished funds from card transactions to be deposited and from which it wished certain charges to be debited.

14.     Regen Medical PC and Defendant Victor designated that account by submitting a voided check for account No. xxxxx6590 in the name of "**Regen Medical Management LLC**" to Plaintiff. A true and accurate copy of that check, redacted to protect potentially confidential information, is attached hereto and incorporated herein as **Exhibit B**.

15.     Funds from card transactions submitted by Region Medical PC were deposited into that account from November 2015 until late January 2016.

16.     On or about January 26, 2016, Dr. Victor submitted a Bank Change form to Plaintiff designating bank account No. xxxxxx7354 in the name of "Region Medical P.C." as its designated account. That form designates "Regen Medical, P.C." as a DBA. A true and accurate copy of that change form, redacted to protect potentially confidential information, is attached hereto and incorporated herein as **Exhibit C**.

17.     Funds from card transactions submitted by Region Medical PC were deposited into that account from late January 2016 until late February 2017.

18.     On or about February 20, 2017, Dr. Victor submitted another Bank Change form,

- 4 -

this time designating bank account No. xxxxxx7370 in the name of "**Regen Medical Management LLC**" as its designated account. That form designates "Regen Medical, PC" as a DBA. A true and accurate copy of that change form, redacted to protect potentially confidential information, is attached hereto and incorporated herein as **Exhibit D**.

19. Funds from card transactions submitted by Region Medical PC have been deposited into that account since late February 2017.

20. On or about November 1, 2017, Plaintiff received a Notice of Levy from the IRS (the "Levy"), indicating that Dr. Victor owes the IRS $431,630.66, and stating that "This Levy requires you to turn over to us this person's property and right to property (*such as money, credits, and bank deposits*) that you have or which you are already obligated to pay this person." A true and accurate copy of the Levy, redacted to protect potentially confidential information, is attached hereto and incorporated herein as **Exhibit E**.

21. The Levy provides further: "Any person who fails or refuses to surrender any property or rights to the property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered … together with costs and interest on such sum … [and] a penalty equal to 50 percent of the amount recoverable …."

22. On or about November 3, 2017, Plaintiff received a Specification of Levy and Demand for Payment of Levy from the DOL (the "Demand"), indicating that Region Medical PC owes the DOL $34,281.96 plus interest, and stating that "you are required without delay to transfer all property in which the Judgment Debtor has an interest and pay all debts due the Judgment Debtor to a UI Employer Services Agent or UI Employer Services Representative of this Department." A true and accurate copy of the Demand, redacted to protect potentially

- 5 -

confidential information, is attached hereto and incorporated herein as **Exhibit F**.

23.     The Demand provides further:  "Failure to turn over any property or funds owed to the judgment debtor may result in you or your company becoming personally obligated for these debts."

24.     Plaintiff has custody or possession of $12,165.52 that is or may be subject to the Levy and/or Demand (the "Stake").

25.     Dr. Victor has advised Plaintiff that he:  (i) disputes the IRS's and DOL's claims to the Stake; (ii) claims that the Stake belongs to Regen Medical LLC; and (iii) demands that Plaintiff release the Stake to Regen Medical LLC.

26.     Dr. Victor provided Plaintiff with the IRS's January 2014 notice of assignment of EIN to Region Medical LLC.  That document: (i) indicates that Dr. Victor is the sole member of Region Medical LLC; and (ii) is addressed to 460 Park Avenue, 17th Floor, New York, NY 10022, which is listed on the New York Department of State's website as the principal executive office for Region Medical PC.  A true and accurate copy of the EIN Assignment, redacted to protect potentially confidential information, is attached hereto and incorporated herein as **Exhibit G**.

27.     Although Dr. Victor is admittedly an owner and principal of both Regen Medical PC and Regen Medical LLC, he claims that the two entities do not have any relationship.

### FIRST COUNT (Interpleader)

28.     Plaintiff repeats the allegations contained in the preceding paragraphs as if set forth here at length.

29.     By reason of these conflicting claims and demands by Claimants to substantially the same Stake, Plaintiff is exposed to the risk of multiple and inconsistent liabilities.

30.     Plaintiff is not in collusion with any party claiming the Stake, claims no right to or interest in the funds constituting the Stake, is indifferent between the Claimants, and is merely a disinterested stakeholder.

31.     By reason of the conflicting claims and demands of Claimants, Plaintiff is in doubt as to which party is entitled to the Stake and Plaintiff could be exposed to liability if it paid the Stake to any Defendant without judicial direction.

32.     Plaintiff is ready and willing to deliver the Stake to the rightful Claimant, but is in doubt which is the rightful one, and is in real danger or hazard by means of such doubt from Claimants' conflicting demands.

33.     Plaintiff is entitled to the relief afforded by interpleader as set forth in CPLR § 1006, including (but not limited to) an order of discharge under CPLR § 1006(f) and an order permitting Plaintiff to pay the Stake into the Court or to a designated person or to retain the Stake to the credit of the action.

WHEREFORE, Plaintiff respectfully requests:

(1) An order of discharge under CPLR § 1006(f);

(2) An order permitting Plaintiff to pay the Stake into the Court or to a designated person or to retain the Stake to the credit of the action;

(3) An Order declaring which Defendant or Defendants is or are entitled to the Stake, less costs and Plaintiff's attorneys' fees and other expenses; and

- 7 -

(4) Such other and further relief as the Court deems just and necessary.

Dated: New York, New York
November 27, 2017

**LOWENSTEIN SANDLER L L P**

By: _____

Jeffrey J. Wild, Esq.
Frank T.M. Catalina, Esq.
1251 Avenue of the Americas
New York, NY 10020
T: (212) 262-6700
F: (212) 262-7402

- and -

**STANLEY ESREY & BUCKLEY, LLP**[1]

Greg Michell, Esq.
Garrett E. Land, Esq.
Promenade, Suite 2400
1230 Peachtree Street, N.E.
Atlanta, GA 30309
T: (404) 835-6200
F: (404) 835-6221

*Co-Counsel for Plaintiff*

---

[1] Lowenstein Sandler LLP will make a motion for *pro hac vice* admission of Greg Michell, Esq. and/or other attorneys at the firm of Stanley Esrey & Buckley LLP once this case has been assigned an Index number by the Court.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PRIORITY PAYMENT SYSTEMS LLC,

      Plaintiff,

            v.

REGEN MEDICAL MANAGEMENT LLC,
REGEN MEDICAL P.C., STEVEN VICTOR,
MD, and NEW YORK DEPARTMENT OF
LABOR,

          Defendants.

Index No.: _____

**VERIFICATION**

STATE OF GEORGIA      )
                    ) ss.:
COUNTY OF FULTON    )

      Jeffrey K. Perry, being duly sworn, deposes and says:

          1.     I am the Counsel of Plaintiff Priority Payment Systems LLC.

          2.     I have read the foregoing Verified Interpleader Complaint and know the contents thereof.  Pursuant to CPLR § 3021, I verify on Plaintiff's behalf that all statements of fact therein are true and correct to my own knowledge, except to those matters stated on information and belief, which matters are not within my personal knowledge, but which I believe to be true based on my review of Plaintiff's records or other investigation.

                              JEFFREY K. PERRY

SWORN TO AND SUBSCRIBED
before me this 27th day
of November, 2017.

_____
Notary Public
My Commission Expires: 4/4/2020

OFFICIAL SEAL
SHAMIKA J SPENCE
Notary Public, Georgia
GWINNETT COUNTY
My Commission Expires
APRIL 4, 2020

# EXHIBIT A

## MERCHANT PROCESSING APPLICATION AND AGREEMENT

**PRIORITY** PAYMENT SYSTEMS
Next Generation Bank Card Solutions

Relationship _____  Association _____

Sales Rep Name _Cliff Green_  Application Date _11/18/15_

| 1. GENERAL INFORMATION | 2. BUSINESS LOCATION INFORMATION | 3. BUSINESS STRUCTURE | Page 1 of 4 |
|---|---|---|---|

Client's Business Name (Doing Business As)
_Regen Medical, PC_

Client's Corporate/Legal Name (Must match IRS income tax filing)
_Regen Medical, PC_

Location Address
_460 Park Avenue, 17th Fl._

Corporate Address (if Different Than Location)
_460 Park Avenue, 17th Fl._

City _New York_ State _NY_ Zip _10022_

City _New York, NY_ State ___ Zip _10022_

Location Phone _212-249-3050_  Location Fax _212-202-4080_

Contact Name _Lorraine_  Contact Phone _212-249-3050_

Customer Service Phone _212-249-3050_

Prior Security Breach? Yes / No

Business Email _lorraine+@regenmedicalpc.com_  D&B#

Business Website Address

Fed Tax ID # (Must match IRS income tax filing) ___5223  Tax Type

Multiple locations? ___Yes _X_No  If Yes, enter # of locations ____

Additional location to existing MID

Tax Filing Name _Regen Medical, PC_

Send retrieval/chargeback requests to
Corporate Address  _X_ Location Address

Date Business Started _12/2010_

Length Current Ownership _5 yrs._

Send monthly merchant statements to ___ Corporate Address  _X_ Location Address  ___ Do Not Mail

Sole Prop  Partnership  LLC/LLP  C Corp  S Corp  Govt. (Local/State/Federal)  501c/Tax Ex.  State Filing:

☐ I certify that I am a foreign entity / nonresident alien.
(If checked, please attach IRS Form W-8.)

NOTE: Failure to provide accurate information may result in a withholding of merchant funding per IRS regulations. (See Part IV, Section A.3 of your Program Guide for further information.)

| 4. OWNERS/PARTNERS/OFFICERS | | 5. TRADE REFERENCE |
|---|---|---|
| OWNER/PARTNER/OFFICER 1 | OWNER/PARTNER/OFFICER 2 | TRADE REFERENCE |

Name _Steven Victor, MD_  |  Name  |  Business Name

Title _CEO/MD_ % Ownership _100%_  |  Title  % Ownership  |  Business Address

Home Address _845 U.N. Plaza_  |  Home Address  |  City  State  Zip

City _New York_ State _NY_ Zip _10017_  |  City  State  Zip  |  Contact

Telephone _917-459-8252_ DL/ID# Issued State Exp Date  |  Telephone  DL/ID#  Issued State  Exp Date  |  Telephone

Social Security #  Date of Birth  |  Social Security #  Date of Birth  |  Prior Bankruptcies? ___Yes ___No  Business and/or ___Personal Date Discharged

Email Address _rhodes.victor@aol.com_  |  Email Address

Patriot Act Notice: To fight the funding of terrorism and money laundering, we are required to obtain, verify and record information that identifies each person (including business entities) who opens an account. To allow us to identify you, we will ask for your name, physical address, date of birth and tax payer ID and may ask for other information, such as your driver's license or other documents.

| 6. NATURE OF BUSINESS | 7. TRANSACTION INFORMATION (see Section 9 American Express) |
|---|---|

Business Type: ___Retail ___Restaurant ___Internet ___Government ___Lodging ___Supermarket ___Mail/Telephone Order

___Petroleum ___Utilities _X_Healthcare ___Education ___QSR ___Charity/Non Profit ___B2B ___Other

Requested Monthly Payment Card Volume $ ▮▮▮  |  Card Present Swiped ▮ — ▮  Sales to Consumers ▮▮▮

Requested Average Payment Card Ticket $ ▮▮▮  |  Card Present Not Swiped —  Sales to Business ▮▮▮

Requested Highest Payment Card Ticket $ ▮▮▮  |  MOTO —  Sales to Govt. —

Seasonal Merchant? ___Yes _X_No  |  Internet (Ecommerce) —  Days to Delivery —

J  F  M  A  M  J  J  A  S  O  N  D  |  Previous Processor

Reason For Leaving

Description of products or services sold  _Medical Services_

Describe your return policy  _All final_

| 8. BANKING ACCOUNT INFORMATION | | | |
|---|---|---|---|
| Deposit Bank Name | Routing# | Account# | ACH Method: |
| Fees Bank Name | Routing# | Account# | ___Combined  ___Individual |

## 9. SERVICE ACCEPTANCE AND FEE SCHEDULE

Select all card types you wish to accept (See Section 1.9 of the Program Guide for details regarding limited acceptance)

[X] Visa Credit   [X] Visa Non-PIN Debit   [X] MasterCard Credit   [X] MasterCard Non-PIN Debit   [X] Discover Network   [X] American Express   [ ] PIN Debit

**Select VI/MC/Discover Network Discount Plan:** (Based on Gross Sales Volume)

[ ] Tiered Basic       [ ] Flat Rate

[X] Pass Through I/C

**Select PinDebit Discount Plan:**

[ ] Pin Debit Network Fee Pass-through + ___ % Markup

**Discount Payment Method:** ___ Daily  [X] Monthly

**Assessments:** ___ Included [X] Bill Separately
(If Pass Through I/C - Assessments MUST Bill Separately)

**Brand Fees:** ___ Included [X] Bill Separately
(If Pass Through I/C - Brand Fees MUST Bill Separately)

### Discount Fees

| QUALIFICATION | DISC. FEE (%) | PER ITEM ($) | QUALIFICATION | DISC. FEE (%) | PER ITEM ($) | QUALIFICATION | DISC. FEE (%) | PER ITEM ($) |
|---|---|---|---|---|---|---|---|---|
| **MasterCard** | | | **Visa** | | | **Discover Network** | | |
| Credit Qual | | | Credit Qual | | | Credit Qual | | |
| Credit Mid-Qual | | | Credit Mid-Qual | | | Credit Mid-Qual | | |
| Credit Non-Qual | | | Credit Non-Qual | | | Credit Non-Qual | | |
| CheckCard Qual | | | CheckCard Qual | | | CheckCard Qual | | |
| CheckCard Mid-Qual | | | CheckCard Mid-Qual | | | CheckCard Mid-Qual | | |
| CheckCard Non-Qual | | | CheckCard Non-Qual | | | CheckCard Non-Qual | | |
| Credit Pass Through IC | | | Credit Pass Through IC | | | Credit Pass Through IC | ███ | |
| CheckCard Pass Through IC | ███ | | CheckCard Pass Through IC | ███ | | CheckCard Pass Through IC | | |
| ERR | | | ERR | | | ERR | | |

| Voyager | All applicable Association fees will be passed through to the merchant at the actual costs assigned by the Association. Fees include, but are not limited to, Visa's APF, Misuse of Authorization Fee, Zero Floor Limit Fee, Acquirer ISA Fee, and MasterCard's NABU Fee, Acquirer Support Fee, Cross Border Fee, and Discover IPF, ISF, Data Usage fee, Amex Net Work Fee et al. |
|---|---|

### American Express

| OptBlue℠ | | | | Amex Direct |
|---|---|---|---|---|

| QUALIFICATION | DISC. FEE (%) | PER ITEM ($) | OptBlue℠ Monthly Card Volume | | ___ Order New   ___ Use Existing |
|---|---|---|---|---|---|
| Credit Qual | | | OptBlue℠ Average Card Ticket | | CAP # ___ |
| Credit Mid-Qual | | | OptBlue℠ Highest Card Ticket | ███ | Existing SE # ___ |
| Credit Non-Qual | | | SE # ___ | | Monthly flat fee of $7.95 or Discount Rate may apply |
| Credit Pass Through IC | ███ | | | | |

**Select OptBlue℠ Discount Plan:**

[ ] Tiered Basic   [ ] Flat Rate

[X] Pass Through I/C

Fee applies to all American Express Programs.

**(2.30% downgrade will be charged by American Express for transactions whenever a CNP or Card Not Present Charge occurs. CNP means a Charge for which the Card is not presented at the point of purchase (e.g., Charges by mail, telephone, fax or the Internet). Note: The CNP Fee is applicable to transactions made on all American Express Cards, including Prepaid Cards.

An Inbound fee of 0.40% will be applied on any Charge made using a Card, including Prepaid Cards, that was issued outside the United States (an used herein, the United States does not include Puerto Rico, the U.S. Virgin Islands and other U.S. territories and possessions). This fee is applicable to all transactions listed in Appendix B, except Education in the following categories: Sporting & Recreation Camps (MCC 7032), Elementary & Secondary Schools (MCC 8211), Colleges, Universities, Professional Schools (MCC 8220), and ChildCare Services (MCC 8351).

[ ] By checking this box, you opt out of receiving future commercial marketing communications from American Express.

Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional or relationship messages from American Express.

### Authorization Fees

| Visa/MC/Discover Network | ___ | Electronic AVS | ███ |
|---|---|---|---|
| Amex/Fleet/Other | ███ | Voice Authorization | ___ |
| Pin Debit Authorization | ___ | Voice AVS | ___ |
| EBT Authorization | ___ | | |

### Monthly Fees

| Monthly Minimum | ███ | Industry Compliance | ███ |
|---|---|---|---|
| Wireless Fee | ___ | Monthly Service Fee | ___ |
| PIN Debit Fee | ___ | Misc Monthly Fee | ___ |
| Industry Non-Compliance (Up to $14.95) | ___ | (if applicable per Section 4.8 of the Merchant Program Guide) | |

### Miscellaneous Fees

| Sales Transaction Fee (All card types) | ___ (per item) | Chargeback Fee | ███ (per occurrence) |
|---|---|---|---|
| Retrieval Fee (All card types) | ___ (per occurrence) | Return Transaction Fee | ___ (per item) |
| Batch Fee | ___ (per item) | Annual Fee | ___ |
| ACH Reject | ___ (per occurrence) | Annual Fee Bill Month | ___ |

### MX Merchant Fees

| MX Merchant Monthly Fee | ███ |
|---|---|
| MX Merchant Plan | ___ Reporting [X] Basic ___ Plus |
| MX Gateway Transaction Fee | ___ Premium ___ Enterprise |
| Bill to | ___ Statement ___ Separate |

In the event that this Agreement is terminated early, Merchant will be responsible for the payment of a ___ early termination fee in accordance with Part IV, Section A.3 of the Merchant Program Guide.

## 10. OTHER CARD TYPES
Page 3 of 4

| | | | | |
|---|---|---|---|---|
| Accept EBT | ___Yes ✗ No | Order Voyager | ___Yes ✗ No | Order ACH/Check Services ___Yes ✗ No |
| Accept EBT Cash Benefit | Yes ✓ No | Order Wright Express | ___Yes ✗ No | (Must attach addendum with app copy) |
| | | (Must attach Wright Express application and Debranding letter with app copy) | | Order Gift Card  Yes ___ No ✗ (Must attach addendum with app copy) |

## 11a. EQUIPMENT / PROCESSING METHOD

Application Type    Retail ☒    Retail w/ Tip ☐    MOTO ☐    Restaurant w/ Tip ☐    Quick Serve Restaurant (no tip) ☐    Hotel ☐    Auto Rental ☐

| Terminal Features | Yes | No | | Yes | No | | Yes | No |
|---|---|---|---|---|---|---|---|---|
| Fraud Check (last 4-digits) | ☐ | ☐ | Purchasing Card | ☐ | ☐ | Invoice/Purchase Order # | ☐ | ☐ |
| AVS + CVV2 | ☐ | ☐ | Server/Clerk # | ☐ | ☐ | Auto Close  Y ☐  N ☐  If yes, time? _____ | | |

IP Connection?    Yes ☐  No ☐  If yes, Terminal Serial_____    Special Requests (Multi-Mid, Dial 9, etc): _____

Wireless?    Yes ☐  No ☐  Wireless Info: MAN/Serial_____    SIM Card Number _____

| TYPE OF EQUIPMENT | | | | PRODUCT NAME | QUANTITY | DEPLOYMENT | | | |
|---|---|---|---|---|---|---|---|---|---|
| Terminal | ☐ Pinpad | ☐ Printer | ☐ VAR* ☐ | Pay trace | (1) | Existing | ☐ Agent | ☐ New Order (attach order form) | ☐ |
| Terminal | ☐ Pinpad | ☐ Printer | ☐ VAR* ☐ | | | Existing | ☐ Agent | ☐ New Order (attach order form) | ☐ |
| Terminal | ☐ Pinpad | ☐ Printer | ☐ VAR* ☐ | | | Existing | ☐ Agent | ☐ New Order (attach order form) | ☐ |
| Terminal | ☐ Pinpad | ☐ Printer | ☐ VAR* ☐ | | | Existing | ☐ Agent | ☐ New Order (attach order form) | ☐ |

*Manufacturer/product/version of PC/Internet Software—————————

Do you use any third party to store, process, or transmit cardholder data?    ___Yes    ___ No

If yes, give name/address: _____

ORDER LEASE_____    Lease Company_____    Lease Term_____ Mos.    Annual Tax Handling Fee    $10.20

Total Monthly Lease Charge————— w/o taxes, lates fees, or other charges that may apply - See Lease Agreement for details.

This is a NON-CANCELLABLE lease for the full term indicated    Client's initials:___

## 11b. CARD NOT PRESENT INFORMATION

If you process more than 30% of your bankcard transactions, or volume, without swiping and/or examining the credit card, please complete this section and provide the information requested.

1. Please submit your Product catalog; brochures; promotional materials; a current price list; and a copy of your service agreement with card holder if applicable. If on the Internet, please include screen-prints of your website address if your site is not yet active.

2. If Internet, please check your type of business:

____ Web Hosting    ____Domain Registration    ____Web page Design    ____Auction    ____Internet Service Gateway

____ Selling Digital Service    ____Advertisement    ____Selling Hard Goods    ____Other: _____

If using the Internet, list encryption method, vendor, and controls used to secure transaction information _____

3. How will the product be advertised or promoted? _____

4. Billing Methods: (Check all that apply)

____ Monthly - _____ %    ____Yearly - _____%    ____ Quarterly - _____%    ____ One Time - _____ %    ____ Hourly - _____ %

5. List the name(s) and address(es) of the vendor(s) from which supplies are purchased.

6. Who performs product/service fulfillment? If direct from vendor, please provide Vendor Name, address and phone number in full:

7. Please describe how a sale takes place from beginning of order until completion of fulfillment:

## 12a. SITE INSPECTION (Completed by Sales Agent)
Page 4 of 4

I have personally conducted a Site Inspection for this merchant, visually inspected the merchant's inventory (if applicable), verified the merchant's payment application is PABP (Payment Application Best Practices) validated (if applicable), and represent that the information in this merchant application is accurate, as to the best of my knowledge. I am subject to criminal penalties and/or financial losses for false or misleading information.

**Sales Agent Name (printed)** _____    **Signature X** _____

## 13. SIGNATURES

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the Program Guide (Version PPS0714) and Confirmation Page, which is part of this Merchant Processing Application (consisting of Sections 1-13) and by this reference incorporated herein. Client acknowledges and agrees that we, our Affiliates and our third party subcontractors and/or agents may use automatic telephone dialing systems to contact Client at the telephone number(s) Client has provided in this Merchant Processing Application and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a cellular or wireless number or if Client has previously registered on a Do Not Call list or requested not to be contacted Client for solicitation purposes. Client hereby consents to receiving commercial electronic mail messages from us, our Affiliates and our third party subcontractors and/or agents from time to time. Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or Internet order. However, if your Application is approved based upon contrary information stated in Section 7, you are authorized to accept transactions in accordance with the percentages indicated in that section.

This signature page also serves as a signature page to the Equipment Lease Agreement appearing in the Third Party Section of the Program Guide, if selected, the undersigned Client being the "Lessee" for purposes of such Equipment Lease Agreement. Client authorizes PRIORITY PAYMENT SYSTEMS ("PRIORITY") and

their respective agents to investigate the references, statements and other data contained herein and to obtain additional information from credit bureaus and other lawful sources, including persons and companies names in this Merchant Processing Application. Client authorizes PRIORITY and BANK and their respective agents (a) to procure information from any consumer reporting agency bearing his/her personal credit worthiness, credit standing, financial capacity, character, general reputation, personal characteristics, or mode of living, and (b) to contact all previous employers, personal references and educational institutions. Each of the undersigned also authorizes us and our Affiliates to provide amongst each other the information contained in this Merchant Processing Application and Agreement and any information received from all references, including banks and consumer reporting agencies. It is our policy to obtain certain information in order to verify your identity while processing your account application. If the Application is approved, each of the undersigned also authorizes us to obtain subsequent consumer reports in connection with the maintenance, updating, renewal or extension of the Agreement.

Client authorizes PRIORITY and BANK and their affiliates to debit Client's designated bank account via Automated Clearing House (ACH) for costs associated with the equipment hardware, software and shipping.

You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time , or processing and acceptance of transactions in certain jurisdictions pursuant to 31 CFR Part 500 et seq, and other laws enforced by the Office of Foreign Assets Control (OFAC).

Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct.

Social Security numbers are classified as "Confidential" information under the PRIORITY Data Classification Retention and Disposal Policy. As such, Social Security numbers may only be accessed by and disclosed to PRIORITY team members and others with a legitimate business "need to know" in accordance with applicable laws and regulations. Social Security numbers, whether in paper or electronic form, are subject to physical, electronic and procedural safeguards, and must be stored, transmitted and disposed of in accordance with the provision of the information applicable to Confidential information. These restrictions apply to all Social Security numbers collected or retained by PRIORITY.

Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by PRIORITY and BANK.

**Client's Business Principal / Officer**

Signature X _____    Title **C E O**

Print Name of Signer **Steven Victor, MD**    Date **11/18/15**

Signature X _____    Title _____

Print Name of Signer _____    Date _____

Personal Guarantee: In exchange for PRIORITY and Synovus Bank (the Guaranteed Parties) acceptance of, as applicable, the Agreement, and/or the Equipment Lease Agreement, the undersigned unconditionally and irrevocably guarantees the full payment and performance of Client's obligations under the foregoing agreements, as applicable, and as modified from time to time, whether before or after termination or expiration of such agreements and whether or not the undersigned has received notice of any amendment of such agreements. The undersigned waives notice of default by Client and agrees to indemnify the Guaranteed Parties for any and all amounts due from Client under the foregoing agreements. The Guaranteed Parties shall not be required to first proceed against Client to enforce any remedy before proceeding against the undersigned. This is a continuing personal guaranty and shall not be discharged or affected for any reason. The undersigned understands that this is a Personal Guaranty of payment and not of collection and that the Guaranteed Parties are relying upon this Personal Guaranty in entering into the foregoing agreements, as applicable.

**Personal Guarantee**

Signature X _____    Print Name: **Steven Victor, MD** Date **11/18/15**

**Personal Guarantee**

Signature X _____    Print Name: _____    Date _____

**Accepted By**

Priority Payment Systems, LLC
P.O. BOX 246, Alpharetta, GA 30009-0246

Synovus Bank
1111 Bay Ave, Columbus, GA 31901

Signature X _____    Signature X _____

## PART IV: CONFIRMATION PAGE

**PROCESSOR**    **Name:**   _Priority Payment Systems_
**INFORMATION:** **Address:**   _P.O. Box 246, Alpharetta, GA 30009-0245_
     **URL:** _www.prioritypaymentsystems.com/manuals/PPS0714programguide.pdf_   Customer Service #: _1-855-813-6293_

Please read the Program Guide in its entirety. It describes the terms under which we will provide merchant processing Services to you.
From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of
your Agreement in order to assist you in answering some of the questions we are most commonly asked.

1. **Your Discount Rates** are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard and Visa. Any
transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 18 of the Program Guide).
2. We may debit your bank account from time to time for amounts owed to us under the Agreement.
3. There are many reasons why a **Chargeback may occur.** When they occur we will debit your settlement funds or settlement account. For a more
detailed discussion regarding Chargebacks see Section 10 of Card Processing Operating Guide.
4. **If you dispute any charge or funding,** you must notify us within 60 days of the date of the statement where the charge or funding appears for Card
Processing.
5. **The Agreement limits our liability to you.** For a detailed description of the limitation of liability see Section 20 of the Card Processing General Terms.
6. We have assumed certain risks by agreeing to provide you with Card processing or check services. Accordingly, we may take certain actions to
mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Card Processing General Terms in Section
23, Term; Events of Default and Section 24, Reserve Account; Security Interest), under certain circumstances.
7. **By executing this Agreement with us you are authorizing us and our Affiliates to obtain financial and credit information regarding your business and
the signers and guarantors of the Agreement until all your obligations to us and our Affiliates are satisfied.
8. The Agreement contains a provision that in the event you terminate the Agreement early, you will be responsible for the payment of an early
termination fee as set forth in Part III, A.3 under "Additional Fee Information."
9. **If you lease equipment from Processor,** it is important that you review Section 1 in Third Party Agreements. Bank is not a party to this Agreement.
**THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM INDICATED.**
10. For questions regarding your Merchant Processing Application and Agreement, please contact Customer Service at 1-855-813-6293, and /
or refer to Important Phone Numbers on the Additional Important Information Page, Part III, Section A.4.

11. **Card Organization Disclosure**
**Visa and MasterCard Member Bank Information: Synovus Bank.**
The Bank's mailing address is 1125 1ˢᵗ Avenue, Columbus, GA 31901, and its phone number is (706)-649-4900.

**Important Member Bank Responsibilities:**
a) The Bank is the only entity approved to extend acceptance of Card Organization products directly to a Merchant.
b) The Bank must be a principal (signer) to the Merchant Agreement.
c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may
be provided to you by Processor.
d) The Bank is responsible for and must provide settlement funds to the Merchant
e) The Bank is responsible for all funds held in reserves that are derived from settlement.

**Important Merchant Responsibilities:**
a) Ensure compliance with Cardholder data security and storage requirements. b) Maintain fraud and Chargebacks below Card Organization thresholds.
c) Review and understand the terms of the Merchant Agreement.
d) Comply with Card Organization rules.
e) Retain assigned copy of this Disclosure Page. ,
f) You may download "Visa Regulations" from Visa's website at: http://usa.visa.com/merchants/operations/op_regulations.html
g) You may download "MasterCard Regulations" from MasterCard's website at: http://www.mastercard.com/us/merchant/support/rules/htm

**Print Client's Business Legal Name:**

_____

By its signature below, Client acknowledges that it has received (either in person, by facsimile, or by electronic transmission) the complete
Program Guide [version PPS0714] consisting of 52 pages (including this confirmation).

Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement.
Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed.

Client understands that a copy of the Program Guide is also available for downloading from the Internet at:
         www.prioritypaymentsystems.com/manuals/PPS0714programguide.pdf

NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED.
**Client's Business Principal:**
Signature [Please sign below]:

X _____

_Steven Victor, MD CEO_      _11/18/15_
    Please Print Name of Signer      Title       Date

# Merchant Services

# Program Terms and Conditions

## (Program Guide)

## PREFACE

Thank you for selecting us for your payment processing needs. Accepting numerous payment options provides a convenience to your customers, increases your customers' ability to make purchases at your establishment, and helps speed payment to your account.

These Program Terms and Conditions ("the Program Guide") presents terms governing the acceptance of Visa,® MasterCard® and Discover® Network Credit Card and Non-PIN Debit Card payments. The Program Guide also includes provisions applicable to American Express® and Other Services. Other Services include all services related to: JCB® Card, PIN Debit Card, and Electronic Benefits Transfer payments, and acceptance of Cards from other Non-Bank Card Organizations such as Voyager Fleet Systems, Inc. ("**Voyage**"), Wright Express Corporation and Wright Express  Financial Services Corporation (collectively, "**WEX**"). Your Merchant Processing Application will indicate the types of payments and Services you have elected to accept.

**This Program Guide,  our Merchant Processing Application and the schedules thereto (collectively, the "Agreement"), contains the terms and  conditions under which Processor and/or Bank  and/or other third parties will provide services to you.  We will not accept any alterations or strike-outs to the Program Guide and, if made, any such alterations or strike-outs shall not apply. Please read this Program Guide completely as it contains important information.**

**You acknowledge that all Services referenced in the Agreement may not be available to  you.**

**IMPORTANT INFORMATION ABOUT BANK'S RESPONSIBILITIES:**

**Discover Network Card Transactions, American Express Card Transactions and Other  Services are not provided to you by Bank, but are provided by Processor and/or third parties.**

**The provisions of this Agreement regarding Discover Network Card Transactions, American Express Card Transactions and Other Services constitute an agreement solely between you and Processor and/or third parties. Bank is not a party to this Agreement in so far as it relates to Discover Network Card Transactions, American Express Card Transactions and Other Services, and Bank is not responsible, and shall have no liability, to you in any way with respect to Discover Network Card Transactions, American Express Card Transactions and Other Services.**

OTHER IMPORTANT INFORMATION:

Cards present risks of loss and non-payment that are different than those with other payment systems. In deciding to accept Cards, you should be aware that you are also accepting these risks.

Visa U.S.A., Inc. ("**Visa**") MasterCard Worldwide ("**MasterCard**"), DFS Services LLC ("**Discover Network**"), and American Express Travel Related Services Company, Inc. ("**American Express**") are payment card networks that electronically exchange Sales Drafts and Chargebacks for Card sales and Credits. Sales Drafts are electronically transferred from banks (in the case of MasterCard and Visa transactions) or network acquirers (in the case of Discover Network transactions) that acquire them from merchants such as yourself through the appropriate Card Organization, to the Issuers. These Issuers then bill their Cardholders for the transactions. The  Card Organizations charge the Acquirers interchange fees and assessments for submitting transactions into their systems. A substantial portion of the Discount Rate or Transaction Fees that you pay will go toward these fees and assessments.

In order to speed up the  payment process, the Issuer transfers the funds back through the Card Organization to the Acquirer at approximately the same time that the Issuer receives the electronic Sales Drafts. Even though the payments under this system are made simultaneously, all payments made through the Card Organizations are conditional and subject to reversals and adjustments.

Each  Card Organization has developed Card Organization Rules that govern their Acquirers and Issuers and the procedures, responsibilities and allocation of risk for this process. Merchants are also bound by Card Organization Rules. The Card Organization Rules and applicable laws give Cardholders and Issuers certain rights to dispute transactions, long after payment has been made to the merchant, including Chargeback rights.

We do not decide what transactions are charged back and we do not control the ultimate resolution of the Chargeback. While we can attempt to reverse a Chargeback to the Issuer, we can only do so if the Issuer agrees to accept it or the Card Organization requires the Issuer to do so after a formal appeal process. Sometimes, your customer may be able to successfully charge back a Card transaction even though you have provided your goods or services and are otherwise legally entitled to payment from your customer. While you may still be able to pursue claims directly against that customer, neither we nor the Issuer will be responsible for such transactions.

You will be responsible for all Chargebacks and adjustments associated with the transactions that you submit for processing.

Please refer to the Glossary for capitalized terms used in the Agreement, including this Preface (if not defined above).

## TABLE OF CONTENTS

**PART I: CARD SERVICES**

**A. Operating Procedures**
1. MasterCard, Visa, Discover Network and American Express Card Acceptance...................................................... 1
1.1. Card Descriptions.................................................... 1
1.2. Effective/ Expiration Dates........................................ 2
1.3. Valid Signature..................................................... 2
1.4. Users Other Than Cardholders....................................... 2
1.5. Special Terms....................................................... 2
1.6. Delayed Delivery or Deposit Balance................................ 3
1.7. Recurring Transaction and Preauthorized Order Regulations.......... 3
1.8. Certain Rules and Requirements..................................... 3
1.9. Card Acceptance..................................................... 3
1.10.Deposits of Principal.............................................. 4
1.11.Merchants in the Lodging Industry.................................. 4
1.12.Customer Activated Terminals and Self-Service Terminals........... 4
1.13. Displays and Advertising.......................................... 4
1.14.Cash Payments by and Cash Disbursements to Cardholders............ 5
1.15. Discover Network Cash Over Transactions........................... 5
1.16. Telecommunication Transactions.................................... 5
2. Suspect Transactions................................................. 5
3. Completion of Sales Drafts and Credit Drafts........................ 6
3.1. Information Required................................................ 6
3.2. Mail/Telephone/Internet (Ecommerce) and Other Card Not Present Sales................................................ 6
3.3. Customer Service Telephone Numbers for Cards Other Than MasterCard Visa and Discover Network........................ 7
4. Data Security........................................................ 7
4.1.Payment Card Industry Data Security Standards(PCIDSS)........ 7
4.2. Data Security Requirements.......................................... 7
4.3. Compliance Audits.................................................. 8
4.4. Immediate Notice Required.......................................... 8
4.5. Investigation...................................................... 8
4.6.Required Information for Discover Network Security Breaches......... 8
4.8 Noncompliance Fees.................................................. 8
4.9. Costs.............................................................. 8
5. Authorizations....................................................... 9
5.1. Card Not Present Transactions...................................... 9
5.2. Authorization via Telephone (Other Than Terminal / Electronic Device Users)............................................ 9
5.3.Authorization via Electronic Devices............................... 9
5.4.Third Party Authorization System................................... 9
5.5.Automated Dispensin Machines....................................... 10
5.6.Pre Authorization for &E (Travel & Entertainment) and Restaurant Merchants.......................................... 10
5.7. Discover Network Procedure for Request for Cancellation of Authorization....................................... 10
5.8. Partial Authorization and Authorization Reversal................... 10
6. Submission/ Deposit of Sales Drafts and Credit Drafts.............. 10
6.1. Submission of Sales for Merchants Other Than Your Business........ 10
6.2. Timeliness......................................................... 10
6.3. Mail/Branch Deposit Procedures..................................... 10
6.4. Electronic Merchants: Daily Batching Requirements & Media Submission................................................ 10
7. Settlement........................................................... 11
8. Refunds/ Exchanges (Credits)......................................... 11
8.1. Refunds............................................................ 11
8.2. Exchanges.......................................................... 11
9.Retention of Records for Retrievals and Chargebacks................. 11
9.1. Retain Legible Copies.............................................. 11

9.2. Provide Sales and Credit Drafts................................... 11
10.Chargebacks,Retrievals and Other Debits............................. 12
10.1. Chargebacks....................................................... 12
10.2. Other Debits...................................................... 14
10.3.Summary(Deposit)Adjustments/Electronic Rejects.................... 14
10.4.Disputing Other Debits and Summary Adjustments.................... 15
11. Account Maintenance................................................ 15
11.1. Change of Settlement Account Number.............................. 15
11.2. Change in Your Legal Name or Structure........................... 15
11.3. Change in Company DBA Name, Address or Telephone/Facsimile Number..................................... 15
11.4. Other Changes in Merchant Profile................................ 15
11.5.Charges for Changes to Account Maintenance........................ 15
11.6. Credit Reports; Bank Account Information.......................... 15
12. Card Organization Monitoring....................................... 15
13.Supplies............................................................ 15

**B. Card General Terms**
14. Special Provisions for American Express ........................... 15
15. Services........................................................... 16
16. Operating Procedures; Card Organization Rules and Compliance........................................... 16
17. Settlement of Card Transactions.................................... 17
18. Exclusivity........................................................ 17
19. Fees; Adjustments; Collection of Amounts Due...................... 17
20. Chargebacks........................................................ 18
21. Representations; Warranties; Covenants; Limitations on Liability; Exclusion of Consequential Damages..................... 18
22. Confidentiality.................................................... 18
23. Assignments........................................................ 19
24. Term; Events of Default............................................ 19
25. Reserve Account; Security Interest................................. 20
26. Financial and Other Information .................................. 21
27. Indemnification.................................................... 21
28. Special Provisions Regarding Non Bank Cards....................... 21
29. Special Provisions for PIN Debit Card..............................23
30. Special Provisions Regarding EBT Transactions.................... 23
31. Special Provisions Regarding Wireless Services.................... 25
32. Special Provisions Regarding Trans Armor Services................ 26
33. Choice of Law; Venue; Waiver of Jury Trial ....................... 27
34. Other Terms........................................................ 28
35. Glossary........................................................... 28

**PART II: THIRD PARTY AGREEMENTS**

Equipment Lease Agreement............................................ 31

**PART III: ADDITIONAL IMPORTANT INFORMATION PAGE FOR CARD PROCESSING**

A.1. Electronic Funding Authorization................................ 33
A.2. Funding Acknowledgement......................................... 33
A.3. Additional Fees, Fee Related Information and Early Termination................................................. 33
A.4. Addresses For Notices........................................... 33

**PART IV: CONFIRMATION PAGE**

Duplicate Confirmation Page ......................................... 34

## PART I: CARD SERVICES

### A. Operating Procedures

This part of the Program Guide (through Section 13) describes the procedures and methods for submitting Credit Card transactions for payment, obtaining authorizations, responding to Chargebacks and Media Retrieval requests, and other aspects of the operations of our services.

Processor is a full-service financial transaction processor dedicated, among other processing services, to facilitating the passage of your Sales Drafts back to the thousands of institutions who issue the MasterCard,® Visa,® and Discover® Network Cards carried by your customers, as well as to the independent Issuers of American Express® and JCB.® The Operating Procedures contained in this part focus primarily on certain of the MasterCard, Visa, American Express and Discover Network Card Organizations Rules, and seek to provide you with the principle for a sound Card program; however, you should consult the Card Organization Rules for complete information and to ensure full compliance with them. They are designed to help you decrease your Chargeback liability and train your employees. (In the event we provide authorization, processing or settlement of transactions involving Cards other than MasterCard, Visa, American Express and Discover Network, you should also consult those independent Issuers' proprietary rules and regulations.)

The requirements set forth in these Operating Procedures will apply unless prohibited by law. You are responsible for following any additional or conflicting requirements imposed by your state or local jurisdiction.

### 1. MasterCard, Visa, American Express & Discover Network Acceptance

**1.1. Card Descriptions.** At the point of sale, the Card must be carefully examined to determine whether it is a legitimate and valid Card. The name of the Card (e.g., Visa, MasterCard, American Express or Discover Network) should appear in bold letters on the Card. For all MasterCard and Visa Cards and for some Discover Network Cards, the Issuer (e.g., XYZ Bank, etc.) should also appear in bold letters on the Card. The following is a description of the authorized Visa, MasterCard, American Express and Discover Network Card designs:

Visa: Visa Cards have the Visa symbol on the right-hand side of the Card. Above the Visa symbol is the 3-dimensional hologram of the Visa Dove design. The expiration date must be followed by one space and may contain the symbol "V." Visa Cards contain a 16-digit account number embossed across the middle of the Cards and the first digit is always a four (4). In addition, Visa Cards have the first four digits of the account number printed directly below the embossed number. You must always check these numbers carefully to ensure that they are the same. Beginning January 2006, Visa has a new Card design which differs significantly from the previous description. You are required to familiarize yourself with the new design by consulting the document entitled "Card Acceptance and Chargeback Management Guidelines for Visa Merchants" (VRM 08. 12.16). You may download the document free of charge from Visa's website at http://www.visa.com/merchant or order a hardcopy to be mailed to you for a nominal charge by telephoning Visa Fulfillment at 800-VISA-311. Both the old and new Visa Card designs will be circulating concurrently in the marketplace through the year 2010. Only Visa Cards fitting the old or new descriptions may be accepted. Beginning May 2008, Visa issued a new card design for un-embossed Visa cards. Unlike embossed Visa cards with raised numbers, letters and symbols, the un-embossed card has a smooth, flat surface. Because of the un-embossed cards flat surface, it cannot be used for transactions that require a card imprint. Un-embossed cards can only be used by merchants who process with an electronic Point Of Sale Terminal. As a result, the bottom of the card bears the following note, "Electronic Use Only."

MasterCard: MasterCard Cards are issued under the following names: MasterCard, EuroCard, Access, Union, Million and Diamond. The MasterCard symbol appears on the front or back of the Card. MasterCard and the Globe designs appear in a 3-dimensional hologram above the symbol. In addition, the words Classic, Preferred, Gold or Business may appear. MasterCard account numbers are sixteen (16) digits, and the first digit is always a five (5). The first four digits of the account must be printed directly below the embossed number. Only MasterCard Cards fitting this description may be accepted. Pursuant to an alliance with MasterCard, Diners Club Cards issued in the United States and Canada are being re-issued with a sixteen 16) digit account number the first two digits of which are now fifty-five (55) and with the MasterCard Mark and hologram on the front of the Diners Club Card. These Diners Club Cards shall be accepted and processed in the same manner as MasterCard transactions. Diners Club International Cards that are issued outside the U.S. and Canada may be re-issued with the MasterCard Mark on the back of the Card. These Diners Club Cards will have account numbers that are fourteen (14) digits, the first two digits or which are thirty-six (36). When these Diners Club Cards are used within the United States, Canada and other designated areas, they will be processed as MasterCard transactions. Beginning January 2006, MasterCard has a new Card design significantly different from the previous description. You are required to familiarize yourself with the new design by consulting a document "MasterCard Card Identification Features." You may download the document free of charge from MasterCard's website at http://www.mastercardmerchant.com. Both the old and new MasterCard Card designs will be circulating concurrently in the marketplace through the year 2010. Only MasterCard Cards fitting the old or new descriptions may be accepted.

Discover Network: All valid standard rectangular plastic Cards bearing the Discover Network Acceptance Mark or the Discover / NOVUS Acceptance Mark, as indicated below, include the following common characteristics and distinctive features.

- Card Numbers are composed of 16 digits and are displayed on the front of the Card.
- Card Numbers are clear and uniform in size and spacing within groupings.
- An embossed security character, displayed as a stylized "D," appears on the same line as the embossed "Member" since date or "Year Joined" date if present) and the "Valid Thru" date. The embossed "Valid Thru" date, if present, appears in mm/yy format and indicates the last month in which the Card is valid. An overprint on the signature panel reads "Discover" or "Discover Network." In some Cards, the overprint may display the name of the Card (e.g., Discover, Discover 2GO, Discover Platinum).
- **Cards manufactured before October 3, 2008** display the Discover Network three-dimensional hologram, bearing a distinct circular shape and images of a globe pierced by an arrow, water, and stars on a repetitive pattern background (the "Discover Network Hologram") on the front of the Card.
- The Discover Network Hologram reflects light and appears to move as the Card is rotated.
- All Cards display a magnetic stripe on the reverse side of the Card. **Cards manufactured on or after October 3, 2008** feature a three-dimensional holographic design that is incorporated into the magnetic stripe. A series of distinct circular shapes will be visible across the length of the magnetic stripe, with blue glow between each shape. When the Card is rotated, the holographic design will reflect light and there will be apparent movement and color switching within the circular shape.
- Cards displaying either the Discover Network Hologram or the holographic magnetic stripe are valid after the effective dates indicated above, with the Discover Network Hologram eventually replaced by the holographic magnetic stripe for new Cards. Although both the Discover Network Hologram and the holographic magnetic stripe will each appear on Cards, valid Cards will not display both designs.
- Depending on the issuance date of the Card, the word "DISCOVER" or "DISCOVER NETWORK" will appear in ultraviolet ink on the front of the Card when it is held under an ultraviolet light.
- An under print of "void" on the signature panel becomes visible if erasure of the signature is attempted.
- The Card Number or the portion of the Card Number displayed on the signature panel on the back of the Card should match the number displayed on the front of the Card and appear in reverse indent printing.
- **CID must be printed in a separate box to the right of the signature panel** on the back of the Card.
- An overprint on the signature panel reads "Discover Network." On some cards, the overprint may display the name of the Card (i.e., Discover, Discover

2GO,® Discover Platinum).
- A Discover Network Zip Indicator may appear on the back of a standard rectangular plastic Card indicating the Card can be used to conduct Contactless Card Transactions.

**NOTE:** Valid Cards may not always be rectangular in shape (e.g., Discover 2GO® Cards) and certain valid Contactless Payment Devices approved by us for use in accessing Card Accounts (e.g., radio frequency (RF) enabled Cards, key fobs, and Mobile Commerce Devices) and to conduct Contactless Card Transactions may not display the features described above.

**Prepaid Gift Card Security Features**
The features described below are found on Prepaid Gift Cards; however, the placement of these features may vary:
- Depending on the issue date of the Card, the Discover Network Acceptance Mark or the Discover/NOVUS Acceptance Mark will appear on the front or back of the Card.
- The embossed, stylized "D" appears on the front of the Card.
- A valid expiration date is embossed on the front of the Card.

**Other Card Features for Cards with a Discover Acceptance Mark**
- The front of the Card may display "Temporary Card," "Prepaid Card," "Gift Card," or "Electronic Use Only," must be printed on the front or the back of the Card.

**NOTE:** Prepaid Gift Cards accepted at a limited, specific list of Merchants may, but are not required to display a Discover hologram and may, but are not required to, bear the Discover Acceptance Mark.

Unembossed PrePaid Cards display a printed Card number. The "Valid Thru" date and the Cardholder name may or may not be printed on the Card. The embossed "D" security character is not present. "Electronic Use Only" is printed on the front or the back of an unembossed Card. Obtain an electronic Authorization Response using a POS device for unembossed Prepaid Cards.

You are required to remain familiar with Discover Card designs and may reference the document "Discover Network Security Features." You may download the document free of charge from Discover Network's website at http://www.discovernetwork.com/fraudsecurity/ fraud.html.

American Express Card. Some Cards contain a holographic image on the front or the back of the plastic to determine authenticity. Not all American Express Cards have a holographic image.
- All American Express Card Numbers start with "37" or "34." The Card number appears embossed on the front of the Card. Embossing must be clear, and uniform in sizing and spacing. Some Cards also have the Card Number printed on the back of the Card in the signature panel. These numbers, plus the last four digits printed on the Sales Draft, must match.
- Pre-printed Card Identification (CID) Numbers must always appear above the Card Number on either the right or left edge of the Card.
- Only the person whose name appears on an American Express Card is entitled to use it. Cards are not transferable.
- The signature on the back of the Card must match the Card Member's signature on the Sales Draft, and must be the same name that appears on the front of the Card. The signature panel must not be taped over, mutilated, erased or painted over.
- Some Cards also have a three digit Card Security Code (3CSC) number printed on the signature panel.
- Do not accept a card outside the valid from and to dates.

**1.2. Effective/Expiration Dates.** At the point of sale, the Card should be carefully examined for the effective (valid from) (if present) and expiration (valid thru) dates, which are located on the face of the Card. The sale date must fall on or between these dates. Do not accept a Card prior to the effective date or after the expiration date. If the Card has expired, you cannot accept it for a Card sale unless you have verified through your Authorization Center that the Card is in good standing, otherwise, you are subject to a Chargeback and could be debited for the transaction.

**1.3. Valid Signature.** Check the back of the Card. Make sure that the signature panel has not been disfigured or tampered with in any fashion (an altered signature panel may appear discolored, glued or painted, or show erasure marks on the surface). The signature on the back of the Card must compare favorably with the signature on the Sales Draft. The Sales Draft must be signed by the Card presenter in the presence of your authorized representative (unless a Card Not Present Sale) and in the same format as the signature panel on the Card; e.g., Harry E. Jones should not be signed H.E. Jones. The signature panels of Visa, MasterCard and Discover Network Cards now have a 3-digit number (CVV2/CVC2/CID) printed on the panel known as the Card Validation Code.

Visa, MasterCard and Discover Network: If the signature panel on the Card is blank, in addition to requesting an Authorization, you must do all the following:
- Review positive identification bearing the Cardholder's signature (such as a passport or driver's license that has not expired) to validate the Cardholder's identity.
- Indicate the positive identification, including any serial number and expiration date, on the Credit Draft or Sales Draft; provided that you must effect PAN Truncation, and must not include the expiration date on the copy of the Sales Draft or Credit Draft that you provide to the Cardholder, or as required by applicable law, the Sales Draft or Credit Draft you retain.
- Require the Cardholder to sign the signature panel of the Card prior to completing the Transaction.

**1.4. Users Other Than Cardholders.** A Cardholder may not authorize another individual to use his/her Card for purchases. Be sure the signature on the Card matches the one on the Sales Draft. Furthermore, any Card having two signatures on the back panel is invalid and any sale made with this Card can result in a Chargeback. For Cards bearing a photograph of the Cardholder, ensure that the Cardholder appears to be the person depicted in the picture which appears on the Card. If you have any questions, call the Voice Authorization Center and request to speak to a Code 10 operator.

**1.5. Special Terms.** If you limit refund/exchange terms or impose other specific conditions for Card sales, the words "No Exchange, No Refund," etc. must be clearly printed (in 1/4" letters) on the Sales Draft near or above the Cardholder's signature. The Cardholder's copy, as well as your copy, must clearly show this information.

During a liquidation and/or closure of any of your outlets, locations and/or businesses, you must post signs clearly visible to customers stating that "All Sales Are Final," and stamp the Sales Draft with a notice that "All Sales Are Final."

Generally, do not give cash, check or in-store Credit refunds for Card sales. Visa allows for the following exclusions: A cash refund to the Cardholder for a small ticket transaction or a no signature required transaction, a cash refund, Credit, or other appropriate form of Credit to the recipient of a gift purchased as a Mail/Phone Order transaction, or a cash refund or in-store Credit for a Visa prepaid card transaction if the Cardholder states that the Visa pre-paid card has been discarded. **NOTE:** A disclosure does not eliminate your liability for a Chargeback. Consumer protection laws and Card Organization Rules frequently allow the Cardholder to dispute these items notwithstanding such disclosures.

**1.6. Delayed Delivery or Deposit Balance.** In a delayed delivery transaction where a Cardholder makes a deposit toward the full amount of the sale, you should execute two separate Sales Drafts (each completed fully as described in Section 3.1), the first for a deposit and the second for payment of the balance upon delivery of the merchandise or the performance of the services.

Visa: For Visa transactions, you must obtain an authorization if the cumulative total of both Sales Drafts exceeds the floor limit. You must obtain an authorization for each Sales Draft on each transaction date. You must assign the separate authorization numbers to each Sales Draft, respectively. You must note on such Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization dates and approval codes.

MasterCard: For MasterCard transactions, you must obtain one authorization. You must note on both Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization date and approval code.

Discover Network: For Discover Network transactions, you must label one Sales Draft "deposit" and the other "balance," as appropriate. You must obtain the "deposit" authorization before submitting the sales data for the "deposit" or the "balance" to us. If delivery of the merchandise or service purchased will occur more than thirty (30) calendar days after the "deposit" authorization, you must obtain a subsequent authorization for the "balance." In addition, you must complete Address Verification at the time of the "balance" authorization, and you must obtain proof of delivery upon delivery of the services/merchandise purchased. You may not submit sales data relating to the "balance" to us for processing until the merchandise/service purchased has been completely delivered.

American Express: For American Express Card transactions, you must clearly disclose your intent and obtain written consent from the Card Member to perform a delayed delivery transaction before you request an Authorization. You must obtain a separate Authorization Approval for each delayed delivery transaction on their

respective charge dates and clearly indicate on each record that the charge is either for the deposit or for the balance of the transaction. You must submit the delayed delivery transaction record for the balance of the purchase only after the items have been shipped, provided or services rendered. For deposits, submission must be on the date the Card Member agreed to pay for the deposit for the purchase. For balances, submission must be on the date the items are shipped, provided or services rendered. You must submit and authorize each delayed delivery transaction under the same Merchant Number and treat deposits on the Card no differently than you treat deposits on all other payment products.

**NOTE:** For MasterCard and Visa transactions, if delivery is more than twenty-five (25) days after the original transaction date and the initial authorization request (as opposed to the thirty (30) days in Discover Network transactions), you should reauthorize the unprocessed portion of the transaction prior to delivery. If the transaction is declined, contact the Cardholder and request another form of payment. For example: On January 1, a Cardholder orders $2,200 worth of furniture and you receive an authorization for the full amount; however, only a $200 deposit is processed. The above procedures are followed, with a $2,000 balance remaining on the furniture; the $2,000 transaction balance should be reauthorized.

**1.7. Recurring Transaction and Preauthorized Order Regulations.** If you process recurring transactions and charge a Cardholder's account periodically for recurring goods or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), the Cardholder shall complete and deliver to you a Cardholder approval for such goods or services to be charged to his account. The approval must at least specify the Card- holder's name, address, account number and expiration date, the transaction amounts, the timing or frequency of recurring charges and the duration of time for which the Cardholder's permission is granted. For Discover Network transactions, the approval must also include the total amount of recurring charges to be billed to the Cardholder's account, including taxes and tips and your Merchant Number.

If the recurring transaction is renewed, the Cardholder must complete and deliver to you a subsequent written request for the continuation of such goods or services to be charged to the Cardholder's account. You may not complete a recurring transaction after receiving a cancellation notice from the Cardholder or Issuer or after a request for authorization has been denied.

If we or you have terminated this Agreement, you may not submit authorization requests or sales data for recurring transactions that are due after the termination date of this Agreement.

You must obtain an authorization for each transaction and write "Recurring Transaction" (or "P. O." for MasterCard transactions) on the Sales Draft in lieu of the Cardholder's signature. A positive authorization response for one recurring transaction Card Sale is not a guarantee that any future recurring transaction authorization request will be approved or paid.

For all recurring transactions, you should submit the 3-digit Card Validation Code number with the first authorization request, but not subsequent authorization requests. Discover Network Card Organization Rules specifically require that you follow this Card Validation Code procedure for Discover Network recurring transactions.

Also, for Discover Network recurring transactions, the Sales Draft must include a general description of the transaction, your merchant name and a toll-free customer service number that the Cardholder may call to obtain customer assistance from you or to cancel the written approval for the recurring transaction.

For American Express recurring transactions, you should periodically verify with Card Members that their information (e.g., Card Number, expiration date, billing address) is still accurate. This will improve the likelihood of obtaining an approval to an Authorization request.

All recurring transactions or preauthorized orders may not include partial payments for goods or services purchased in a single transaction.

You may not impose a finance charge in connection with a Recurring Transaction or Pre-authorized Order.

If you process recurring payment transactions, the Recurring Payment Indicator must be included in each authorization request, and as applicable, each Batch submission entry. Penalties can be assessed by the Card Organizations for failure to use the Recurring Payment Indicator.

**1.8. Certain Rules and Requirements.** The following rules are requirements strictly enforced by Visa, MasterCard and Discover Network:

- Your minimum Credit Card acceptance amount cannot exceed $10.00. Such minimum amount must be established to all Credit Cards regardless of Card Issuer or Card brands. Unless you are a federal government entity or institution of higher learning, you must not establish a maximum amount as a condition for accepting a Card, except that for Discover transactions, you may limit the maximum amount a Discover Network Cardholder may spend if, and only if, you have not received a positive authorization response from the Issuer. Setting a minimum transaction amount limit for Debit Cards (Pin Debit or Non-PIN Debit) is prohibited.
- You may impose a surcharge or fee for accepting a Card only in accordance with applicable law and Card Organization Rules.
- You cannot establish any special conditions for accepting a Card.
- You may provide a discount/incentive for a consumer to pay with cash, check, Credit Card, Debit Card, etc., however, you must clearly and conspicuously disclose the discount to consumers. Also, you must offer the discount to all consumers and you cannot discriminate based upon Card brand or Card Issuer. However, you may choose not to accept either U.S. issued Debit Cards or U.S. issued Credit Cards under the terms described in Section 1.9.
- You cannot require the Cardholder to supply any personal information (e.g., home or business phone number; home or business address; or driver's license number) unless instructed by the Authorization Center. The exception to this is for a mail/telephone/ Internet order or delivery-required transaction, and zip code for a card-present key-entered transaction in order to obtain an Address Verification. Any information that is supplied by the Cardholder must not be in plain view when mailed.
- Any tax required to be collected must be included in the total transaction amount and not collected in cash.
- You cannot submit any transaction representing the refinance or transfer of an existing Cardholder obligation deemed uncollectible.
- You cannot accept a Visa Consumer Credit Card or Commercial Visa Product, issued by a U.S. Issuer, to collect or refinance an existing debt.
- You cannot submit a transaction or sale that has been previously charged back.
- You must create a Sales Draft or Credit Draft for each Card transaction and deliver at least one copy of the Sales Draft or Credit Draft to the Cardholder.
- You cannot submit a transaction or sale to cover a dishonored check.
- If you accept Card checks, your Card check acceptance policy must treat the acceptance of checks from all payment card brands that you accept equally (e.g., if you accept MasterCard, Visa and Discover Network, your check acceptance policy must treat checks for all three payment card brands equally). You must handle these Card checks like any other personal check drawn upon a bank in the United States.
- Failure to comply with any of the Card Organization Rules may result in fines or penalties.
- You will inform the Cardholder that you are responsible for the Card transaction including your goods and services and for related customer service, dispute resolution and performance of the terms and conditions of the transaction.

**1.9. Card Acceptance.** If you have indicated either in the Application or by registering with us at least thirty (30) days in advance that, as between Non-PIN Debit Card transactions and Credit Card transactions, you will limit your acceptance to either (i) only accept Non-PIN Debit transactions; or (ii) only accept Credit Card transactions, then the following terms in this Section 1.9 will apply:

**1.9.1.** You will be authorized to refuse to accept for payment either Non-PIN Debit Cards or Credit Cards that are issued within the United States. You will, however, continue to be obligated to accept all foreign issued Credit Card or Debit Cards issued by MasterCard, Visa or Discover Network so long as you accept any type of MasterCard, Visa or Discover Network branded Card.

**1.9.2.** While many Debit Cards include markings indicating debit (such as "Visa Checkcard, Visa Buxx, Gift Card, DEBIT, or Mastermoney), many Debit Cards may not include any such markings. It will be your responsibility to determine at the point of sale whether a Card is of a type that you have indicated that you will accept. You agree to institute appropriate systems and controls to limit your acceptance to the Card types indicated. You may purchase a table of ranges of numbers currently associated with Debit Card transactions upon execution of confidentiality/non-disclosure agreements required by the Card Organizations. You will be responsible for updating your systems to utilize such tables and to obtain updated tables.

**Merchant Use and Disclosure of BIN Information (Visa/MasterCard).** Servicers may provide BIN information or other product-identifying data to the Merchant or its Merchant Servicer solely for purposes of identifying Visa or MasterCard Card product types at the point of sale. Servicers must provide this Visa BIN information to any Merchant requesting it for the permitted purpose. Servicers must provide a complete list of the BINs that apply to Debit MasterCard Cards to Merchants upon any form of reasonable request. A U.S. Merchant or its Merchant Servicer that receives BIN information or other product-identifying data from Servicers must not use such information for any reason other than to identify Visa or MasterCard Card product types at the point of sale and to implement

acceptance practices permitted by the Visa or MasterCard Operating Rules (including, without limitation, "Discount Offer – U.S. Region 5.2.D.2" in the Visa International Operating Regulations; and Rule 5.11.1 "Discrimination" in the MasterCard Rules manual) based on such information, unless authorized by Visa or MasterCard, as applicable. A U.S. Merchant or its Merchant Servicer must not disclose BIN information or other product-identifying data to any third party without prior written permission from Visa or MasterCard, as applicable.

If Merchant provides BIN or other product data information to a Merchant Servicer, Merchant must:

- Ensure that the Merchant Servicer complies with the substance of these "Merchant Use and Disclosure of BIN Information" requirements

- Include the substance of these requirements in Merchant's agreement or contract with its Merchant Servicer

As used in the foregoing provisions, "Merchant Servicer" means any contractor, agent, hardware provider, software provider or service provider who is engaged directly or indirectly by Merchant or who otherwise acts for or on behalf of Merchant in connection with Merchant's acceptance of Cards or the submission of Charges or Credit Vouchers to Servicers, or who otherwise assists Merchant in the performance of Merchant's obligations under the Merchant Agreement, and includes without limitation any "Agent", "Merchant Servicer", "Third Party", "Merchant processor", "Data Storage Entity", "Payment Service Provider", "Internet Payment Service Provider", or "Payment Facilitator" who acts for or on behalf of Merchant within the meaning of the Operating Rules, and any other person or entity who will store transmit, process, or otherwise have access to, any Cardholder or card transaction data in connection with Merchant's performance of Merchant's obligations under the Merchant Agreement.

Merchant Use and Disclosure of BIN Information (Visa/MasterCard)

Servicers may provide BIN information or other product-identifying data to the Merchant or its Merchant Servicer solely for purposes of identifying Visa or MasterCard Card product types at the point of sale. Servicers must provide this Visa BIN information to any Merchant requesting it for the permitted purpose. Servicers must provide a complete list of the BINs that apply to Debit MasterCard Cards to Merchants upon any form of reasonable request.

A U.S. Merchant or its Merchant Servicer that receives BIN information or other product-identifying data from Servicers must not use such information for any reason other than to identify Visa or MasterCard Card product types at the point of sale and to implement acceptance practices permitted by the Visa or MasterCard Operating Rules (including, without limitation, "Discount Offer – U.S. Region 5.2.D.2" in the Visa International Operating Regulations; and Rule 5.11.1 "Discrimination" in the MasterCard Rules manual) based on such information, unless authorized by Visa or MasterCard, as applicable.

A U.S. Merchant or its Merchant Servicer must not disclose BIN information or other product-identifying data to any third party without prior written permission from Visa or MasterCard, as applicable.

If Merchant provides BIN or other product data information to a Merchant Servicer, Merchant must:

- Ensure that the Merchant Servicer complies with the substance of these "Merchant Use and Disclosure of BIN Information" requirements

- Include the substance of these requirements in Merchant's agreement or contract with its Merchant Servicer

As used in the foregoing provisions, "Merchant Servicer" means any contractor, agent, hardware provider, software provider or service provider who is engaged directly or indirectly by Merchant or who otherwise acts for or on behalf of Merchant in connection with Merchant's acceptance of Cards or the submission of Charges or Credit Vouchers to Servicers, or who otherwise assists Merchant in the performance of Merchant's obligations under the Merchant Agreement, and includes without limitation any "Agent", "Merchant Servicer", "Third Party", "Merchant processor", "Data Storage Entity", "Payment Service Provider", "Internet Payment Service Provider", or "Payment Facilitator" who acts for or on behalf of Merchant within the meaning of the Operating Rules, and any other person or entity who will store transmit, process, or otherwise have access to, any Cardholder or card transaction data in connection with Merchant's performance of Merchant's obligations under the Merchant Agreement.

**1.9.3.** To the extent that you inadvertently or unintentionally accept a transaction that you are not registered to accept, such transaction will downgrade and you will be charged the Non-Qualified Rate or, if you are utilizing the Enhanced Recovery Reduced Discount option, you will be charged the Enhanced Recovery Reduced Rate on the volume of said transaction that Client was not registered to accept, in addition to the difference between the MasterCard / Visa/Discover Network Qualified Rate agreed to in Section 9 of the Service Fee Schedule and the actual interchange rate assessed to the downgraded transaction.

**1.9.4.** Based upon your choice to accept only the Card types indicated in the application, you must remove from your premises any existing signage indicating that you accept all Visa, MasterCard or Discover Network Cards and use approved specific signage reflecting your policy of accepting only Non-PIN Debit or Credit Cards.

**1.9.5.** Even if you elect not to accept Non-PIN Debit Card transactions as provided above, you may still accept PIN Debit Card transactions if you have signed up for PIN Debit Card Services.

**1.10. Deposits of Principals.** Owners, partners, officers and employees of your business establishment, and the guarantors who signed the Application, are prohibited from submitting Sales Drafts or Credit Drafts transacted on their own personal Cards, other than transactions arising from bona fide purchases of goods or services in the ordinary course of your business. Such use in violation of this Section 1.10 is deemed a cash advance, and cash advances are prohibited.

**1.11. Merchants in the Lodging Industry.**

**1.11.1. Generally.** There are additional rules and requirements that apply to merchants in the lodging industry for practices including, but not limited to, Guaranteed Reservations and charges for no shows, advance deposits, overbookings, and priority checkout. If you are a merchant in the lodging industry, **you must contact us for these additional rules and requirements. Failure to do so could result in additional charges or termination of this Agreement.**

**1.11.2. Lodging Service Programs.** In the event you are a lodging merchant and wish to participate in Visa's and/or MasterCard's lodging services programs, please contact your sales representative or relationship manager for details and the appropriate MasterCard and Visa requirements.

**1.11.3. Written Confirmation of Guaranteed Reservations.** You must provide the Cardholder with written confirmation of a guaranteed reservation. The confirmation must contain:

- Cardholder's name as it appears on the Card, if present.
- Card Number, truncated where required by applicable law to you or us and Card expiration date if present, unless prohibited by applicable law to you or us.
- Reservation confirmation number.
- Anticipated arrival date and length of stay.
- The cancellation policy in its entirety, inclusive of the date and time the cancellation privileges expire.
- Any other pertinent details related to the reserved accommodations.

**1.11.4. Cancellation of Guaranteed Reservations.** If a Cardholder requests a cancellation in accordance with Merchant's cancellation policy and specified time frames, Merchant must provide the Cardholder with a cancellation number and instructions to retain a record of it. If a Cardholder requests a written confirmation of the cancellation, Merchant must forward this confirmation within three (3) Business Days of the Cardholder's request. The cancellation confirmation must contain: Cardholder's reference that charges were placed on the Card, if applicable, or a guarantee that a "no-show" charge will not be placed on the Card.

- Cardholder's name as it appears on the Card, if present.
- Card Number, truncated as required by applicable law to you or us.
- Card expiration date if present, unless proh bited by applicable law to you or us.
- Reservation cancellation number.
- Date of cancellation.
- The name of the Merchant's employee that processed the cancellation.
- Any other pertinent information related to the reserved accommodations.

**1.12. Customer Activated Terminals and Self-Service Terminals.** Prior to conducting Customer Activated Terminal ("CAT") transactions or Self-Service Terminal transactions **you must contact us for approval and further instructions, rules and requirements that apply to CAT and Self-Service Terminal transactions. Failure to do so could result in additional charges or termination of this Agreement.**

**1.13. Displays and Advertising.** You must prominently display appropriate Visa, MasterCard, Discover Network, American Express and, if applicable, other Card Organization decals and program Marks at each of your locations, in catalogs, on websites and on other promotional materials as required by Card Organization

Rules. You may not indicate that Visa, MasterCard, Discover Network, American Express, or any other Card Organization endorses your goods or services.

Your right to use the program Marks of the Card Organizations terminates upon the earlier of (i) if and when your right to accept the Cards of the respective Card Organization terminates (e.g., if your right to accept Discover Network Cards terminates, you are no longer permitted to use Discover Network Program Marks), (ii) delivery of notice by us or the respective Card Organization to you of the termination of the right to use the Mark(s) for that Card Organization, or (iii) termination of the license to use the program Marks by the respective Card Organization to us.

**1.13.1. Discover Network Sublicense to Use Discover Network Program Marks.**

You are prohibited from using the Discover Network Program Marks, as defined below, other than as expressly authorized in writing by us. "Discover Network Program Marks" means the brands, emblems, trademarks and/or logos that identify Discover Network Cards, including, without limitation, Diners Club International Cards. Additionally, you shall not use the Discover Network Program Marks other than as a part of the display of decals, signage, advertising and other forms depicting the Discover Network Program Marks that are provided to you by us or otherwise approved in advance in writing by us.

You may use the Discover Network Program Marks only to promote the services covered by the Discover Network Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by you must be approved in advance by us in writing. You shall not use the Discover Network Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Discover Network Program Marks. You recognize that you have no ownership rights in the Discover Network Program Marks. You shall not assign to any Person any of the rights to use the Program Marks.

**1.13.2. American Express sublicense to Use American Express Marks.** You must not use our Marks in any way that injures or diminishes the goodwill associated with that Mark, nor (without our prior written consent) indicate that we endorse your goods or services. You shall only use our Marks as reasonably necessary to perform your obligations under the Agreement and shall cease using our Marks upon termination of the Agreement. The guidelines listed below apply to the Merchant's use of the American Express "Blue Box" logo.

- The "Blue Box" logo must appear on all point of purchase materials and signs.
- The space around the "Blue Box" must equal at least 1/3 the size of the box.
- The "Blue Box" logo minimum size is 3/8" and 1/2" is the preferred size.
- Always spell out American Express.
- A minimum distance of 1-1/2 times the size of the "Blue Box" must be allowed between the "Blue Box" logo and another Mark.

**1.14. Cash Payments by and Cash Disbursements to Cardholders.** You must not accept any direct payments from Cardholders for charges of merchandise or services which have been included in a Sales Draft; it is the right of the Issuer to receive such payments. You may not make any cash disbursements or cash advances to a Cardholder as part of a Card transaction unless you are a financial institution with express authorization in writing in advance from us or our sponsor bank, which is the Visa and MasterCard Member Bank identified in Part IV, Duplicate Confirmation Page, below (referred to herein as "Bank" and we and Bank are collectively referred to herein as "Servicers"). For Discover, cash advances in authorized jurisdictions other than the United States may be conducted in an originating currency provided that cash advances may be subject to dispute and/or Acquirer fees.

**1.15. Discover Network Cash Over Transactions.** Cash Over transactions are not available for MasterCard or Visa transactions. You may issue Cash Over in connection with a Discover Network Card sale, provided that you comply with the provisions of this Agreement, including the following requirements:

- You must deliver to us a single authorization request for the aggregate total of the goods/ services purchase amount and the Cash Over amount of the Card sale. You must not submit separate authorization requests for the purchase amount and the Cash Over amount.
- The Sales Draft must include both the purchase amount and the Cash Over amount, and you may not use separate Sales Drafts for the purchase amount and Cash Over amount.
- No minimum purchase is required for you to offer Cash Over to a Discover Network Cardholder, provided that some portion of the total Card sale must be attributable to the purchase of goods or services.
- The maximum amount of cash that you may issue as Cash Over is $100.00.
- (Cash Over may not be available in certain markets. Contact us for further information).

**1.16. Telecommunication Transactions.** Telecommunication Card Sales occur when a telephone service provider is paid directly using a Card for individual local or long-distance telephone calls. (**NOTE:** Pre-paid telephone service cards are not and do not give rise to Telecommunication Card Sales). **Prior to conducting Telecommunication transactions you must contact us for approval and further instructions, rules and requirements. Failure to do so could result in additional charges or termination of this Agreement.**

## 2. Suspect Transactions

If the appearance of the Card being presented or the behavior of the person presenting the Card is suspicious in nature, you must immediately call the Voice Authorization Center and ask to speak to a Code 10 operator. Answer all their questions and follow their instructions. While not proof that a transaction is fraudulent, the following are some suggestions to assist you in preventing fraudulent transactions that could result in a Chargeback.

**Ask yourself, does the Customer:**

- appear nervous/agitated/hurried?
- appear to be making indiscriminate purchases (e.g., does not care how much an item costs, the size, etc.)?
- make purchases substantially greater than your usual customer (e.g., your average transaction is $60, but this transaction is for $360)?
- insist on taking the merchandise immediately (e.g., no matter how difficult it is to handle, is not interested in free delivery, alterations, etc.)?
- appear to be purchasing an unusual amount of expensive items or the same items?
- take an unusual amount of time to sign the Sales Draft, or look at the back of the Card as he signs?
- talk fast or carry on a conversation to distract you from checking the signature?
- take the Card from a pocket instead of a wallet?
- repeatedly come back, in a short amount of time or right before closing time, to make additional purchases?
- cause an unusual, sudden increase in the number and average sales transactions over a one- to three-day period?
- tell you he has been having some problems with his Issuer and request that you call a number (that he provides) for a "special" handling or authorization?
- have a previous history of disputed charges?
- place orders to be shipped to an address other than the billing address, or use anonymous/ free email domains?
- place orders sent to zip codes or countries where you show a history of fraudulent claims?

**Does the Card:**

- have characters the same size, height, style and all within alignment?
- appear to be re-embossed (the original numbers or letters may be detected on the back of the Card)?
- have a damaged hologram?
- have a Magnetic Stripe on the back on the Card?
- have an altered signature panel (e.g., appear discolored, glued or painted, or show erasure marks on the surface)?
- have "valid from" (effective) and "valid thru" (expiration) dates consistent with the sale date?

If you use an electronic terminal and swipe the Card, make sure the account number displayed on the terminal and/or the Sales Draft matches the number on the Card. If you cannot or do not verify the account number and accept the sale, you are subject to a Chargeback and could be debited for the amount of the transaction. IF THE NUMBERS DO NOT MATCH, DO NOT ACCEPT THE CARD AS A FORM OF PAYMENT, EVEN THOUGH AN AUTHORIZATION CODE FOR THE MAGNETICALLY SWIPED CARD NUMBER MAY BE RECEIVED.

**Fraud-Prone Merchandise Tips:**

- Jewelry, video, stereo, computer and camera equipment, shoes and men's clothing are typically fraud-prone because they can easily be resold.

- Be suspicious of high dollar am unts and transactions with more than one fraud-prone item, e.g., two VCRs, three gold chains, etc.

**If you suspect fraud:**
- Call the Voice Authorization Center and ask to speak to a Code 10 operator.
- If the terminal  oes not display t e Card number, call the POS Help Desk for terminal assistance.

**REMEMBER: AN AUTHORIZATION C  DE ONLY INDICATES THE AVAILABILITY OF A CARDHOLDER S CREDIT AT THE TIME OF THE TRANSACTION. IT DOES NOT WARRANT THAT TH  PERSON PRESENTING THE CARD IS THE RIGHTFUL CARDHOLDER. IF PROPER PROCEDURES ARE NOT FOLLOWED AT THE TIME OF THE  RANSACTION, YOU ARE SUBJECT TO A CH ARGEBACK AND YOUR ACCOUNT MAY BE DEBITED FOR THE AMOUNT OF THE TR NSACTION.**

### 3. Completion of Sa es Drafts and  redit Drafts

You must prepare a Sales Draft or Credit Draft, as applicable, for each Card transaction an  provide a copy  f it or a transaction receipt or copy of the Draft to the Cardholder at the time  he Card transaction is completed.

**3.1. Information Required.** All of the following information must be contained on a single page document constituting a Sales Draft:
- Cardholder's a count number must appear on the Credit Draft or Sales Draft in the manner requi ed by applicable law and Card Organization Rules. **NOTE: The copy of the Sales Draft or Credit Draft you provide to a Cardholder must not incl ude the Cardholder's Card expiration date or any more than the last four digits of the Cardholder's Card number. Some states have similar re uirements that also apply to the Sales Drafts cr Credit Drafts you retain.** MasterCard requires that Card expiration dates be excluded from the Sales Drafts or Credit Drafts your business retains. You  re solely respo sible to determine the Card account num r truncation requirements and Card expiration date exclusion requirements  or your state/ju isdiction;
- Clear imprint o  the Card. When ver the term "imprint" is used it refers to the process of using a manual imprinting machine to make an impression of the Card on a Sales Draft; it does  ot include the printout from a printer attached to an electronic device. If you use an electronic device (e.g., authorization / draft capture terminal, cash register, POS Device, etc.) and swipe the Card to read and capture the Card information via the Magnetic Stripe, you do n t have to imprint the Card. **HOWEVER, IF THE TERMINAL FAILS TO READ THE MAGNETIC STRIPE OR IF YOU ARE REQUIRED TO OBTAIN A VOICE AUTHORIZATION, TH EN YOU MUST IMPRINT THE CARD. IN ADDITION, THE SA ES DRAFT MUST HAVE THE CARDHOLDER'S SIGNATURE.  AILURE TO FO LOW THESE PROCEDURES WILL PREVENT YOU FROM DEFENDING A TRANSACTION IN THE EVENT THAT IT IS CHARGED BACK UNDER  CLAIM THAT THE RIGHTFUL CARDHOLDER DID NOT AUTHO RIZE THE PURCHASE. ENTERING INFORMATION INTO A TERMINAL MANUALLY WILL NOT PREVENT THIS TYPE OF CHARG BACK. FOR M IL, TELEPHONE, INTERNET AND OTHER CARD NOT PRESEN  ORDERS SEE  ECTION 3.2;**
- Cardholder's signature. However, eligible merchants participating in MasterCard's Quick Payment  ervice Program, Visa Easy Payment Program, and Discover Netw rk's No Signatu e Program, and/or certain Discover Network transactions (see not  below) are not required to obtain the Cardholder's signature unde  certain conditions set forth by each program;
- Date of the transaction;
- Amount of the transaction (inclu ing the approved currency of the sale);
- Description of t e goods and/or services involved in the transaction (if there are too  many items, com ine them into one description; e.g., "clothing" instead of "one pair of  ants, one shirt"). Do not carry information onto a second Sales Draft;
- Description of  ur merchandise return and Credit/refund policy;
- A valid authorization code; and
- Merchant's Doi g Business As ("D/B/A") name and location (city and state required) and Merchant Account Number.
- When imprinting Sales Drafts, d  not alter the Cardholder account number, circle or underline any information on the Sales Draft or alter a Sales Draft in any way after t e transaction has been completed and signed. Stray marks and other alterations on a Sales Draft may render it electronically not able to be scanned, unreadable or illegi le. This may result in a Chargeback or Summary A justment to your account.
- For Discover N twork sales using a paper Sales Draft (as opposed to Electronic Dr ft Capture), the paper Sales Draft must also contain the initials of your representative  r employee that conducted the transaction. For Discover Network  redits, the Credit Draft must contain the signature of your authorized representative  r employee that conducted the transaction.
- Discover Card Sales in an amo nt more than $25.00 including sales taxes, tip, and/or Cash Over amount are not eligible for treatment as No Signature Required Card Sales and you m ay lose a dispute of such a Card Sale if the Merchant fails to obtain the Cardholder's Signature on the Sales Draft.
- Eligible merchants participating in No Signature Program, Quick Payment Service a d/or Small Ticket are only required to provide the Cardholder with the completed Sal s Draft when req ested by the Cardholder.

**NOTE:** For Discover Network transactions, if you are a merchant operating under certain merchant category codes approved by Discover Network, you are n t required to obtain the Cardholder's signature so long as the full track data is transmitted in the authorization request and the sale amount is $25.00 or less.

**3.2. Mail / Telephone / Internet (Ecommerce) Orders and Other Card Not Present Sale .** You may only engage in mail/telephone/Internet orders provided they do not exceed the percentage of your total payment Card volume reflected on your application. Failure to adhere to this requirement may result in cancellation of your Agreement. Merc ants conducting Internet transactions using MasterCard or Visa Cards must have special codes (an "Electronic Commerce Indicator") added to their author ation and settle ent records. Discover Network does not use a  Electronic Commerce Indicator. Failure to register as a mercha t conducting Internet transactions can res lt in fines imposed by the Card Organizations.

Mail, Telephone, Internet and other Card Not Present transactions have a substantially higher risk of C argeback. Since you will not have an imprinted or magnetically swiped transaction and you will not have the Cardholder's signature on the Sal s Draft as you would in a face-to-face transaction, you will assume all risk associated with accepting a mail/telephone/ Internet or other Card Not Present t ansaction. The following procedures, while they will not eliminate Chargebacks, are useful in reducing them and should be followed by you:
- Obtain the expiration date of Card.
- On the Sales  Draft, clearly pri t the Cardholder's account number; effective and expiration date ; date of transaction; description of the goods and services; amount of the transaction (including shipping, handling, insurance, etc.);  ardholder's nam , billing address and shipping address; authorization code; and mer hant's name an  address (city and state required); provided, that you must effect  AN Truncation, and must not include the expiration date, on the copy of the Sales Daft or Credit Draft that you provide to the Cardhold  r, or as required by applicable law, the Sales Draft or Credit Draft you retain.
- For mail orders, write "MO"; for t lephone orders, write "TO" on the Cardholder's signature line.
- If feasible, obtain and keep a co y of the Cardholder's signature on file on a form authorizing you to submit telephone and mail order transactions.
- You should utilize the Address  erification Service for all Card Not Present Transa tions (see note below). Address Verification is specifically required for all Discover Network
- Card Not Pres nt Transactions, and if you do not receive a positive match through AVS, you may not process the Discover Network Card Not Prese t Transaction. If  ou do not have  VS, contact us immediately.
- You should ob ain the 3-digit Card Validation Code number and include it with each authorization request. Discover Network Card Organization Rules specifically req ire that you sub it the Card Validation Code with the authorization r quest for all Dis over Network Card Not Present Transactions.
- For telephone orders, it is recommended that written verification of the sale be requested from the Ca dholder (sent by mail or fax).
- You may not submit a transacti n for processing until after the merchandise has  een shipped or t e service has been provided to the customer. (The Card Organizations will permit t e immediate billing of merchandise manufactured to the customer' s specifications [i.e., special/custom orders] provided the Cardholder has been advise  of the billing details.)

- You should provide a copy of the Sales Draft to the Cardholder at the time of delivery. You must also obtain proof of delivery of the goods or services to the address designated by the Cardholder (i.e., by getting a signature of the Cardholder or person designated by the Cardholder through the delivery carrier). If the Cardholder visits one of your locations to receive the goods or services purchased, obtain an imprint of the Card and the Cardholder's signature.
- Notify the Cardholder of delivery time frames and special handling and/or cancellation policies. Merchandise shipping dates must be within seven (7) days of the date authorization was obtained. If, after the order has been taken, additional delays will be incurred (e.g., out of stock), notify the Cardholder and reauthorize the transaction.
- You may not require a Cardholder to complete a postcard or other document that displays the Cardholder's account number in clear view when mailed.
- If you accept orders via the Internet, your web site must include the following information in a prominent manner:
  - Complete description of the goods or services offered;
  - Description of your merchandise return and Credit/refund policy;
  - Customer service contact, including email address and/or telephone number;
  - Transaction currency (U.S. dollars, unless permission is otherwise received from Servicers);
  - Any applicable export or legal restrictions;
  - Delivery policy;
  - Consumer data privacy policy;
  - A description of the transaction security used on your website;
  - The sale or disclosure of databases containing Cardholder account numbers, personal information, or other Card transaction information to third parties is prohibited;
  - Address of merchant including country;
  - Cancellation policy; and
  - Date any free trial period ends.
- You may not accept Card Account Numbers through Electronic Mail over the Internet.

**NOTE:** Address Verification Service ("AVS") does not guarantee against Chargebacks, but used properly, it assists you in reducing the risk of fraud by confirming whether certain elements of the billing address provided by your customer match the billing address maintained by the Issuer. AVS also may help you avoid incurring additional interchange expenses. AVS is a separate process from obtaining an Authorization and will provide a separate response. A transaction may not match addresses when submitted for AVS and still receive an Authorization. It is your responsibility to monitor the AVS responses and use the information provided to avoid high- isk transactions.

**3.2.1. Discover Network Protocol for Internet Transactions.** Each Internet Discover Network Card transaction accepted by you and submitted to us shall comply with Discover Network standards, including, without limitation, Discover Network standards governing the formatting, transmission and encryption of data, referred to as the "designated protocol." You shall accept only those Internet Discover Network Card transactions that are encrypted in accordance with the designated protocol. As of the date of these Operating Procedures, the designated protocol for the encryption of data is Secure Socket Layer (SSL). We may, at our discretion, withhold Settlement until security standards can be verified. However, the designated protocol, including any specifications with respect to data encryption, may change at any time upon thirty (30) days advance written notice. You shall not accept any Internet Discover Network Card transaction unless the transaction is sent by means of a browser, which supports the designated protocol.

**3.3. Customer Service Telephone Numbers** for Card types which are funded by individual non-bank Card Organizations include:

**American Express/ESA or Direct 1-800-528-5200**
**JCB, International 1-800-366-4522**
**Voyager 1-800-987-6591**
**WEX 1-800-492-0669 (24 hours)**

## 4. Data Security

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING THE PROTECTION OF CARDHOLDER DATA. PLEASE REVIEW CAREFULLY AS FAILURE TO COMPLY CAN RESULT IN SUBSTANTIAL FINES AND LIABILITIES FOR UNAUTHORIZED DISCLOSURE AND TERMINATION OF THIS AGREEMENT. IN ADDITION TO THE SPECIFIC ITEMS SET FORTH BELOW, YOU AGREE TO IMPLEMENT AND MAINTAIN COMMERCIALLY REASONABLE SECURITY PROCEDURES FOR CONSUMER AND CARDHOLDER PERSONAL INFORMATION.**

**4.1. Payment Card Industry Data Security Standards (PCI DSS).** Visa, MasterCard, Discover Network, JCB and American Express aligned data security requirements to create a global standard for the protection of Cardholder data. The resulting Payment Card Industry Data Security Standards (PCI DSS) defines the requirements with which all entities that store, process, or transmit payment card data must comply. PCI DSS is the name used to identify those common data security requirements. The Cardholder Information Security Program (CISP) is Visa USA's data security program, the Site Data Protection (SDP) program is MasterCard's data security program, Discover Network Information Security and Compliance (DISC) is Discover Network's data security program, and the American Express Data Security Requirements (DSR) is American Express' data security Program, each based on the PCI DSS and industry aligned validation requirements. PCI DSS compliance validation is focused on Merchant Equipment (as defined below) where Cardholder data is processed, stored or transmitted, including:

- All external connections into your network (i.e., employee remote access, third party access for processing, and maintenance);
- All connections to and from the authorization and settlement environment (i.e., connections for employee access or for devices such as firewalls, and routers); and
- Any data repository outside of the authorization and settlement environment.

For the purposes of this Section 4, "Merchant Equipment" means any and all equipment you use in connection with Card authorization, clearing, completing, settling, transmitting or other related processing, including, without limitation, all telecommunication lines and wireless connections and software, systems, point-of-sale terminals, card readers, merchandise and card scanners, printers, PIN pad devices and other hardware, whether owned by you, Merchant Providers or other Persons used by you.

The Card Organizations or we may impose fines or penalties, or restrict you from accepting Cards if it is determined that you are not in compliance with the applicable data security requirements. We may in our sole discretion, suspend or terminate Services under this Agreement for any actual or suspected data security compromise. You agree that you will not request any Authorizations, submit any Sales Drafts or Credit Drafts until you have read and understood the PCI DSS, CISP, SDP and DISC for which you are liable. By requesting any Authorizations, or submitting any Sales Drafts or Credit Drafts, you will be deemed to have done so upon your receipt of your request or submission of any Authorizations, Sales Drafts or Credit Drafts.

You must comply with the data security requirements described in this Section 4.1, including, without limitation, PCI DSS, SDP, CISP, DSOP and DISC, and any additional Card Organization requirements applicable to payment applications and PIN transactions.

Detailed information about PCI DSS can be found at the PCI DSS Council's website: www.pcisecuritystandards.org.
Detailed information about Visa's CISP program can be found at Visa's CISP website: www.visa.com/cisp.
Detailed information about MasterCard's SDP program can be found at the MasterCard SDP website: www.mastercard.com/sdp.
Detailed information about DISC can be found at Discover Network's DISC website: http://www.discovernetwork.com/fraudsecurity/disc.html.
Detailed information about the American Express Data Security Requirements can be found at American Express' DSR website: www.americanexpress.com/dsr.

**4.2. Data Security Requirements. You must comply with the data security requirements shown below:**

- You must install and maintain a secure network firewall to protect data across public networks.
- You must protect stored data and data sent across networks, using methods indicated in the PCI DSS.
- You must use and regularly update anti-virus software and keep security patches up-to-date.
- You must restrict access to data by business "need to know," assign a unique ID to each person with computer access to data and track access to data by unique ID.
- You must not use vendor-supplied defaults for system passwords and other security parameters.
- You must regularly test security systems and processes.
- You must maintain a policy that addresses information security for employees and contractors.
- You must restrict physical access to Cardholder information.
- You may not transmit Cardholder account numbers to Cardholders for Internet transactions.
- You cannot store or retain Card Validation Codes (three-digit values printed in the signature panel of most Cards, and a four-digit code printed on the front of an American Express Card) after final transaction authorization.
- You cannot store or retain Magnetic Stripe data, PIN data or AVS data. Only Cardholder account number, Cardholder Name and Cardholder expiration date can be retained subsequent to transaction authorization.
- You must destroy or purge all Media containing obsolete transaction data with Cardholder information.
- You must keep all systems and Media containing Card account, Cardholder, or transaction information (whether physical or electronic) in a secure manner so as to prevent access by, or disclosure to any unauthorized party.
- For Internet transactions, copies of the transaction records may be delivered to Cardholders in either electronic or paper format.
- You must use only services and Merchant Equipment that have been certified as PCI-DSS compliant by the Card Organizations.

**4.3. Compliance Audits.** You may be subject to ongoing validation of your compliance with PCI DSS standards. Furthermore, we retain the right to conduct an audit at your expense, performed by us or a Person designated by us to verify your compliance, or that of your agents or Merchant Providers, with security procedures and these Operating Procedures.

**4.4. Immediate Notice Required.** In the event that transaction data is known or suspected of having been accessed or retrieved by any unauthorized Person, you must contact us immediately, and in no event more than 24 hours after becoming aware of such activity.

**4.5. Investigation.** You must, at your own expense (i) perform or cause to be performed an independent investigation, including a forensics analysis performed by a certified forensic vendor acceptable to us and the Card Organizations, of any data security breach of Card or transaction data, (ii) perform or cause to be performed any remedial actions recommended by any such investigation, and (iii) cooperate with us in the investigation and resolution of any security breach. Notwithstanding the foregoing, if required by a Card Organization, we will engage a forensic vendor approved by a Card Organization at your expense. You must cooperate with the forensic vendor so that it may immediately conduct an examination of Merchant Equipment, and your and Merchant Providers' procedures and records and issue a written report of its findings.

**4.6. Required Information for Discover Network Security Breaches.** For security breaches involving Discover Network transactions and/or track data, you must provide us and/or Discover Network with the following information: (i) the date of breach; (ii) details concerning the data compromised (e.g., account numbers and expiration dates, Cardholder names and addresses, etc.); (iii) the method of such breach; (iv) your security personnel contacts; (v) the name of any person (including law enforcement) assisting you with your investigation of such breach; and (vi) any other information which we reasonably request from you concerning such breach, including forensics reports. You shall provide such information as soon as practicable, and the items listed in (i) - (v) shall be provided to us in any event within 48 hours of your initial notification to us of the breach.

**4.7. Merchant Providers.** The data security standards set forth in this Section 4 also apply to Merchant Providers. Before you engage any Merchant Provider, you must provide to us in writing (a) the Merchant Provider's legal name, (b) contact information, and (c) intended function. You acknowledge and agree that you will not use, or provide Cardholder data access to, any Merchant Provider until you receive our approval and, if required, confirmation of our registration of that Merchant Provider with applicable Card Organizations. You must ensure that you and Merchant Providers: (i) comply with the registration process which can involve site inspections, background investigations, provision of financial statements, and any other information required by a Card Organization; (ii) comply with the periodic and other reporting required by a Card Organization; and (iii) comply with all applicable Card Organization Rules, including without limitation, those requiring security of Cardholder data. You may allow Merchant Providers access to Cardholder data only for purposes authorized under and in conformance with the Card Organization Rules. You are respons ble for all our costs and expenses associated with our review, approval, certification (and recertification as may be required by us or the Card Organization Rules) and registration of any Merchant Providers.

Your use of the Services, equipment, software, systems, materials, supplies or resources of third parties regarding your Card transactions processing, including, without limitation, Merchant Providers and any third party lessors or licensors, will not affect your obligations under this Agreement to us which will apply to the same extent as if you had not used them. We have no liability or responsibility to you or others regarding these third parties, even if we referred them to you. These third parties are your agents, and you are solely respons ble for (i) determining whether they can meet your needs and standards, (ii) their actions, inactions and compliance with the terms of this Agreement and the Card Organization Rules and (iii) any and all fees, costs, expenses and other obligations owed to them by you or owed by them to us or to Card Organizations.

**4.8. Noncompliance Fees.** If we have not received receipt of your validation of compliance with your PCI DSS standards within the first 90 days of the date of the Agreement, you will be charged a monthly non-compliance fee as set forth in the Application or as otherwise communicated to you, for the period beginning upon expiration of the 90 day period, until such time as you are compliant or this Agreement is terminated, whichever comes first. This monthly non-compliance fee is in addition to any and all other fees for which you are responsible related to your failure to be compliant as required hereunder.

**4.9. Costs.** If you or a Merchant Provider (or other Person used by you) are determined by any Card Organization, regardless of any forensic analysis or report, to be the likely source of any loss, disclosure, theft or compromise of Cardholder data or Card transaction information (together, **"Compromised Data Events"**) and regardless of your belief that you have complied with the Card Organization Rules or any other security precautions and are not respons ble for the Compromised Data Event, you must promptly pay us for all related expenses, claims, assessments, fines, losses, costs, and penalties and Issuer reimbursements imposed by the Card Organizations against us (together, "Data Compromise Losses"). In addition to the foregoing, you must also pay us promptly for all expenses and claims made by Issuers against us alleging your responsibility for the Compromised Data Event, apart from any claim procedures administered by the Card Organizations.

Each authorization request you submit to us must fully comply with the applicable provisions of this Agreement. Submission of an authorization request that does not fully comply may result in assessment of additional fees to you, a declined authorization response or a Chargeback to you.

You must obtain an Authorization Approval Code from us (or a Person, as provided in Section 5.4) for all transactions. A positive authorization response for MasterCard remains valid for seven (7) days for electronic processed transactions. For true paper merchants for MasterCard and Visa transactions the Authorization remains valid for thirty (30) days. A positive authorization response for Discover Network transactions remains valid for ninety (90) days. Failure to settle within these timeframes may result in a late presentment Chargeback.

Failure to obtain an Authorization Approval Code for a sales transaction may result in a Chargeback and/or the termination of your Agreement. Authorization Approval Codes can be obtained through your POS Terminal or a Voice Response Unit ("VRU"). Any fees related to authorizations will be charged for a request for an Authorization Approval Code, whether or not the transaction is approved.

Do not attempt to obtain an Authorization Approval Code provided by someone other than us except as described in Section 5.4. If a Cardholder or another service provider provides you with either an authorization number or with a telephone number for obtaining authorizations, the Authorization Approval Code you receive may not be valid. Even if the transaction is initially processed and funded, it may be charged back at a later date. Also, if you receive a purported Authorization Approval Code from someone other than us, we will not have the supporting records and will be unable to verify that you received the authorization if that is later questioned in a Chargeback.

An Authorization Approval Code only indicates the availability of credit on an account at the time the authorization is requested. It does not warrant that the person presenting the Card is the rightful Cardholder, nor is it a promise or guarantee that you will not be subject to a Chargeback.

If you obtain Address Verification, you must review the AVS response separately from the authorization response and make your own decision about whether to accept the transaction. A transaction can receive an Authorization Approval Code from the Issuer even if AVS is unavailable or reflects that the address provided to you does not match the billing address on file at the Issuer. If the authorized Cardholder disputes such a transaction, you will be responsible for the resulting Chargeback.

If you receive a Referral response to an attempted authorization, you may not submit the transaction without calling for and receiving a voice authorization. After receiving a Referral response you may not attempt another authorization on the same Card through your POS Terminal.

If you fail to obtain an authorization Approval Code or if you submit a Card transaction after receiving a decline (even if a subsequent authorization attempt results in an Authorization Approval Code), your transaction may result in a Chargeback and may be assessed fines or fees by the Card Organizations for which you will be responsible. These currently range from $25 to $150 per transaction. To avoid these costs and related Chargebacks, always obtain an Authorization Approval Code directly from your terminal before submitting a transaction for settlement.

For Cards other than MasterCard, Visa, American Express and Discover Network or for check acceptance, you must follow the procedures for authorization and acceptance for each.

You may not attempt to obtain multiple authorizations for a single transaction. If a sale is declined, do not take alternative measures with the same Card to obtain an approval of the sale from other authorization sources. Instead, request another form of payment. If you accept and process a transaction that was declined, or attempt multi-transactions and/or multi-authorizations, you are subject to a Chargeback, Card Organization fines and/or cancellation of your Agreement.
For MasterCard transactions, automated fuel dispensers must ensure that completion messages are submitted for MasterCard Cards within 60 minutes of the Authorization.

## 5. Authorizations

**5.1. Card Not Present Transactions.** You must obtain the 3-digit Card Validation Code (CVV2, CVC2, CID and submit this Code with all authorization requests with respect to transactions where the Card is not present (e.g., telephone, mail or internet sales). However, for recurring transaction authorizations you should submit the Card Validation Code with the first authorization request only, and not with subsequent recurring transaction authorization requests. (See Section 1.7).
**NOTE: For each Card Not Present Discover Network transaction, you must also verify the name and billing address of the Discover Network Cardholder using the Address Verification System (AVS), and if you do not receive a positive match, do not process the Discover Network Card Not Present transaction.**
**5.2. Authorization via Telephone (Other Than Terminal / Electronic Device Users).**
- Call your designated voice authorization toll free number and enter the authorization information into the VRU using a touch tone phone or hold for an authorization representative.
- If advised to pick up a Card, use reasonable and peaceful means to do so, and do not take any action that will alarm or embarrass the Card presenter. You will bear all responsibility for claims, liabilities, costs and expenses as a result of any action by you, your employees, vendors or agents, that attempt to retain a Card without the Issuer's direct request or failure to use reasonable, lawful means in retaining or attempting to retain the Card. Forward the Card to: Attn:Rewards Department, P.O.Box 5019, Hagerstown, MD 21740. You may be paid a reward for the return of the Card.
- On occasion, the Authorization Center will ask you to obtain identification from the cardholder before issuing an approval code. If you are instructed to do so, clearly write the appropriate identification source and numbers in the space provided on the Sales Draft unless otherwise prohibited by law.
- If the sale is declined, please remember that our operators are only relaying a message from the Issuer. The fact that a sale has been declined should not be interpreted as a reflection of the Cardholder's creditworthiness. The Cardholder should be instructed to call the Issuer.
**5.3. Authorization via Electronic Devices.**
- If you use an electronic terminal to obtain an Authorization Approval Code, all sale should be authorized through this equipment. Authorizations through other methods will result in additional charges to you.
- If your terminal malfunctions, refer to your Quick Reference Guide, if necessary, or call the POS Help Desk. The problem will either be corrected promptly or may require terminal programming or replacement. During the period in which your terminal is not functioning, remember to check it periodically since most terminal problems are temporary in nature and are quickly corrected.
- If a terminal is moved or if wires are disconnected, causing malfunction, call the POS Help Desk immediately and follow their instructions. You may be responsible for any service charges incurred for reactivation of the terminal.
- Until the terminal becomes operable, you must call your designated voice authorization toll free number and enter authorization information into the VRU using a touch tone phone. During this time, each transaction must be imprinted using a manual Imprinter machine. Failure to obtain an Authorization Approval Code and to imprint these transactions could result in a Chargeback to your account.
**5.4. Third Party Authorization System.** If you have contracted with another authorization network to obtain Credit Card authorization, i.e., your terminal can Split Dial, liability resulting from discrepancies with that network must be resolved between you and that network. We will not research Chargebacks resulting from Authorization Approval Codes obtained from another authorization service organization. Such Chargebacks will be passed through to you for resolution. If an authorization provided by a third party authorization system is challenged in a Chargeback, you must obtain proof (e.g., third party authorization logs) from the authorization source and submit it to us within the time frame specified on the Chargeback documentation.
IF YOU CONTRACTED TO USE ONE OF OUR AUTHORIZATION SERVICES, DO NOT USE ANOTHER THIRD PARTY SYSTEM WITHOUT NOTIFYING CUSTOMER SERVICE. OTHERWISE, WE WILL BE UNABLE TO SUCCESSFULLY RESEARCH AND DEFEND ANY AUTHORIZATION RELATED CHARGEBACKS ON YOUR BEHALF. THIS DELAY WILL SIGNIFICANTLY DECREASE YOUR TIME TO RESEARCH AND PROVIDE PROOF OF AUTHORIZATION, THUS REDUCING YOUR OPPORTUNITY TO REVERSE A CHARGEBACK.
If you utilize another authorization network, you will be responsible for the downgrade of any transactions to a higher cost interchange that result from a mismatch of information to our systems and those of third party authorization networks (see Section 18.1).
If you use a third party authorization network, you must also comply with Section 4.7.
**Call the following for other Card types:**
**JCB, International 1-800-522-9345**
**Voyager 1-800-987-6539**
**WEX 1-800-842-0071**

**Available 24 hours/day; 7 days/week.**

All approved sales authorized in this manner must be entered manually as "post authorization" transactions into the terminal, once the terminal becomes operational. All Credit transactions must be entered into the terminal for data capture. You may be subject to a Chargeback if you receive a Referral and subsequently receive an approval. To reduce the risk of such a Chargeback, the Card should be imprinted using a manual Imprinter machine. (For specific

procedures on Electronic Data Capture, refer to the Terminal Operating Instructions/Users Guide.) If the terminal malfunctions for more than twenty-four (24) hours, contact Customer Service for further instructions on processing your transactions.

**5.5.** **Automated Dispensing Machines.** Records must be produced for all transactions whose origin and data capture are automated dispensing machines or Limited Amount Terminals. Records should include the Cardholder account number, merchant's name, terminal location, transaction date and amount.

**5.6.** **Pre-Authorization for T&E (Travel & Entertainment) and Restaurant Merchants.**

If you are a business engaged in providing travel and/or entertainment services (e.g., car rentals, hotels, motels, etc.) or a restaurant business, and engage in the practice of "pre-authorization" you must comply with the following general procedures.

- A hotel, motel, or car rental merchant may obtain an estimated Visa, MasterCard or Discover Network authorization at the time of check-in.
- Restaurants must not add an estimated tip amount to the authorization request beyond the value of the goods provided, or services rendered, plus any applicable tax.
- You must notify the Cardholder of the dollar amount you intend to "Pre-Authorize."
- If the customer decides to use another form of payment (e.g., cash, check, etc.) you must promptly call the Voice Authorization Response Unit to delete the authorization hold. Provide the Cardholder's account number, original dollar amount and date of the transaction, and the authorization code. If a new transaction takes place, a new imprinted and signed Sales Draft for the exact amount and a new authorization code for that amount must be obtained.
- VEHICLE RENTAL PROVIDERS MAY NOT INCLUDE POTENTIAL VEHICLE DAMAGE OR INSURANCE DEDUCTIBLES IN ANY PREAUTHORIZATIONS.
- If you receive a decline on a transaction, you must wait twenty-four (24) hours before attempting to reauthorize. If you reauthorize prior to this time frame and receive an approval, you may be subject to a Chargeback and a fine imposed by the Card Organizations.
- Hotels, motels, and car rental merchants are allowed up to a 15% variance above the amount authorized. If the final amount charged to the Cardholder exceeds the original estimate by more than 15% above the preauthorization, you must authorize any additional amounts, and all incremental authorization codes must be written in the authorization area along with the date of authorization and the amount authorized.
- Pre-Authorization for certain establishments, are allowed up to a 20% (instead of 15%) variance above the amount authorized. If the final amount exceeds the amount "pre-authorized" by more than 20%, you must authorize the additional amount. Estimating the Authorization amount to include a tip is prohibited. The authorization request should include only the amount associated with the bill presented to the consumer.
- You should obtain an authorization for the initial estimated charges and then monitor the charges to ensure that the actual charges made do not exceed the estimated charges. If the actual charges exceed the amount of the initial estimated authorization (and any subsequent estimated authorizations), then you must secure a positive authorization for the additional amount. **NOTE:** Subsequent authorizations should only be for the additional amount of total charges and not include amounts already authorized.
- The estimated amount of any pre-authorization for lodging accommodations must be based on (i) the intended length of stay; (ii) the room rate; (iii) applicable taxes and service charges; and (iv) other miscellaneous charges as dictated by experience.
- If an authorization request is declined, no charges occurring after that date will be accepted for that Cardholder.
- You do not need to obtain a final authorization if the total sum of charges (the final amount) does not exceed 120% of the previously authorized charges. You must record the dates, authorized amounts, and their respective Authorization Approval Codes on the Sales Draft(s).

**5.7.** **Discover Network Procedure for Request for Cancellation of Authorization.**

- If a Discover Network Card sale is cancelled or the amount of the transaction changes following your receipt of authorization for the sale, you must call your Authorization Center directly and request a cancellation of the authorization. An authorization may be cancelled at any time within fifteen (15) days of your receipt of the authorization, but must be cancelled before the sales data relating to the transaction is submitted to us, after which the authorization cannot be changed. For an authorization cancellation, you must provide us with the following information, in this order:
- The Discover Network Merchant Number used in the authorization; • The Card number;
- The original amount of the authorization being cancelled;
- The new amount of the total transaction (if any);
- The original authorization code for the authorization being cancelled;
- The expiration date of the Card; and
- A brief reason for the authorization cancellation.

**5.8.** **Partial Authorization and Authorization Reversal.** Partial authorization provides an alternative to a declined transaction by permitting an Issuer to return an authorization approval for a partial amount, an amount less than the transaction amount requested by the merchant when the available card balance is not sufficient to approve the transaction in full. The Cardholder is able to use up the remaining funds on the card and select another form of payment (i.e., another payment card, cash, check) for the remaining balance of the transaction. For MasterCard transactions, partial authorization is optional for batch authorized e-commerce transactions, mail order, telephone order transactions and recurring payment transactions. For Discover transactions, partial Authorization support is optional for Card Not Present transactions. If you support partial authorizations, a partial authorization indicator must be included in each authorization request.

An authorization reversal must be submitted if the authorization is no longer needed, a partial amount of the total authorized is submitted for the settled transaction, or the Cardholder elects not to complete the purchase. The transaction sent for settlement must be no more than the amount approved in the partial authorization response. In the event that you wish to support the partial authorization functionality, you must contact Processor for additional rules and requirements.

## 6. Submission/Deposit of sales and Credit Drafts

**6.1.** **Submission of Sales for Merchants Other Than Your Business.** You may present for payment only valid charges that arise from a transaction between a bona fide Cardholder and your establishment. If you deposit or attempt to deposit transactions that arise from sales between Cardholders and a different business than the one approved by us in our Agreement with you, then the transaction may be charged back, we may suspend or debit funds associated with all such transactions, and we may immediately terminate your account and the Agreement.

**6.1.1.** **Factoring.** Factoring is considered merchant fraud and strictly prohibited. Factoring is the submission of authorization requests and/or Sales Drafts by a merchant for Card transactions transacted by another business. If you submit Sales Drafts on behalf of another person, you will suffer any losses associated with the disputes of any such Sales Draft and/or transaction. Also if any fraud is involved, you could face criminal prosecution.

**6.2.** **Timeliness.** In order to qualify for the lowest interchange Discount Rate, all Sales and Credit Drafts must be properly completed and submitted daily. If you have not received payment for submitted Sales Drafts after one (1) week from your normal payment date, contact Customer Service. Late Submission of Sales or Credit Drafts may result in increased interchange rates or fees or in a Chargeback to you.

**6.3.** **Mail / Branch Deposit Procedures.** Complete the appropriate summary form designated for your use. Imprint the completed summary with your Merchant Identification Card, if applicable, and sign it. Please do not staple or clip Sales Drafts together or to summary forms. This will distort the Cardholder's account number and may result in a Summary Adjustment or Chargeback to you. Mail your deposits daily to us, or, if your Agreement allows deposit at a local bank branch, you must make daily deposits.

Do not send us the merchant copies (which are for your records); submit only the Bank hard copies of the transactions. If merchant copies are submitted, they will be returned to you unprocessed.

**6.4.** **Electronic Merchants: Daily Batching Requirements & Media Submission.**

Batches must be transmitted to us by the time indicated in Section A.2. of Part III, of this Agreement) in order to be processed on the date of transmission. Additionally, if you deposit via magnetic tape, electronic transmissions, or Electronic Data Capture terminal, and have contracted to send the actual Sales Drafts and Credit Drafts to us for imaging and retrieval, the Media must be batched daily by register/terminal following the procedures below. Failure to do so may result in a processing fee and/or a Chargeback due to our inability to retrieve the Media as requested by the Issuer.

10

• A register/terminal Batch header form must be filled out for each Batch of Media.
• The Batch header must be imprinted with your Merchant Identification Card, and all areas completed properly (i.e., Batch number, date, amount, number of items, etc.).
• The Batch/deposit total must match to the settled/reconciled amount displayed on the terminal upon closing the Batch.
• Any discrepancies between the actual Media and electronic display must be reconciled and corrected before storing the Media (for merchants who contract to hold their Media) or before sending us the copies of the deposit. Otherwise, transactions may appear to be a new Submission and may be manually keyed (causing duplicate billing to Cardholders and resulting in Chargebacks) or we may not be able to retrieve an item when requested by the Issuer.
• It is your responsibility to ensure that the actual Media is batched correctly and, depending on the terms of your Agreement, either stored at your location or sent to Processor. (In some cases, the actual Media is sent daily to your head office, and forward ed to Processor f or imaging.)
• **You must confirm t at your equipment has transmitted its Batches to us at least once daily.** Even i your equipment is designed or programmed to close and submit Batches without your interve tion, it is ultimately your responsibility to confirm th t the Batches have been transmitted to us for processing.

## 7. Settlement

Except as otherwise set forth in this Pro ram Guide, Your funds for MasterCard/Visa/ Discover Network transactions will ordinarily be processed and transferred to your financial institution within two (2) Business Days from the time a Batch is received by Processor if your financial institution is the Bank. If your financial institution is not the Bank, your MasterCard/Visa/Discover transactions will ordinarily be processed via the Federal Reserve within two (2) Business Days from the time a Batch is received by Processor. The Federal Reserve will transfer such amounts to your financial institution.

If you have been classified by Discove Network as having a Discover Direct Strategic Relationship with Discover Network, we will not acquire your Discover Network transactions and they will be su ject to your agreement with Discover Network.

You acknowledge and agree that if we have not agreed to or do not acquire transactions for any Card type (i) we have no liability or responsibility whatsoever for the settlement of dispu es regarding tho e transactions and (ii) you will pursue directly with the related Card Organization all claims and disputes regarding those transactions. You agre to pay us for p r item processing, authorization and other fees in the Application f r any non-acquired transaction services you receive from us.

## 8. Refunds/Exchanges (Credits)

**8.1. Refunds.**
   • You must promptly complete and submit a Credit Draft for the total amount of the Cr dit, which must i clude the following information:
      ▪ The account number and expiration date;
      ▪ The Cardholder's name;
      ▪ Your na me, city, state and Merchant Account Number;
      ▪ A description of the goods or services;
      ▪ The transaction date of the Credit;
      ▪ The total amount of the Credit; and
      ▪ For Dis over Network transactions, the approved currency used and the signa ture of your authorized representative or employee.
   • You cannot process a Credit transaction that does not correspond to a refund on a previous transacti n on the original Sales Draft.
   • Full refunds m st be for the exact dollar amount of the original transaction inclu ing tax, handlin charges, etc. (You must identify the shipping and handling charg s incurred.) The refund amount may not be for more than the original Card sale amount.
   • All dollar amo nts and other handwritten information must be clearly written. (Stray marks on the Cre it Draft will render it unscannable/illegible.)
   • Do not circle or underline any information on the Credit Draft.
   • Imprint the Credit Draft with the same Card used by the Cardholder to make the ori jinal purchase w en applicable. You should not credit an account th t differs from the account used for the original transaction.
   • Never give cas or check Credit refunds for Card sales.
   • Have the Card older sign the C edit Draft, give the Cardholder the appropriate cop , and deposit the Credit Draft immediately. Failure to process a Credit within five (5) calendar days ma result in a Chargeback.
   • Authorization is not required for Credits.
**8.2. Exchanges.**
   • No additional paperwork is nece sary for an even exchange. Just follow your standard company policy.
   • For an uneven exchange, complete a Credit Draft (follow the procedures outlined in Section 8.1) fo the total amount of only the merchandise returne . The Cardholder 's account will be credited for that amount. Then, complete a new Sa es Draft for the t tal amount of any new merchandise purchased.

## 9. Retention for Records for Retrie als and Chargebacks

**9.1. Retain Legible Copies.**
For MasterCard and Visa: You must se urely retain legible copies of all Sales Drafts and Credit Drafts or any other transaction records for a period of eighteen (18) months from the date of each transaction and a period of five (5) years for the retention of healthcare Sales Drafts and Credit Drafts. The Sales Drafts you retain must comply with all requirements (see Section 3.1).
For Discover Network: You must securely retain legible copies of all Sales Drafts and Credit Drafts or any other transaction records for the longer of (i) 365 days or (ii) the resolution of an pending or threatened disputes, claims, disagreements or litigatio involving the C rd transaction. You must also keep images or other copies of Sales Drafts fo no less than three (3) years from the date of the Discover Network transaction.
For American Express: You must submit the Credit to American Express directly, or through your Processor, for payment. You must securely retain legible copies of all Sales Drafts and Credit Drafts or any other transaction records for 24 months from t e date you sub itted the corresponding Credit to us. You must also provide a copy of the redit Draft to the Card Member or as required by applicable law, truncate the Card Number and do not print the Card's expiration date on copies of Credit Drafts delivered to the Card Member.

   • You cannot intentionally submit a sale and an offsetting Credit at a later date sole y for the purpos of debiting and crediting your own or a customer's account.
   • You are responsible for paying all refunds submitted to us on your merchant accoun . We assume no responsibility for verifying any Credits or refunds.
   • Do not process a Credit transaction once a Chargeback is received. Credits issued after a Chargeba k has been received may not be recoverable and the merchant woul t be financially responsible for the credit as well as the Chargeback.
   • YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTIT TE APPROPRI TE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FRO SUBMITTING CREDITS THAT DO NOT REFLECT BONA FIDE R ETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.
**9.2. Provide Sales an Credit Drafts.** You must provide all Sales Drafts and Credit Draft or other transaction records requested by us within the shortest time limits established by C rd Organization ules. You are responsible for any deficiencies in C rd transaction data transmitted or otherwise delivered to us.

## 10. Chargebacks, Retrievals and Other Debits

**10.1. Chargebacks.**

**10.1.1. Generally.** Both the Cardholder and the Issuer have the right to question or dispute a transaction. If such questions or disputes are not resolved, a Chargeback may occur. As a result, we will debit your Settlement Account or settlement funds for the amount of each Chargeback. It is strongly recommended that, whenever possible, you contact the Cardholder directly to resolve a disputed transaction or Chargeback, unless the dispute involves a Discover Network Cardholder, in which case Discover Network rules and regulations expressly prohibit you from contacting the Discover Network Cardholder regarding the dispute. You are responsible for all Chargebacks, our Chargeback fees, and related costs arising from your transactions.

**10.1.2. Transaction Documentation Requests.** In some cases, before a Chargeback is initiated, the Issuer will request a copy of the Sales Draft, via a request for transaction documentation. We will forward the request to you. You must respond to the request within the time frame and manner set forth in the request. We will then forward your response to the Issuer. If you fail to timely respond, we will so notify the Issuer and a Chargeback may result. Upon receipt of a transaction documentation request, immediately retrieve the requested Sales Draft(s) using the following guidelines:

- Make a legible copy, centered on 8-1/2 x 11-inch paper (only one (1) Sales Draft per page).
- Write the 'case number' from the request for transaction documentation on each copy /page.
- If applicable, make copies of a hotel folio, car rental agreement, mail/phone/internet order form, or other form of receipt.
- If a Credit transaction has been processed, a copy of the Credit Draft is also required.
- Letters are not acceptable substitutes for Sales Drafts.
- Fax or mail copies of the Sales Draft(s) and Credit Drafts, if applicable, to the fax number or mail address provided on the request form.
- If you fax your response, please set your fax machine to print your fax number and name on the documents that you send. We can use this information to help determine where the documentation received originated from should additional research be required.
- Additionally, please set the scan resolution on your fax machine to the highest setting. The higher resolution setting improves the clarity of characters and graphics on the documentation transmitted and helps reduce the number of illegible fulfillments and/or Chargebacks.
- If we do not receive a clear, legible and complete copy of the transaction document within the timeframe specified on the request, you may be subject to a Chargeback for "non-receipt" for which there is no recourse.

A handling fee may be charged by the Issuer and will be debited from your Settlement Account or settlement funds if, a transaction documentation request results from a difference in the following information on the Sales Draft and the transmitted record: Merchant name or an incorrect city, state, foreign country and/or transaction date.

**10.1.3. Chargeback Process.** Regardless of whether you respond to a transaction documentation request, a Chargeback may be debited to your Settlement Account for numerous reasons (see below). If the Issuer submits a Chargeback, we will send you a Chargeback notification, which may also include a request for transaction documentation. **Due to the short time requirements imposed by MasterCard, Visa, Discover Network and American Express, it is extremely important that you respond to a Chargeback notification and transaction documentation request within the time frame set forth in the notification.** Do not process a Credit transaction once a Chargeback is received; the Issuer will credit the Cardholder's account. Credits issued after a Chargeback has been received may not be recoverable and the merchant would be financially responsible for the Credit as well as the Chargeback. If the information you provide is both timely and, in our sole discretion, sufficient to warrant a representation of the transaction and / or reversal of the Chargeback, we will do so on your behalf. However, representment and/or reversal is/are ultimately contingent upon the Issuer and/or Cardholder accepting the transaction under applicable Card Organization guidelines. Representment or reversal is not a guarantee that the Chargeback has been resolved in your favor.

For Visa Chargebacks: If we reverse the Chargeback and represent the transaction to the Issuer, the Issuer, at its sole discretion, may elect to submit the matter for arbitration before Visa. Visa currently charges a $250 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Issuer, and the Chargeback is upheld, you will be responsible for all such fees and any other applicable fees and penalties imposed by Visa, as they may change from time to time. Such fees and penalties will be debited from your Settlement Account or settlement funds, in addition to the Chargeback.

For MasterCard Chargebacks: If we reverse the Chargeback and represent the transaction to the Issuer, the Issuer, at its sole discretion, may elect to resubmit the Chargeback. In such event, at the discretion of Processor, we will debit your Settlement Account or settlement funds for the Chargeback. However, if you feel strongly that it is an invalid Chargeback, we may, on your behalf and at your request, submit the matter for arbitration before MasterCard. MasterCard currently charges a $250 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Issuer, and the Chargeback is upheld, you will be responsible for all such fees and any other penalties imposed by MasterCard as they may change from time to time. Such fees and penalties will be debited from your Settlement Account or settlement funds, in addition to the Chargeback.

For Discover Network Chargebacks: If Discover Network rejects our representment request and you feel strongly that the Chargeback is invalid, we may, at the discretion of Processor and on your behalf and at your request, submit the matter for dispute arbitration before Discover Network. Discover Network charges fees for representment requests and an arbitration fee as published in their fee schedule.

If the Chargeback is not disputed within the applicable time limits set forth by MasterCard, Visa, Discover Network and American Express rules and regulations, reversal rights are forfeited. Our only alternative, for Visa and MasterCard non-fraud Chargeback reason codes, is to attempt a "good faith collection" from the Issuer on your behalf. This process can take up to six (6) months and must meet the Issuer's criteria (e.g., at or above a set dollar amount). Good faith collection attempts are not a guarantee that any funds will be collected on your behalf. Issuers normally charge good faith collection fees, which are deducted from the transaction amount if accepted in addition to any processing fees that are charged by us.

For American Express Chargebacks: You may request a Chargeback reversal if the Chargeback was applied in error. In order for us to consider your request, you must have responded to the original inquiry within the specified timeframe, request the Chargeback reversal no later than 20 days after the date of the Chargeback, and provide all supporting documentation to substantiate the error. If a Chargeback is applied, the Chargeback reversal can only be requested if you prove that you already issued a Credit to the Card Member for the amount of the disputed charge.

**NOTE:** Discover Network does not offer good faith collection for Acquirers.

MasterCard and Visa Card Organization Rules require that a merchant make a good faith attempt and be willing and able to resolve any disputes directly with the Cardholder. Discover Network rules and regulations, however, prohibit you and/or us from contacting the Cardholder directly regarding dispute(s) or any other matter, except as required for acceptance of Discover Network transactions, and require you and/or us to submit any responses to dispute notices directly to Discover Network.

Due to Card Organization Rules, you may not re-bill a Cardholder after a Chargeback is received for that transaction, even with Cardholder authorization.

We strongly recommend that you include a detailed rebuttal letter along with all pertinent documents when responding to a transaction request or a Chargeback notification (e.g., rental agreement, imprinted portion of the invoice or Sales Draft; the portion signed by the Cardholder; and the area where the authorization codes, with amounts and dates, are located).

Due to the short time frames and the supporting documentation necessary to successfully (and permanently) reverse a Chargeback in your favor, we strongly recommend the following:

- Avoid Chargebacks by adhering to the guidelines and procedures outlined in these Operating Procedures.
- If you do receive a Chargeback, investigate, and if you dispute the Chargeback, submit the appropriate documentation within the required time frame.
- Whenever possible, contact the Cardholder directly to resolve the dispute, unless the dispute relates to a Discover Network Cardholder, in which case direct contact with the Discover Network Cardholder regarding the dispute is prohibited by Discover Network Card Organization Rules.
- If you have any questions, call Customer Service.

**10.1.4. Chargeback Reasons.** The following section outlines the most common types of Chargebacks. This list is not exhaustive. For ease of understanding, we have combined like Chargebacks into six groupings. We have included recommendations on how to reduce the risk of Chargebacks within each group. These are recommendations only, and do not guarantee that you will be able to prevent Chargebacks.

**1. Authorization Issues:** Proper Authorization procedures were not followed and valid Authorization was not obtained.

**The following scenarios could cause an Authorization Related Chargeback to occur:**

- Authorization not obtained.
- Authorization was declined.
- Transaction processed with an expired card and Authorization was not obtained.
- Transaction was processed with an invalid account number and Authorization was not obtained.
- Card Recovery Bulletin (CRB) or Exception File was not checked (transactions below floor limit).

**To reduce your risk of receiving an Authorization Related Chargeback:**

• Obtain valid Authorization on the day of the transaction.

> ■ Card Present Transactions-Authorization must be obtained on the transaction date for the amount settled.
> ■ Card Not Present Transactions-Authorization must be obtained on the transaction date for the amount settled. However, if merchandise is being shipped, Authorization must be obtained within seven calendar days of the transaction ship date.

- If a declined response is received, then request another form of payment from the Cardholder.
- If a Referral response is received, then follow proper voice procedures to obtain a valid Authorization and obtain an imprint of the card.
- "Pick-up" response indicates that the Issuer is requesting for the card to be retained and returned back to them. The Card should not be accepted for payment. Additionally, you can choose to retain the Credit Card and return it to the Acquirer.
- Merchants should not exceed any predetermined thresholds for specific terminal types as specified by each Card Organization.

**2. Cancellations and Returns:** Credit was not processed properly or the Cardholder has cancelled and/or returned items.

**The following scenarios could cause a Cancellation and Return Related Chargeback to occur:**

- Cardholder received damaged or defective merchandise.
- Cardholder continued to be billed for cancelled recurring transaction.
- Credit transaction was not processed.

**To reduce your risk of receiving a Cancellation and Return Related Chargeback:** • Issue Credit to the Cardholder for the same account as the purchase in a timely manner.

> – Do not issue Credit to the Cardholder in the form of cash, check or in-store/merchandise Credit as we may not be able to recoup your funds in the event the transaction is charged back.

- Ensure customers are fully aware of the conditions for recurring transactions. Cancel recurring billings as soon as notification is received from the Cardholder or as a Chargeback, and Issue the appropriate Credit as needed to the Cardholder in a timely manner.
- Pre-notify the Cardholder of billings within 10 days (Domestic) and 15 (International) prior to billing, allowing the Cardholder time to cancel the transaction.
- Provide proper disclosure of your refund policy for returned/cancelled merchandise, or services to the Cardholder at the time of transaction.
  > – Card present, Cardholder signed the Sales Draft containing disclosure.
- If applicable, the words "NO EXCHANGE, NO REFUND," etc. must be clearly printed in 1/4-inch lettering on the Sales Draft near or above the Cardholder signature.
  > – Ecommerce, provide disclosure on website on same page as check out requiring Cardholder to click to accept prior to completion.
  > – Card Not Present, provide cancellation policy at the time of the transaction.
  > – Provide cancellation numbers to Cardholder's when lodging services are cancelled. • Ensure delivery of the merchandise or services ordered to the Cardholder.

- **3. Fraud:** Transactions that the Cardholder claims are unauthorized; the account number is no longer in use or is fictitious, or the merchant was identified as "high risk."
- **The following scenarios could cause a Fraud Related Chargeback to occur:**
- Multiple transactions were completed with a single card without the Cardholder's permission. • Counterfeit card was utilized and proper acceptance procedures were not followed.
- Authorization was obtained; however, full track data was not transmitted.
- Cardholder states that they did not authorize or participate in the transaction.

**NOTE:** Visa Fraud Chargebacks: Chargeback representment rights do not exist if you failed to fulfill a retrieval request and/or provide a sales slip that contains all required data elements. To preserve Chargeback representment rights, respond to all retrieval requests with a clear leg ble copy of the transaction document that contains all required data elements within the required timeframe that is specified by the retrieval request.

**To reduce your risk of receiving a Fraud Related Chargeback: Card Present Transactions:**

- Obtain an Authorization for all transactions.
- If you are utilizing an electronic device to capture card information, swipe all Card transactions through your electronic authorization device to capture Cardholder information and ensure the displayed Cardholder number matches the number on the Card.
- If you are unable to swipe the Card or if a Referral response is received, imprint the Card using a valid imprinting device that will capture the embossed Card and merchant information. Do not alter the imprint on the draft in any way. Manually entering the information into the terminal does not protect you from this type of Chargeback. All pertinent information relating to the transaction must be written on the manually imprinted draft (transaction date, dollar amount, authorization code and merchandise description) along with the Cardholder signature.

**NOTE:** Do not imprint on the back of a signed Sales Draft. The imprint must be on the transaction document that contains all transaction elements to prove the Card was present at the time of the transaction.

- Obtain the Cardholder signature for all transactions; ensure the signature on the Sales Draft matches the signature on the back of the Card.
- Process all transaction one time and do not Batch out transactions multiple times.
- Educate staff on procedures to eliminate point of sale (POS) fraud.

**Card Not Present Transactions:**

- Participation in recommended Fraud Prevention Tools:
  > – Verified by Visa Program
  > – MasterCard Secure Code
  > – Address Verification Services
  > – CVV2, CVC2 and CID Verification

**NOTE:** While transactions utilizing these tools may still be disputed, the service may assist you with your decision to accept the Card for the transaction.

- Ensure you ship to the AVS confirmed address (bill to and ship to should match).
- Obtain Authorization for all transactions.
- Ensure merchant descriptor matches the name of the business and is displayed correctly on the Cardholder statement.
- Ensure descriptor includes correct business address and a valid customer service number.
- American Express offers fraud mitigation tools for both Card Present and Card Not Present transactions to help verify that a charge is valid. These tools help you mitigate the risk of fraud at the point of sale, but are not a guarantee that a charge is in fact valid or bona fide, or that you will not be subject to a Chargeback. For optimal use of the tools, please visit American Express' Fraud Prevention Information at: www.americanexpress.com/fraudinfo.

**4. Cardholder Disputes:** Merchandise or services not received by the Cardholder, Merchandise defective or not as descr bed.

**The following scenarios could cause a Cardholder Dispute Chargeback to occur:**

- Services were not provided or merchandise was not received by the Cardholder.
- The Cardholder was charged prior to merchandise being shipped or merchandise was not received by agreed upon delivery date or location.
- Cardholder received merchandise that was defective, damaged, or unsuited for the purpose sold, or did not match the description on the transaction

documentation/verbal description presented at the time of purchase.
- Cardholder paid with an alternate means and their Card was also billed for the same transaction.
- Cardholder cancelled service or merchandise and their Card was billed.
- Cardholder billed for a transaction that was not part of the original transaction document.

**To reduce your risk of receiving a Cardholder Dispute Related Chargeback:**
- Provide Services or Merchandise as agreed upon and described to the Cardholder; clearly indicate the expected delivery date on the sales receipt or invoice.
- Contact the Cardholder in writing if the merchandise or service cannot be provided or is delayed, and offer the Cardholder the option to cancel if your internal policies allow.
- In the event that the Cardholder received defective merchandise or the merchandise received was not as described; resolve the issue with the Cardholder at first contact.
- If the merchandise is being picked up by the Cardholder, have them sign for the merchandise after inspection that it was received in good condition.
- Do not charge the Cardholder until the merchandise has been shipped, ship according to the agreed upon terms and obtain signed Proof of Delivery from the Cardholder.
- If unable to provide services or merchandise, issue a Credit to Cardholder in a timely manner.
- Accept only one form of payment per transaction and ensure the Cardholder is only billed once per transaction.
- Do not bill Cardholder for loss, theft or damages unless authorized by the Cardholder.

**5. Processing Errors:** Error was made when transaction was processed or it was billed incorrectly.

**The following scenarios could cause a Processing Error Chargeback to occur:**
- Transaction was not deposited within the Card Organization specified timeframe.
- Cardholder was issue a Credit Draft; however, the transaction was processed as a sale.
- Transaction was to be processed in a currency other than the currency used to settle the transaction.
- The account number or transaction amount utilized in the transaction was incorrectly entered.
- A single transaction was processed more than once to the Cardholder's account.
- Cardholder initially presented Card as payment for the transaction; however Cardholder decided to use an alternate form of payment.
- Limited amount or self-service terminal transaction was processed for an amount which is over the pre-determined limit.

**To reduce your risk of receiving a Processing Error Related Chargeback:**
- Process all transactions within the Card Organization specified timeframes. • Ensure all transactions are processed accurately and only one time.

**NOTE:** In the event that a transaction was processed more than once; immediately issue voids, transaction reversals or Credits.
- Ensure that credit transaction receipts are processed as Credits and sale transaction receipts are processed as sales.
- Ensure all transactions received a valid Authorization Approval Code prior to processing the transaction and obtain a legible magnetic swipe or imprinted Sales Draft that is signed.
- Do not alter transaction documentation or make any adjustments unless the Cardholder has been contacted and agrees to any modifications of the transaction amount.
- Ensure limited amount, self-service and automated fuel dispenser terminals are set properly to conform to the pre-determined limits.

**6. Non Receipt of Information:** Failure to Respond to a Retrieval Request or Cardholder Does Not Recognize

**The following scenarios could cause Non Receipt of Information Chargeback to occur:**
- The transaction documentation was not provided to fulfill the retrieval request.
- The retrieval request was fulfilled with an illegible Sales Draft or was an invalid fulfillment (incorrect sales draft or sales draft did not contain required information which may include signature).
- The Cardholder does not recognize or is unfamiliar with the transaction due to the merchant name and / or location not matching the name and / or location where the transaction took place.

**To reduce your risk of receiving a Non Receipt of Information Related Chargeback:**
- Provide a clear and legible copy of the Sales Draft that contains all required data elements within the required timeframe that is specified on the retrieval request.
- Ensure that the most recognizable merchant name, location and/or customer service phone number is provided on all transactions.
- Retain copies of all transaction documentation for the required timeframe that is specified by each Card Organization.
- Develop efficient methods to retrieve transaction documentation to maximize ability to fulfill requests.

**10.2. Other Debits.** We may also debit your Settlement Account or your settlement funds in the event we are required to pay Card Organization fees, charges, fines, penalties or other assessments as a consequence of your sales activities. Such debits shall not be subject to any limitations of time specified elsewhere in the Agreement, including, without limitation the following, which we may add to or delete from this list as changes occur in the Card Organization Rules or our Operating Procedures pursuant to Section 15:
- Card Organization fees, charges, fines, penalties, registration fees, or other assessments including any fees levied against us or any amount for which you are obligated to indemnify us.
- Currency conversion was incorrectly calculated.
  **NOTE:** For Discover Network transactions, you are not permitted to convert from your local Discover Network approved currency into another currency, nor may you quote the price of a transaction in U.S. Dollars if completed in another approved currency.
- Discount Rate not previously charged.
- Reversal of deposit posted to your account in error.
- Debit for Summary Adjustment not previously posted.
- Reversal of Credit for deposit previously posted.
- Debit for Chargeback never posted to your account.
- Debit for EDC Batch error fee.
- Card Organization Merchant Chargeback/fraud monitoring fees – excessive Chargeback handling fees.
- Failure of transaction to meet Member Controller Authorization Service ("MCAS") – Cardholder account number on exception file.
- Original transaction currency (foreign) not provided.
- Travel Voucher exceeds maximum value.
- Debit and/or fee for investigation and/or Chargeback costs related to this Agreement, or for costs related to our collection activities in an amount no less than $100.00.
- Costs arising from replacement or damage to equipment rented.
- Payment of current or past due amounts for any equipment purchase, rental or lease.
- Incorrect merchant descriptor (name and/or city, state) submitted.
- Incorrect transaction date submitted.
- Shipping and handling interchange fees.
- Costs or expenses associated with responding to any subpoena, garnishment, levy or other legal process associated with your account in an amount no less than $150.00.

**10.3. Summary(Deposit)Adjustments/Electronic Rejects.** Occasionally, it is necessary to adjust the dollar amount of your summaries/Submissions (deposits) and credit or debit your Settlement Account or settlement funds accordingly. The following is a list of the most frequent reasons for Summary (Deposit) Adjustments/Electronic Rejects:

- Your summary reflected an arithmetic error.
- Submitted sales not included in your Agreement (e.g., American Express).
- The dollar amount is unreadable/illegible.
- The Cardholder's account number is unreadable/illegible.
- Duplicate Sales Draft submitted.
- Card number is incorrect/incomplete.
- Summary indicated credits, but no credits were submitted.

**10.4. Disputing Other Debits and Summary Adjustments.** In order to quickly resolve disputed debits and Summary Adjustments, it is extremely important that the items listed in this section be faxed or sent to the address listed on the notification.

If the Summary Adjustment is for an unreadable or incorrect Cardholder account number, resubmit the corrected Sales Draft with your next deposit. Also, if the transaction is over thirty (30) calendar days old, you must reauthorize and obtain a valid Authorization Approval Code.

A clear and legible copy of the Sales Draft containing the following should be obtained from your files:

- Date of sale/Credit;
- Cardholder's account number, name and signature;
- Total amount of the sale and description of goods and services; and • Date and Authorization Approval Code.
- Include a dated cover letter detailing the reasons for requesting a review of the debit or Summary Adjustment and documentation to support your dispute. (You should retain a copy of the correspondence and all documentation for your files.) If the inquiry is related to prior correspondence, be sure to include the control number we previously used.
- Immediately fax or mail the Sales Draft or Credit Drafts to the fax number or address provided on your notification letter.
- If you have any questions, please call the Customer Service number provided on the last page of this Program Guide. If a Customer Service Representative informs you that additional documentation is required in order to fully review the item, please immediately submit your rebuttal and transaction documentation to the fax number or address listed on the debit notification.

To order additional supplies, call Customer Service when you have two months' inventory left. We will ship you an adequate amount of supplies. The amount of supplies (based on usage) on hand should not exceed a three- to six-month supply.

In an EMERGENCY, please contact Customer Service using the number provided on the last page of this Program Guide. If supplies are sent via an express delivery service, the delivery charges will be debited to your account. You are responsible for unauthorized use of sales/credit and summary Media. We recommend that you store all supplies in a safe location. You may be charged for supplies and applicable shipping and handling charges.

## 11. Account

**11.1. Change of Settlement Account Number.** If you change the Settlement Account in which you receive the proceeds of your transactions, you must call Customer Service or your Relationship Manager immediately. If you accept payment types other than Visa, MasterCard and Discover Network (such as the American Express Card), you are also responsible for contacting the Card Organizations or companies governing those Cards to notify them of this change.

**11.2. Change in Your Legal Name or Structure.** You must call Customer Service or your relationship Manager and request a new Agreement.

**11.3. Change in Company DBA Name, Address or Telephone/Facsimile Number.**

To change your company or location DBA name, address (or e-mail address), or telephone / facsimile number, you must send the request in writing to the address on your statement.

**11.4. Other Change(s) in Merchant Profile.** You must immediately notify us of any change to the information on file with us in your merchant profile, including: (i) any new lines or types of business; (ii) change in ownership; (iii) the opening, closing or liquidation of business or any location; (iv) change in Card processing method (i.e., paper Sales Drafts to POS Device); (v) voluntary or involuntary party to a bankruptcy case; (vi) entry into a loan or other agreement with a Person that seeks to affect this Agreement; and/or (vii) change from a business that exclusively conducts Card-present retail sales to one that accepts Card sales by mail, telephone or Internet transactions. We retain the right to terminate this Agreement if you fail to notify us of any change to the information in your merchant profile.

**11.5. Charges for Changes to Account Maintenance.** You may be charged for any changes referenced in this Section or any other changes requested by you or otherwise necessary related to account maintenance.

**11.6. Credit Reports; Bank Account Information.** Client and each undersigned individual authorize us and Synovus Bank and their respective agents to from time to time additional information from credit bureaus and other lawful sources, including on persons and companies named in this Guide, and to obtain individual and/or business credit reports, including requesting reports from consumer reporting agencies on persons signing below as a principal or officer of Client or as a guarantor (if such person asks us whether or not a consumer report was requested, we will tell such person, and if we received a report, we will give such person the name and address of the agency that furnished it). Our privacy policy for the collection and use of social security numbers can be found at www.prioritypaymentsystems.com/.

## 12. Card Organization Monitoring

MasterCard, Visa, Discover Network and American Express have established guidelines, merchant monitoring programs and reports to track merchant activity such as, but not limited to excessive Credit, reported fraud and Chargebacks, and increased deposit activity. In the event you exceed the guidelines or engage in practices that could circumvent such monitoring programs or submit suspicious transactions as identified by a Card Organization or any related program or reports, you may be subject to: (i) operating procedure requirement modifications; (ii) Chargebacks and/or increased fees; (iii) settlement delay or withholding; (iv) termination of your Agreement; or (v) audit and imposition of fines.

## 13. Supplies

**Placing Orders.**

- To order additional supplies, call Customer Service when you have two months' inventory left. We will ship you an adequate amount of supplies. The amount of supplies (based on usage) on hand should not exceed a three- to six-month supply.
- In an EMERGENCY, please contact Customer Service using the number provided on the last page of this Program Guide. If supplies are sent via an express delivery service, the delivery charges will be debited to your account.
- You are responsible for unauthorized used of sales/Credit and summary Media. We recommend that you store all supplies in a safe location.
- You may be charged for supplies and applicable shipping and handling charges.

## 14. Special Provisions For American Express

The provisions in this Section 14 apply to American Express Card acceptance and Transactions. Merchants must also comply with the American Express Merchant Operating Guide which can be obtained at www.americanexpress.com/merchantopguide.

**14.1 American Express Transaction Data.** The transaction data you collect to facilitate the Charge must be or have been provided directly to you by the Cardholder. You must not accept or have accepted transaction data from, nor shall you provide or have provided transaction data to, any third parties other than

your covered parties (as defined in the Data Security Operating Policy (DSOP)). If you fail to comply with this requirement, in addition to other rights and remedies regarding "monitoring.", you may be charged a fee as indicated on the Merchant Processing Application, we may suspend Card acceptance privileges at your establishments, or terminate the Agreement. Where Cardholders pay you using payment or "e-wallet" accounts (which Cardholders may have created by providing Card Member information when the account was established), the transaction data collected to facilitate the Card Not Present Charge has already been provided directly by the Cardholder.

You are not required to have the Cardholder re-enter the transaction data. All information required by American Express evidencing one or more transactions, including information obtained at the point of sale, information obtained or generated during Authorization and Submission, and any Chargeback

**14.2 Disclosure and Use of Data Collected Under Agreement.** We may disclose to American Express data and information that you provide on your Application and that we collect as part of performing American Express payment processing services or transaction related services including information about you. American Express may use the information that you provide in the Application at the time of setup to screen and/or monitor you in connection with Card marketing and administrative purposes. American Express also may use such information to perform its responsibilities in connection with American Express Card acceptance, promote the American Express Network, perform analytics and create reports, and for any other lawful business purposes, including marketing purposes. American Express may otherwise use and share your information for business purposes and as permitted by Applicable Law. American Express uses reasonable administrative, technical and physical security measures to protect Program Merchant information consistent with the sensitivity of the information.

**14.3 Consent for American Express to Contact You by Phone, eMail, Text or Facsimile.** American Express may use the information you provide in the Application (as such information may be updated) to call you or send you communications or materials via email, SMS, text or facsimile regarding American Express products, services and resources available to you. You consent and agree to receive autodialed, automated and/or prerecorded calls and communications (which may include SMS or text messages) at the telephone number(s) you have provided. If you provide a fax number, you consent and agree to receiving fax communications from American Express. In connection with the foregoing, you understand that the calls made or communications sent to you by American Express may be subject to charges or fees by your telecommunications or other applicable service provider that are your responsibility to pay. You understand that your consent under this Section 14.3 is not a condition of purchasing or receiving any product or service or entering into this Agreement.

**Opt-Out:** Your opt-out of receiving marketing related communications and materials from American Express by calling Processor at the Customer Service Number stated in Part IV, Section A.5 of the Program Guide. If you have opted-out, you may still receive messages or communications from American Express related to important information about your account.

**14.4 Conversion to a Direct Relationship with American Express.** You acknowledge and agree that upon written notice from us, you will be converted to a direct American Express Card acceptance relationship with American Express if and when the annual American Express Card charges that you submit under this Agreement are greater than $1,000,000. You agree that , upon conversion, (i) you will be bound by American Express' then-current Card Acceptance Agreement with respect to American Express Transactions; (ii) American Express will set pricing and other fees payable y you for American Express Card acceptance; and (iii) you will no longer be able to submit American Express Card transactions under this Agreement, but this Agreement will continue in full force and effect with respect to other payments and services you elected to receive on your Application.

**14.5 No Assignment of Payments.** You acknowledge and agree that you shall not assign to any third party any payments due to you under this Agreement as the result of American Express Card transactions, and all indebtedness arising from American Express Card charges will be for bona fide sales of goods and services (or both) at your establishments and free of liens, claims, and encumbrances other than ordinary sales taxes; provided, however, that you may sell and assign future transaction receivables to us, our Affiliates and/or any other funding source that partners with us or our Affiliates.

**14.6 Third Party Beneficiary Rights.** American Express is a direct and intended thirdparty beneficiary of this Agreement, and may enforce any terms of this Agreement that apply to American Express, including American Express Card acceptance and transaction processing, directly against you.

**14.7 Your Right to Opt-Out of American Express Card Acceptance.** You may opt out of accepting American Express Cards at any time without directly or indirectly affecting your rights to accept any other payment products.

**14.8 Collections from American Express Cardholder.** You may not bill or collect from any American Express Cardholder for any purchase or payment on the American Express Card unless a Chargeback has been exercised, you have fully paid for such Charge, and you otherwise have the right to do so.

**14.9 American Express-Excessive Disputes** You may be subject to various fees and assessments as set forth on the Application, including fees for excessive disputes. Some fees and assessments are for special products or services, while others may be applied based upon non-compliance of American Express policies and procedures. Many non-compliance fees and assessments can be avoided by correcting the actions that are causing such non-compliance.

**14.10 American Express Right to Modify or Terminate Agreement.** American Express has the right to modify the Agreement with respect to American Express Card transactions or to terminate your acceptance of American Express Card transactions and to require Processor to investigate your activities with respect to American Express Card transactions.

## B. Card General Terms

In addition to the preceding Operating Procedures, our Agreement with you includes the following General Terms. If you fail to follow any of the provisions of the Operating Procedures or General Terms, you may incur certain liabilities and we may terminate our Agreement.

## 15. Services

Subject to Card Organization Rules, Services may be performed by us or our agents, including, without limitation, our respective Affiliates, including the provision of terminals or other equipment and local support functions in connection with this Agreement.

## 16. Operating Procedures; Card Organization Rules and Compliance

You agree to follow all requirements of this Agreement in connection with each Card transaction and to comply with all applicable Card Organization Rules, including without limitation, the data security requirements described in Section 4 above. From time to time, we may amend the Operating Procedures, by providing you with at least 20 days' prior written notice, and those provisions will be deemed incorporated into this Agreement. However, for changes in the Card Organization Rules or for security reasons, certain changes in Card procedures may become effective on shorter notice. If there are any inconsistencies between the General Terms and the Operating Procedures, the General Terms will govern. You are responsible for staying apprised of all applicable changes to the Card Organization Rules and maintaining compliance with the Card Organization Rules. Card Organization Rules may be available on web sites such as http://usa.visa.com/merchants/, http://mastercardmerchant.com, and www.americanexpress.com/merchantopguide, as those links may change from time to time.

## 17. Settlement of Card Transaction

**17.1.** We will only be required to settle Card transactions for Card types specified in your Application. Promptly after presentment of Sales Drafts pursuant to the Operating Procedures, we will initiate a transfer of the applicable settlement funds to you.

**17.2.** Unless otherwise agreed to in writing to the contrary, all discount rates are deducted daily. All settlements for Visa, MasterCard, Discover Network and American Express Card transactions will be net of Credits, Summary Adjustments, applicable discount fees when due, Chargebacks and any other amounts then due from you. We may also set off from any payments otherwise due, any amounts owed to any of our respective Affiliates, whether or not arising out of or related to this Agreement.

**17.3.** All credits to your Settlement Account or other payments to you are provisional and are subject to, among other things, our right to deduct fees, our final audit, Chargebacks (including our related losses), and fees and fines imposed by the Card Organizations. You agree that we may debit or credit your Settlement Account for any deficiencies, overages, fees, pending Chargebacks and any other amounts owed to us or any of our respective Affiliates, or we may deduct such

16

amounts from settlement funds or other amounts due to you from us, or our respective Affiliates. Alternatively, we may elect to invoice you for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

**17.4.** We will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by you or any Person.

**17.5.** In addition to any other remedies available to us under this Agreement, you agree that should any Event of Default (see Section 23.4) occur, we may, with or without notice, change processing or payment terms and/or suspend credits or other payments of any and all funds, money and amounts now due or hereafter to become due to you pursuant to the terms of this Agreement, until we have had reasonable opportunity to investigate such event.

**17.6.** You acknowledge and agree that transfers to and from the Settlement Account shall be based on the account number and routing number supplied by you. We are not responsible for detecting errors in any Settlement Account information you provide, including the account numbers and routing numbers, even if any of those numbers do not correspond to the actual account or financial institution identified by name.

**17.7.** You acknowledge and accept your responsibility and obligation to verify funds are present prior to writing checks or authorizing ACH debits. You additionally agree to be in compliance with any federal and or state law in the recognition of funds in your account(s).

**17.8.** This Agreement is a contract whereby we are extending financial accommodations to you within the meaning of Section 365(c) of the U.S. bankruptcy code. Your right to receive any amounts due to become due from us is expressly subject and subordinate to Chargeback, setoff, lien, security interest and our rights to withhold settlement funds under this Agreement, without regard to whether such Chargeback, setoff, lien, security interest and the withholding of settlement funds rights are being applied to claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured.

## 18. Exclusivity

During the term of this Agreement, you shall use us as your exclusive provider of all Services.

## 19. Fees; Adjustments; Collection of Amounts Due

**19.1.** In consideration of the Services provided by us, you shall be charged, and hereby agree to pay us any and all fees set forth in this Agreement (for the purposes of clarity, this includes the Application and any additional pricing supplements or subsequent communications), all of which shall be calculated and payable pursuant to the terms of this Agreement and any additional pricing supplements or subsequent communications.

If a transaction fails to qualify for your anticipated interchange levels or you inadvertently or intentionally accept a transaction other than the type anticipated for your account (including a different Card type), then, as applicable to your pricing method, you will be charged a higher interchange, Discount Rate or Non-Qualified Interchange Fee, as well any applicable surcharge for that transaction, all as further described in Section A.3 of Part III of this Agreement and in the Application. With respect to inadvertent or intentional acceptance of a transaction other than the type anticipated for your account (including a different Card type), you will also be subject to payment to us of our then-current transaction fee(s) with respect to such Card and/or transaction and be liable, obligated and responsible under this Agreement for any such transaction to the same extent as you would be if it was of a Card type elected and approved.

For more information on Visa's and MasterCard's interchange rates, please go to www.visa.com and www.mastercard.com.

**19.2.** All authorization fees will be charged for each transaction that you attempt to authorize. All capture fees will be charged for each transaction that you transmit to us for settlement.

**19.3.** The fees for Services set forth in this Agreement are based upon assumptions associated with the anticipated annual volume and average transaction size for all Services as set forth in this Agreement and your method of doing business. If the actual volume or average transaction size are not as expected or if you significantly alter your method of doing business, we may adjust your discount fee and transaction fees without prior notice.

**19.4.** The fees for Services set forth in this Agreement may be adjusted to reflect increases, or new fees imposed by Card Organizations, including without limitation, interchange, assessments and other Card Organization fees, or to pass through increases or new fees charged to us by other Persons related to the Services. All such adjustments shall be your responsibility to pay and shall become effective upon the date any such change or addition is implemented by the applicable Card Organization or other Person as specified in our notice to you.

**19.5.** Subject to Section 23.3, we may also increase our fees or add new fees for Services for any reason at any time, by notifying you twenty (20) days' prior to the effective date of any such change or addition.

**19.6.** If you receive settlement funds by wire transfer, we may charge a wire transfer fee per wire.

**19.7.** To the extent the Automated Clearing House ("ACH") settlement process is used to effect debits or credits to your Settlement Account, you agree to be bound by the terms of the operating rules of the National Automated Clearing House Association, as in effect from time to time. You hereby authorize us to initiate credit and debit entries and adjustments to your account through the ACH network and/or through direct instructions to the financial institution where your Settlement Account is maintained for amounts due under this Agreement and under any agreements with us or our respective Affiliates for any related services, as well as for any credit entries in error. You hereby authorize the financial institution where your Settlement Account is maintained to effect all such debits and credits to your account. This authority will remain in full force and effect until we have given written notice to the financial institution where your Settlement Account is maintained that all monies due under this Agreement and under any other agreements with us or our respective Affiliates for any related services have been paid in full.

**19.8.** You agree to pay any fines imposed on us by any Card Organization resulting from Chargebacks and any other fees or fines imposed by a Card Organization with respect to your acts or omissions. You are also responsible for any fines or fees imposed on us as a result of acts or omissions by your agents or third parties.

**19.9.** If your Chargeback percentage for any line of business exceeds the estimated industry Chargeback percentage, you shall, in addition to the Chargeback fees and any applicable Chargeback handling fees or fines, pay us an excessive Chargeback fee for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry Chargeback percentage is subject to change from time to time by us in order to reflect changes in the industry Chargeback percentages reported by Visa, MasterCard, American Express or Discover Network. Your Chargeback Percentage will be calculated as the larger of (a) the total Visa, MasterCard, American Express and Discover Network Chargeback items in any line of business in any calendar month divided by the number of Visa, MasterCard, American Express and Discover Network transactions in that line of business submitted that month, or (b) the total dollar amount of Visa, MasterCard, American Express and Discover Network Chargebacks in any line of business received in any calendar month divided by the total dollar amount of your Visa, MasterCard, American Express and Discover Network transactions in that line of business submitted in that month.

**19.10.** You must promptly and carefully review statements or reports provided or made available to you (physically, electronically or otherwise) reflecting Card transaction activity, including, activity in the Settlement Account and Reserve Account, whether provided by us or others. If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is or should have been effected or such shorter period as provided in the terms and conditions that govern such account. If you no if you after such time period, we may, in our discretion, assist you, at your expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but we shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by us to assist you in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

**19.11.** If you do not pay us all fees and any other amounts due under this Agreement within thirty (30) days of the date of our merchant statement or other statement setting forth the amount due, then we may, in our sole discretion, charge you interest, for such time that the amount and all accrued interest remain outstanding at the lesser of (i) the per annum rate equal to Bank's then current prime rate plus two percent (2%), based on a 360 day year, or (ii) the maximum rate permitted by applicable law.

## 20. Chargebacks

**20.1.** You shall be responsible for reimbursing us for all transactions you submit that are charged back. See the Operating Procedures for additional information regarding Chargebacks and Chargeback procedures.

**20.2.** You shall reimburse us for any Chargebacks, return items, or other losses resulting from your failure to produce a Card transaction record requested by us within the applicable time limits.

## 21. Representations; Warranties; Covenants; Limitations on Liability; Exclusion of Consequential Damages

**21.1.** Without limiting any other warranties hereunder, you represent, warrant to and covenant with, us, and, with the submission of each Sales Draft reaffirm, the following representations, warranties and/or covenants:

**21.1.1.** each Card transaction is genuine and arises from a bona fide transaction permissible under the Card Organization Rules by the Cardholder directly with you, represents a valid obligation for the amount shown on the Sales Draft, preauthorized order, or Credit Draft, and does not involve the use of a Card for any other purpose;

**21.1.2.** Each Card transaction represents an obligation of the related Cardholder for the amount of the Card transaction;

**21.1.3.** The amount charged for each Card transaction is not subject to any dispute, setoff or counterclaim;

**21.1.4.** each Card transaction amount is only for respective merchandise or services (including taxes, but without any surcharge) sold, leased or rented or other payments to you and, except for any delayed delivery or advance deposit Card transaction expressly authorized by this Agreement, that merchandise or service was actually delivered to or performed for the Cardholder entering into that Card transaction simultaneously upon your accepting and submitting that Card transaction for processing;

**21.1.5.** with respect to each Card transaction, you have no knowledge or notice of any fact, circumstance or defense which would indicate that such Card transaction is fraudulent or not authorized by the related Cardholder or which would otherwise impair the validity or collectability of that Cardholder's obligation arising from that Card transaction or relieve that Cardholder from liability with respect thereto;

**21.1.6.** each Card transaction is made in accordance with these General Terms, Card Organization Rules and the Operating Procedures; and

**21.1.7.** Each Sales Draft is free of any alternation not authorized by the related Cardholder;

**21.1.8.** You have completed one Card transaction per sale; or one Card transaction per shipment of goods for which the Cardholder has agreed to partial shipments;

**21.1.9.** You are validly existing, in good standing and free to enter into this Agreement;

**21.1.10.** Each statement made on the Application or other information provided to us in support of this Agreement is true and correct;

**21.1.11.** You are not doing business under a name or style not previously disclosed to us;

**21.1.12.** you have not changed the nature of your business, Card acceptance practices, delivery methods, return policies, or types of products or services sold requiring a different merchant category code under Card Organization Rules, in a way not previously disclose to us;

**21.1.13.** You will use the Services only for your own proper business purposes and will not resell, directly or indirectly, any part of the Services to any Person;

**21.1.14.** You have not filed a bankruptcy petition not previously disclosed to us;

**21.1.15.** You own and control the Settlement Account, and no third party security interest or lien of any type exists regarding the Settlement Account or any Card transaction.

**21.1.16.** you will not at any time during the term of this Agreement, or until all amounts due under this Agreement have been paid in full, grant or pledge any security interest or lien in the Reserve Account, Settlement Account or transaction proceeds to any Person without our consent;

**21.2.** THIS AGREEMENT IS A SERVICE AGREEMENT. WE DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, MADE TO YOU OR ANY OTHER PERSON, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OR OTHERWISE OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SERVICES OR ANY GOODS PROVIDED BY A THIRD PARTY.

**21.3.** IN NO EVENT SHALL WE OR OUR AFFILIATES OR ANY OF OUR OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT ACKNOWLEDGES AND AGREES THAT PAYMENT OF ANY EARLY TERMINATION FEE OR LIQUIDATED DAMAGES AS PROVIDED ELSEWHERE IN THIS AGREEMENT SHALL NOT BE PROHIBITED BY THIS PARAGRAPH.

**21.4.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTIONS 26 or 20.5), OUR CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT), REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY, SHALL NOT EXCEED, (I) $50,000; OR (II) THE AMOUNT OF FEES RECEIVED BY US PURSUANT TO THIS AGREEMENT FOR SERVICES PERFORMED IN THE IMMEDIATELY PRECEDING 12 MONTHS, WHICHEVER IS LESS.

**21.5.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTION 26), OUR LIABILITY FOR ANY DELAY IN FUNDING TRANSACTIONS TO YOU FOR ANY REASON, OTHER THAN FOR ANY REASON DESCRIBED IN SECTIONS 16.4 AND 16.6, WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT YOU SUBMIT THE TRANSACTION TO THE DATE THAT WE FUND THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS AS SET BY THE FEDERAL RESERVE BANK OF NEW YORK, NEW YORK, FROM TIME TO TIME, LESS ONE PERCENT (1%).

**21.6.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, BANK IS NOT RESPONSIBLE, AND SHALL HAVE NO LIABILITY, TO YOU IN ANY WAY WITH RESPECT TO AMERICAN EXPRESS CARD, PIN DEBIT CARD, AND ELECTRONIC BENEFITS TRANSFER TRANSACTIONS, GIFT CARD SERVICES, AND TRANSACTIONS INVOLVING CARDS FROM OTHER NON-BANK CARD ORGANIZATIONS, SUCH AS VOYAGER FLEET SYSTEMS, INC., WRIGHT EXPRESS CORPORATION AND WRIGHT EXPRESS FINANCIAL SERVICES CORPORATION.

## 22. Confidentiality

**22.1.** Unless you obtain consents from us and each applicable Card Organization, Issuer and Cardholder, you must not use, disclose, store, sell or disseminate any Cardholder information obtained in connection with a Card transaction (including the names, addresses and Card account numbers of Cardholders) except for purposes of authorizing, completing and settling Card transactions and resolving any Chargebacks, Retrieval Requests or similar issues involving Card transactions, other than pursuant to a court or governmental agency request, subpoena or order. You shall use proper controls for and limit access to, and render unreadable prior to discarding, all records containing Cardholder account numbers and Card imprints. You may not retain or store Magnetic Stripe data or Card Validation Codes after a transaction has been authorized. If you store any electronically captured signature of a Cardholder, you may not reproduce such signature except upon our specific request.

**22.2.** You acknowledge that you will not obtain ownership rights in any information relating to and derived from Card transactions. Cardholder account numbers, personal information and other Card transaction information, including any databases containing such information, may not be sold or disclosed to a Person as an

asset upon a bankruptcy, insolvency or failure of Client's business. Upon a bankruptcy, insolvency or failure of Client's business, all Card transaction information must be returned to Servicers or acceptable proof of the destruction of all Card transaction information must be provided to Servicers.

**22.3.** You will treat this Agreement, the Card Organization Rules and any information supplied or otherwise made accessible by us or our agents as confidential, including without limitation, (i) information about the products, services, operations, procedures, customers, suppliers, sales, pricing, business plans and marketing strategies of Servicers or Bank, their respective Affiliates and the customers, clients and suppliers of any of them; (ii) any scientific or technical information, design, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords Servicers or Bank a competitive advantage over its competitors; and (iii) all confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow chart , databases, inventions, know-how, show-how and trade secrets, whether or not patentable or copyrightable and will not disclose the same to any third parties, provided, however, t hat these restrictions do not apply to information: (a) rightfully obtained on a non-confidential basis from a Person and your agents and representatives, which Person was not subject to a duty of confidentiality, (b) rightfully and independently known by you on a non-confidential basis prior to its disclosure or (c) generally available to the public other than through any disclosure by or fault of you, your agents or representatives.

**22.3.1.** Our confidential information shall be used by you only to exercise your rights and to perform our obligations hereunder. Client shall receive our confidential information in confidence and not disclose the confidential information to any t ird party, except as may be agreed upon in writing by us. Client shall safeguard all of our confidential information using a reasonable degree of care, but not less than that degree of care used by it in safe- guarding its own similar information or material. Upon request by us or upon termination of this Agreement, Client shall return to us or destroy all of our confidential information in its possession or control.

**22.3.2.** The obligations of confidentiality and restrictions on use in this Section shall not apply to any confidential information that: (i) was in the public domain prior to the date of the Agreement or subsequently came into the public domain through no fault of Client; (ii) was received from a third party free of any obligation of confidence of Client to the third party an d which third party, to Client's knowledge, was not under an obligation to keep the information confidential; (iii) was already in Client's possession prior to receipt from us; (iv) is required to be disclosed by law, regulation or court order after giving us as much advance notice as practical of the possibility of disclosure; or (v) is subsequently and independently developed by Client's employees, consultants or agents without use of or reference to our confidential information.

**22.3.3.** Except as specifically provided for herein, this Section does not confer any right, license, interest or title in, to or under our confidential information to Client. Except as specifically provided for herein, no license is hereby granted to Client under any patent, trademark, copyright, trade secret or other proprietary rights of ours.

**22.3.4.** Client acknowledges that breach of the restrictions on use or disclosure of any our confidential information would result in immediate and irreparable harm to us, and money damages would be inadequate to compensate for that harm. We shall be entitled to equitable relief, in addition to all other available remedies, to redress any breach.

**22.4.** With respect to any information received by us from Client via its use of the Services, we will keep such information confidential in accordance with applicable law; provided, that we may disclose such information (i) to third parties as we deem appropriate to provide the Services, (ii) our auditors and attorneys (internal and external) and regulators, (iii) as required or permitted by law, regulation or court order (iv) to our respective Affiliates as we deem appropriate.

**22.5.** You shall not assign to any Person the rights to use the Marks of Servicers, our agents or the Card Organizations.

**22.6.** All rights, title, and interest in and to all intellectual property related to the Services (including without limitation, the content of any materials, web screens, layouts, processing techniques, procedures, algorithms, and methods), owned, developed or licensed by us prior to, during the term of, or after the Agreement, or employed by us in connection with the Services and any updates, changes alterations, or modifications to or derivative works from such intellectual property, shall be and remain, as among the Parties, our exclusive property of us.

**22.7.** Client agrees that we may obtain relevant information from any applicable telecommunications provider utilized by Client, as necessary to investigate any allegation of fraud, suspected fraud or other actual or alleged wrongful act by Client in connection with the Services.

## 23. Assignments

**23.1.** Any transfer or assignment of this Agreement by you, without our prior written consent, by operation of law or otherwise, is voidable by us. Any transfer of voting control of you or your parent shall be considered an assignment or transfer of this Agreement. Furthermore, you shall indemnify and hold us harmless from all liabilities, Chargeback fees, expenses, costs, fees and fines arising from such transferee's or assignee's Submission of Card transactions to us for processing. For purposes of this Section 22, any transfer of voting control shall be considered an assignment or transfer of this Agreement.

**23.2.** The payment Services provided by us require access to a single bank account in which we may initiate both credits and debits. You may not enter into any agreement that would require, in any circumstance or event, the transfer of any payments or proceeds from Card transactions covered by this Agreement to the custody or control of any Person. You may not assign any rights, including the right of payment under this agreement, to any other person. In the event that you make an assignment (or provide a security interest) of receivables covered by this Agreement, then we may, at our option, elect to (a) refuse to acknowledge such assignment unless accompanied by an Authorization to both initiate debits or credits to the bank account of the assignee, (b) terminate this Agreement immediately, or (c) charge for any transfers that we are called upon to make manually to fulfill such an assignment at the rate of $100 per transfer. You agree to indemnify and hold us harmless from all liabilities and expenses incurred in connection with any assignment of your rights, including our right to payment under this Agreement.

**23.3.** Without notice to you or your consent, another Visa and MasterCard member may be substituted for Bank under whose sponsorship this Agreement is performed with respect to Visa and MasterCard transactions. Upon substitution, such other Visa and Maste Card member shall be responsible for all obligations required of Bank for Visa and MasterCard transactions, including without limitation, full responsibility for its Card program and such other obligations as may be expressly required by applicable Card O ganization Rules.

Subject to Card Organization Rules, we may assign or transfer this Agreement and our rights and obligations hereunder and/or may delegate our duties hereunder, in whole or in part, to any Person, whether in connection with a change in sponsorship, as set forth in the preceding paragraph, or otherwise, without notice to you or your consent.

**23.4.** Except as set forth elsewhere in this Section and as provided in the following sentence, this Agreement shall be binding upon successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, or other person charged with taking custody of a party's assets or business, shall have any right to continue, assume or assign this Agreement.

## 24. Term; Events of Default

**24.1.** This Agreement shall become effective upon the date this Agreement is approved by our Credit Department.

**24.2.** The initial term of this Agreement shall commence and shall continue in force for three years after it becomes effective. Thereafter, it shall continue until we or you terminate this A reement upon written notice to the other, or as otherwise authorized by this Agreement.

**24.3.** Notwithstanding the above or any other provisions of this Agreement, either Processor, Bank or we may terminate this Agreement at any time and for any reason by providing 30 days' advance notice to you. Either Processor, Bank or we may term nate this Agreement immediately or with shorter notice upon an Event of Default as provided under Section 2 .4 of this Agreement. In the event we provide notice to you of any new fees or increases in existing fees for Services, pursuant to Section 18.5, you may terminate this Agreement without further cause or penalty by notifying us that you are terminating this Agreement prior to the effective date of such new fees or increases. However, maintaining your merchant account, or your continued use of the Services after the effective date of any such fee changes shall be deemed your acceptance of such fee changes for the Services, throughout the term of this Agreement.

**25.4.** If any of the following events shall occur (each an "Event of Default"):

**24.4.1.** A material adverse change in your business, financial condition, or business prospects; or

24.4.2. Any assignment or transfer of voting control of you or your parent; or

24.4.3. A sale of all or a substantial portion of your assets; or

24.4.4. irregular Card sales by you, excessive Chargebacks, noncompliance with any applicable data security standards, as determined by Servicers, or any Card Organization, or any other Person, or an actual or suspected data security breach, or any other circumstances which, in our sole discretion, may increase our exposure for your Chargebacks or otherwise present a financial or security risk to us; or

24.4.5. Any of your representations, warranties or covenants in this Agreement are breached in any respect; or

24.4.6. You default in any material respect in the performance or observance of any term, condition or agreement contained in this Agreement, including, without limitation, the establishment or maintenance of funds in a Reserve Account, as detailed in Section 24; or

24.4.7. You default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any of our respective Affiliates; or

24.4.8. You default in the payment when due, of any material indebtedness for borrowed money; or

24.4.9. You file a petition or have a petition filed by another party under the U.S. bankruptcy code or any other laws relating to bankruptcy, insolvency or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against you in an involuntary case under such laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of you or of a substantial part of your property; or make a general assignment for the benefit of creditors; or take any action for the purpose of authorizing any of the foregoing; or

24.4.10. Your independent certified accountants shall refuse to deliver an unqualified opinion with respect to your annual financial statements and your consolidated subsidiaries; or

24.4.11. A violation by you of any applicable law or Card Organization Rule or our reasonable belief that termination of this Agreement or suspension of Services is necessary to comply with any law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the U.S. Department of the Treasury or your breach, as determined by Servicers, of Section 33.2 ("Compliance with Laws"),

then, upon the occurrence of (1) an Event of Default specified in subsections 23.4.4, 23.4.9 or 23.4.11, we may consider this Agreement to be terminated immediately, without notice, and all amounts payable hereunder shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by you, and (2) any other Event of Default, this Agreement may be terminated by us giving not less than 10 days' notice to you, and upon such notice all amounts payable hereunder shall be due and payable on demand.

24.5. Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement, which by their terms are intended to survive or be perpetual or irrevocable. Such provisions shall survive the expiration or termination of this Agreement. All obligations by you to pay or reimburse us for any obligations associated with transactions you have submitted to us will survive termination of this Agreement until finally and irrevocably paid in full and settled.

24.6. If any Event of Default occurs, regardless of whether such Event of Default has been cured, we may, in our sole discretion, exercise all of our rights and remedies under applicable law, and this Agreement including, without limitation, exercising our rights under Section 24.

24.7. In the event you file for protection under the U.S. bankruptcy code or any other laws relating to bankruptcy, insolvency, assignment for the benefit of creditors or similar laws, and you continue to use our Services, it is your responsibility to open new accounts to distinguish pre and post filing obligations. You acknowledge that as long as you utilize the accounts you established prior to such filing, we will not be able to systematically segregate your post-filing transactions or prevent set-off of the pre-existing obligations. In that event, you will be responsible for submitting an accounting supporting any adjustments that you may claim.

24.8. The Card Organizations often maintain lists of merchants who have had their merchant agreements or Card Acceptance rights terminated for cause. If this Agreement is terminated for cause, you acknowledge that we may be required to report your business name and the names and other information regarding its principals to the Card Organizations for inclusion on such list(s). You expressly agree and consent to such reporting if you are terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by Visa, MasterCard or Discover Network. Furthermore, you agree to waive and hold us harmless from and against any and all claims which you may have as a result of such reporting.

24.9. After termination of this Agreement for any reason whatsoever, you shall continue to bear total responsibility for all Chargebacks, fees, Credits and adjustments resulting from Card transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due under this Agreement.

## 25. Reserve Account; Security Interest

As a condition for our providing Card Program Services, we may request, in our sole discretion, that you provide additional collateral security for your obligations hereunder, which additional collateral security shall be of a kind, and in amounts, satisfactory to us in our sole discretion, and which shall be in addition to any other collateral provided for in Section 24.4.1(ii) hereof. Such additional collateral security may include, for example, (A) a letter of credit, if issued in an amount and on terms acceptable to us by a letter of credit issuing bank acceptable to us, or (B) the pledge to us of a certificate of deposit owned by you in amount satisfactory to us and provided all agreements (including agreements of third parties) in form and substance satisfactory to us and all filings and/or other actions necessary in order to perfect in us a continuing first priority security interest therein on terms acceptable to us, are entered into, made and/or taken as the case may be. We may require that all or any part of the additional collateral take the form of a Reserve Account, established as hereinafter set forth in this Section 24, at any time when:(i) this Agreement, or the provision of Services hereunder, shall have been terminated for any reason or any party hereto shall have given notice of termination thereof, or (ii) there shall have occurred an event which entitles us to terminate this Agreement or the provision of Services hereunder or which, with the giving of notice and/or the passage of time would entitle us to terminate this Agreement or the provision of Services hereunder, and you have not provided alternative additional collateral security of a kind, and in amounts, satisfactory to us as set forth above in this Section, or (iii) neither (i) nor (ii) above in this Section is applicable, but we have determined that additional collateral security is required, have requested that you provide same, and you have failed to provide alternative additional collateral security of a kind, and in amounts satisfactory to us as set forth above in this Section. Any Reserve Account that is established shall be subject to the terms and conditions set forth below in this Section 24 and any other terms and conditions of this Agreement relating to the "Reserve Account". Whenever we require that additional collateral security take the form of a Reserve Account, the following provisions of this Section 24 shall apply:

25.1. You expressly authorize us to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 24. The amount of such Reserve Account shall be set by us, in our sole and unfettered discretion, based upon your processing history and the potential risk of loss to us as we may determine from time to time. In addition to, or in lieu of establishing any Reserve Account, we may debit your bank account in satisfaction of amounts due or, in our reasonable discretion, may become due pursuant to this Agreement.

25.2. The Reserve Account may require immediate funding in instances of fraud or suspected fraud or unusual activity or an Event of Default or upon three days' notice to you. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to your Settlement Account or any other accounts held by Bank or any of its Affiliates, at any financial institution maintained in the name of Client, any of its principals, or any of its guarantors, or if any of same are authorized signers on such account; or (ii) diversion withholding set-off of any payments otherwise due to you. In the event of termination of this Agreement by any party, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by us for the greater of ten (10) months after termination of this Agreement or for such longer period of time as is consistent with our liability for Card transactions and Chargebacks in accordance with Card Organization Rules. Your funds will be held in an account commingled with reserve funds of our other Clients, without involvement by an independent escrow agent, and you will not have access to the funds in a Reserve Account unless and until we release those funds to you, in

our sole discretion, pursuant to this Section 24. Unless specifically agreed in writing by us or specifically required by applicable law, funds held by us in a Reserve Account shall not accrue interest. Notwithstanding the foregoing, we shall be entitled to accrued interest on any such funds held.

**25.3.** If your funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges and amounts due from you, or if the funds in the Reserve Account have been released, you agree to promptly pay us such sums upon request.

**25.4.1.** To secure your obligations to us and our respective Affiliates under this Agreement and any other agreement for the provision of related equipment or related services (including any obligations for which payments on account of such obligations are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause), you grant to us a first priority lien and security interest in and to (i) the Reserve Account and (ii) any of your funds pertaining to the Card transactions contemplated by this Agreement now or hereafter in our possession, whether now or here after due or to become due to you from us. Any such funds, money or amounts now or hereafter in our possession may be commingled with other funds of ours, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other customers of ours. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, we are hereby authorized by you at any time and from time to time, without notice or demand to you or to any other Person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of your obligations to us and our respective Affiliates under this Agreement and any other agreement with us our respective Affiliates for any related equipment or related services (including any check services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or not matured. You agree to duly execute and deliver to us such instruments and documents as we may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

**25.4.2.** To the extent funds are held in a separate Reserve Account, the Reserve Account shall be maintained at Bank, or at another depository institution approved by Bank, and shall be subject to (i) Servicers' security interest pursuant to this subsection 24.4, and (ii) unless Bank requires that the Reserve Account be maintained at Bank, an account control agreement (as defined by the applicable sections of the Uniform Commercial Code, hereinafter referred to as "Control Agreement") among you, the institution at which the Reserve Account is held (such institution hereinafter referred to as "Settlement Account Bank") and Servicers (such investment account hereinafter referred to as the "Control Account"). The Control Agreement shall be in form and substance satisfactory to Servicers. The Settlement Account Bank shall be a national bank which is mutually acceptable to you and Servicers.

**25.4.3.** For sake of clarification and notwithstanding anything in the Agreement to the contrary, in the event Servicers deduct, holdback, suspend, off set or set off any settlement monies or amounts otherwise due you pursuant to the terms of this Agreement (collectively "Set Off Funds"), you acknowledge that such Set Off Funds will be held in a commingled Reserve Account(s) of Servicers maintained at Bank, unless such Set Off Funds are wired or deposited by Servicers into any Control Account, separate Reserve Account maintained at Bank, or into any control account pursuant to a Control Agreement in which case Servicers will transfer Set Off Funds from their commingled Reserve Account(s) to the Control Account as soon as practicable using commercially reasonable efforts. Any Reserve Account will be under the sole control of Bank, and any and all Reserve Account funds will be held at Bank.

**25.4.4.** If in replaceme it of or in addition to the first priority lien and security interest in the Reserve Account, you grant to Servicers a first priority lien and security interest in and to one or more certificates of deposit, the certificates of deposit shall be uncertificated and shall be subject to an Acknowledgement of Pledge of Certificate of Deposit and Control Agreement (the "Certificate of Deposit Control Agreement") by, between and among Customers, Servicers and the financial institution that has established and issued the certificate of deposit. The form of the Certificate of Deposit Control Agreement and the financial institution that will establish and issue the certificate of deposit shall be satisfactory and acceptable to Servicers.

**25.5.** You acknowledge and agree that we will have no liability under any legal theory whatsoever as a result of the exercise of our rights to establish a Reserve Account pursuant to this Agreement and this Section 24.

## 26. Financial and Other Information

**26.1.** Upon request, you will provide us and our Affiliates, quarterly financial statements within 45 days after the end of each fiscal quarter and annual audited financial statements within 90 days after the end of each fiscal year. Such financial statements shall be prepared in accordance with generally accepted accounting principles. You will also provide such other financial statements and other information concerning your business and your compliance with the terms and provisions of this Agreement as we may reasonably request. You authorize us and our Affiliates to obtain from third parties financial and credit information relating to you in connection with our determination whether to accept this Agreement and our continuing evaluation of your financial and credit status. We may also access and use information which you have provided to Bank for any other reason. Upon request, you shall provide, and/or cause to be provided, to us and our Affiliates, or our representatives or regulators (as well as those of the Card Organizations) reasonable access to your or your Merchant Providers' facilities and records for the purpose of performing any inspection and/or copying of books and/or records deemed appropriate. In such event, you shall pay the costs incurred by us or our Affiliates for such inspection, including, but not limited to, costs incurred for airfare and hotel accommodations.

**26.2.** You will provide us with written notice of any judgment, writ, warrant of attachment, execution or levy against any substantial part (25% or more in value) of your total assets not later than three (3) days after you become aware of same.

## 27. Indemnification

**27.1.** You will be liable for and agree to indemnify and hold us harmless from and against all losses, liabilities, damages and expenses: (a) resulting from any breach of any warranty, covenant or agreement or any misrepresentation by you under this Agreement; (b) arising out of your or your employees' or your agents' negligence or willful misconduct, in connection with Card transactions or otherwise arising from your provision of goods and services to Cardholders; (c) arising out of your use of the Services; (d) we or parties acting on our behalf incur in enforcing our rights under this Agreement or in collecting any amounts due under this Agreement; or (e) arising out of any third party indemnifications we are obligated to make as a result of your actions (including indemnification of any Card Organization or Issuer).

**27.2.** We agree to indemnify and hold you harmless from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by us under this Agreement or arising out of our or our employees' gross negligence or willful misconduct in connection with this Agreement; provided that this indemnity obligation shall not apply to Bank with respect to Discover Network Card Transactions, American Express Card Transactions and Other Services, including JCB Card, PIN Debit Card, and Electronic Benefits Transfer Transactions, and Transactions involving Cards from other Non-Bank Card Organizations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.

## 28. Special Provisions Regarding Non-Banks

**28.1.** Non-Bank Card transactions are provided to you by Processor and not by Bank and include transactions made using Discover Network, American Express, JCB, Voyager and WEX Card types. The Services provided, transactions processed and other matters contemplated under this Section 27 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 27 directly conflict with another provision of this Agreement, in which case the terms of this Section 27 will control; provided, however, that (i) Bank is not a party to this Agreement insofar as it relates to Non-Bank Card services, and Bank is not liable to you in any way with respect to such Services and (ii) you agree to pay Processor any per item processing, authorization and other fees described in the

Application for any non-acquired transaction services you receive from Processor. For the purposes of this section, the words "we," "our" and "us" refer only to the Processor and not to the Bank. You authorize us to share information from your Application with American Express, JCB (and Discover Network on its behalf), Discover Network or any other Non-Bank Card Organization.

**28.2.** [Reserved]

**28.3. If you accept JCB Cards,** you agree to be bound by all JCB and/or Discover Network provisions of this Agreement. You also acknowledge and agree that JCB transactions will be processed under and subject to Discover Network Card Organization Rules.

**28.4. If you accept Voyager and/or WEX Cards,** you agree to be bound by the WEX and/or Voyager rules. You also agree to be bound by all other provisions of this Agreement which are applicable to WEX and/or Voyager.

**28.5. If you execute a separate WEX Merchant Agreement** (WEX Non Full Service Program), you understand that we will provide such agreement to WEX, but that neither we nor WEX shall have any obligation whatsoever to you with respect to processing WEX Cards unless and until WEX executes your WEX Merchant Agreement. If WEX executes your WEX Merchant Agreement and you accept WEX Cards, you understand that WEX transactions are processed, authorized and funded by WEX. You understand that WEX is solely responsible for all agreements that govern WEX transactions and that we are not responsible and assume absolutely no liability with regard to any such agreements or WEX transactions, including but not limited to the funding and settlement of WEX transactions. You understand that WEX will charge additional fees for the services that it provides.

**28.6. If you elect to participate in the WEX Full Service Program, the following terms and conditions shall apply:**

a) You shall provide, at your own expense, all equipment necessary to permit the electronic acceptance of the WEX Cards, including the operation and maintenance of the equipment, telecommunication link, and provision of all networking services;

b) All authorization request data for WEX Card sales must include WEX Cardholder account number, vehicle number, Card expiration date, driver identification number; and the amount of the transaction, date and time of the transaction, quantity of goods sold, unit price, and product code (the "Authorization Request Data"). All manual WEX Card sales (i.e., sales facilitated by a card imprinter) must include an Authorization number or other approval code from WEX along with the aforementioned Authorization Request Data;

c) You shall not submit a WEX Card sale for processing when a WEX Card is not presented at the time of the WEX Card sale;

d) You shall complete a WEX Card sale only upon the receipt of an Authorization approval message and not accept a WEX Card when an expired Card/decline message is received;

e) You shall not submit a WEX Card sale for processing until the goods have been delivered or services performed;

f) You shall not accept a WEX Card where the WEX Card appears to be invalid or expired or there is reasonable belief that the WEX Card is counterfeit or stolen;

g) You shall provide a copy of the receipt for a WEX Card sale, upon the request of the Cardholder, to the extent permitted by applicable law, which shall not include the full account number or driver identification number;

h) You shall require the Cardholder to sign a receipt when a WEX Card sale is not completed by an island Card reader;

i) You shall take all commercially reasonable efforts to protect manual WEX Card sales data from fraud or misuse;

j) You shall not divide the price of goods and services purchased in a single WEX Card sale among two or more sales receipts or permit a WEX Card sale when only partial payment is made by use of the WEX Card and the balance is made with another bank Card;

k) You shall maintain are cord of all WEX Card sales, including the Authorization Request Data, for a period of one year and produce such records upon the reasonable request of WEX;

l) You shall notify Bank of any errors contained within a settlement report within forty-five (45) days of receipt of such report. Processor will not accept reprocessing requests for WEX transactions older than 90 days;

m) You shall allow WEX to audit records, upon reasonable advance notice, related to the WEX Full Service; and

n) You shall retransmit WEX Card sales data when reasonably requested to do so.

Client acknowledges and agrees that its sole remedies with respect to the WEX Full Acquiring services shall be against Bank for the WEX Full Acquiring Services and not WEX, except to the extent that WEX knows of any fraud related to the WEX Cards and fails to provide notice of such fraud or WEX commits fraud in respect to the WEX Full Acquiring Services.

**28.7. If you accept Voyager Cards:**

- In addition to the information stated in Section 1 (MasterCard, Visa and Discover Network Acceptance) of the Operating Procedures, you should check Fleet Cards for any printed restrictions at the point of sale.
- In addition to the information provided under Section 1.5 (Special Terms) of the Operating Procedures, you shall establish a fair policy for the exchange and return of merchandise. You shall promptly submit credits to us for any returns that are to be credited to a Voyager Cardholder's account. Unless required by law, you shall not give any cash refunds to any Voyager Card holder in connection with a sale.
- In addition to the information required under Section 3.1 (Information Required) of the Operating Procedures, the following information must be contained on the single page document constituting the Sales Draft for Voyager transactions:
  - Time of transaction
  - Type of fuel sold
  - As permitted by the applicable POS device, odometer reading
  - For all cashier-assisted Sales Drafts and Credit Drafts processed manually using a card
- Imprinter if required, the identification number from the source credentials provided by Cardholder to valid Cardholder's identity (e.g., Driver's License number).
- If an increase in the number of Voyager transaction authorization calls from you not due to our or Voyager system outages in excess of 15% for a given month as compared to the previous month occurs, we may, in our discretion, deduct telephone charges, not to exceed $.25 (25 cents) per call, for the increased calls, from your settlement of your Voyager transactions.
- In addition to the information provided under Section 7 (Settlement) of the Operating Procedures, settlement of Voyager transactions will generally occur by the fourth banking day after we process the applicable card transactions. We shall reimburse you for the dollar amount of sales submitted for a given day by you, reduced by the amount of Chargebacks, tax exemptions, discounts, credits, and the fees set forth in the Application. Neither we nor Voyager shall be required to reimburse you for sales submitted more than sixty (60) days from the date of purchase.
- For daily transmission of sales data, you shall maintain true and complete records in connection with the information required to be provided under this paragraph for a period of not less than thirty-six (36) months from the date of the generation of the data. You may store records on electronic media. You are respons ble for the expense of retaining sales data records and Sales Drafts.
- In addition to the scenario identified in Section 10.1.4 of this Program Guide that could cause an authorization related Chargeback to occur, with respect to Voyager transactions, Chargebacks shall be made in accordance with any other Voyager rules. Notwithstanding termination or expiration of this paragraph or the Agreement, you shall remain liable for all outstanding Chargebacks on Voyager transactions.
- In addition to the information provided under Section 20 (Representations; Warranties; Covenants; Limitations of Liability; Exclusion of Consequential Damages) of the General Terms, in no event shall our cumulative liability to you for losses, claims, suits, controversies, breaches or damages for any cause whatsoever in connection with Voyager transactions exceed the lesser of $10,000.00 or the Voyager transaction fees paid by you to us for the two months prior to the action giving arise to the claim.
- Notwithstanding anything in this Agreement to the contrary, our obligation to provide services to you relating to any Fleet Card will terminate automatically without penalty to us or the related Card Organization upon the earlier of (i) the termination or expiration of our agreement with such Card Organization, (ii)

at least twenty (20) days prior written notice by us to you; (iii) your failure to comply with material terms relating to such Fleet Card transactions, or (iv) written notice, if a Card Organization discontinues its Card.

## 29. Special Provisions for PIN Debit Cards

The special provisions outlined in this Section 28 apply only to those PIN Debit Card transactions that are processed by a Cardholder entering a PIN. These provisions do not apply to PIN Debit Card transactions which do not involve entry of a PIN. The Services provided, transactions processed and other matters contemplated under this Section 28 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 28 directly conflict with another provision of this Agreement, in which case the terms of this Section 28 will control.

**29.1. PIN Debit Card Acceptance.** Most, but not all, ATM Cards (Debit Cards) can be accepted at the point of sale at participating locations. Examine the back of the PIN Debit Card to determine if the Card participates in a PIN Debit network that you are authorized to accept. PIN Debit network Mark(s) are usually printed on the back of the Card. If the PIN Debit Card is valid and issued by a financial institution Issuer participating in a PIN Debit network, you must comply with the following general requirements for all participating PIN Debit networks, in addition to the specific requirements of that PIN Debit network:

- You must honor all valid PIN Debit Cards when presented that bear authorized PIN Debit network Marks.
- You must treat transactions by Cardholders from all Issuers in the same manner.
- You may not establish a minimum or maximum transaction amount for PIN Debit Card acceptance.
- You may not require additional information, besides the PIN, for the completion of the transaction unless the circumstances appear suspicious. A signature is not required for PIN Debit Card transactions.
- You shall not disclose transaction related information to any party other than your agent, a PIN Debit network, or Issuer and then only for the purpose of settlement or error resolution.
- You may not process a Credit Card transaction in order to provide a refund on a PIN Debit Card transaction.

**29.2. Transaction Processing.** The following general requirements apply to all PIN Debit Card transactions:

- All PIN Debit Card transactions must be authorized and processed electronically. There is no Voice Authorization or Imprinter procedure for PIN Debit Card transactions.
- You may not complete a PIN Debit Card transaction that has not been authorized. If you cannot obtain an Authorization at the time of sale, you should request another form of payment from the Cardholder or process the transaction as a Store and Forward or Resubmission, in which case you assume the risk that the transaction fails to authorize or otherwise declines. The Cardholder should be instructed to contact the Issuer to find out why a transaction has been declined.
- You may not complete a PIN Debit Card transaction without entry of the PIN by the Cardholder. The PIN must be entered into the PIN pad only by the Cardholder. You cannot accept the PIN from the Cardholder verbally or in written form.
- The PIN Debit network used to process your transaction will depend upon, among other things, our own business considerations, the availability of the PIN Debit network at the time of the transaction and whether a particular PIN Debit Card is enabled for a particular PIN Debit network. The PIN Debit network utilized to route your transaction may or may not be the lowest cost network available. Federal regulations afford you the right to make use of any PIN Debit network routing enabled on a PIN Debit Card. To arrange for your PIN Debit network routing preferences (if any) to be used, contact Processor. If you do not contact Processor to arrange for your PIN Debit network routing preferences to be used, then we may, in our sole discretion (i) utilize any PIN Debit network available to us for a given transaction (including a PIN Debit network affiliated with Processor) and (ii) add and/or remove PIN Debit networks available to you based on a variety of factors including availability, features, functionality and our own business considerations.
- You must issue a receipt to the Cardholder upon successful completion of a transaction and in effect PAN Truncation on it.
- You may not manually enter the account number. The account number must be read electronically from the Magnetic Stripe. If the Magnetic Stripe is unreadable, you must request another form of payment from the Cardholder.
- Any applicable tax must be included in the total transaction amount for which Authorization is requested. Tax may not be collected separately in cash.
- **YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING CREDITS AND VOIDS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.**

**29.3. Cash Back From Purchase.** You have the option of offering cash back to your customers when they make a PIN Debit Card purchase. You may set a minimum and maximum amount of cash back that you will allow. If you are not now offering this service, your terminal may require additional programming to begin offering cash back.

**29.4. Settlement.** Within one Business Day of the original transaction, you must balance each location to our system for each Business Day that each location is open.

**29.5. Adjustments.** An adjustment is a transaction that is initiated to correct a PIN Debit Card transaction that has been processed in error. You will be responsible for all applicable adjustment fees that may be charged by a PIN Debit Card network. Some PIN Debit networks may have established minimum amounts for adjustments.

**There are several reasons for adjustments being initiated:**

- The Cardholder was charged an incorrect amount, either too little or too much.
- The Cardholder was charged more than once for the same transaction.
- A processing error may have occurred that caused the Cardholder to be charged even though the transaction did not complete normally at the point of sale.

All parties involved in processing adjustments are regulated by time frames that are specified in the operating rules of the applicable PIN Debit network, The Electronic Funds Transfer Act, Regulation E, and other applicable law.

## 30. Special Provisions Regarding EBT Transactions

If you elect to accept EBT Cards and engage in EBT transactions, the terms and conditions of this Section 29 shall apply.

EBT transactions are provided to you by Processor and not by Bank. The Services provided, transactions processed and other matters contemplated under this Section 29 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 29 directly conflict with another section of this Agreement, in which case the terms of this Section 29 will control; provided, however, that Bank is not a party to this Agreement insofar as it relates to EBT transactions, and Bank is not liable to you in any way with respect to such Services. For the purposes of this section, the words "we," "our" and "us" refer only to the Processor and not to the Bank.

We offer electronic interfaces to EBT networks for the processing, settlement and switching of EBT transactions initiated through the use of a state-issued EBT card ("EBT Card") at your POS Terminal(s) for the provision of United States Department of Agriculture, Food and Nutrition Service ("FNS"), Supplemental Nutrition Assistance Program ("SNAP") and Women, Infants and Children Benefits ("WIC Benefits") and/or government delivered Cash Benefits (Cash Benefits, together with FNS, SNAP and WIC Benefits, collectively are referred to as the "EBT benefits") to EBT benefit recipients ("EBT customers"), subject to the terms below.

**30.1. Acceptance of EBT Benefits.** You agree to accept EBT Cards and provide EBT benefits to EBT customers through the use of a POS Terminals, PIN pad and printer or other equipment that meet standards set forth in the EBT Rules ("Authorized Terminal") applicable to such EBT benefits during your normal business

hours, in a manner consistent with your normal business practices and in accordance with the EBT Rules.

The "EBT Rules" means (i) all procedures that we establish and provide to you from time-to-time regarding your acceptance of EBT Cards and provision of EBT benefits to EBT customers; (ii) the Quest Rules, as amended from time-to-time, issued by the National Automated Clearing House Association and as approved by the Financial Management Service of the U.S. Treasury Department, as necessary (and any rules that succeed or replace the Quest Rules); and (iii) other such laws, rules, regulations and procedures that are applicable to the acceptance of EBT Cards and the provision of EBT benefits by you under this Section 29, including without limitation, laws pertaining to delivery of services to EBT customers and EBT customer confidentiality, the federal Civil Rights Act of 1964, Rehabilitation Act of 1973, Americans with Disabilities Act of 1990, Clean Air Act, Clean Water Act, Energy Policy and Conservation Act, Immigration Reform and Control Act of 1986, regulations issued by the Department of Agriculture pertaining to Food Stamp Program, and, any additional procedures specified by the state regarding lost EBT Cards, forgotten PINs, discrepancies in benefits authorized and similar matters by providing EBT customers with information such as telephone numbers and addresses of the state or other appropriate agencies. The "Food Stamp Program" is the government benefits program operated under the authority of the Food Stamp Act of 1964.

You will provide EBT benefits to EBT customers, in accordance with the procedures set forth in the EBT Rules, in the amount authorized through your Authorized Terminal upon presentation by an EBT customer of an EBT Card and such EBT customer's entry of a valid PIN. If the Authorized Terminal fails to print EBT benefit issuance information as approved and validated as a legitimate transaction, you will comply with the procedures set forth in the EBT Rules for authorization of EBT benefits in such instance. You are solely responsible for your provision of EBT benefits other than in accordance with authorizations timely received from EBT service provider. You will not resubmit any EBT Card transaction except as specifically permitted by the EBT Rules and procedures applicable to such EBT Card transaction. You must provide a receipt for each EBT transaction to the applicable EBT customer.

You will not accept any EBT Card for any purpose other than providing EBT Benefits, including without limitation accepting an EBT Card as security for repayment of any EBT customer obligation to you. In the event of any violation of this provision, you will be obligated to reimburse the state or us for any EBT benefits unlawfully received by either you or an EBT customer to the extent permitted by law. Cash should never be dispensed for FNS, SNAP and WIC Benefits.

You authorize us to initiate EBT Card transactions and to receive settlement for such transactions on your behalf.

**30.2. Manual EBT Vouchers.** In accordance with the procedures set forth in this Section 29 and the EBT Rules, you will manually accept EBT Cards during periods of time when your Authorized Terminal is not working or the EBT system in not available; you will manually provide EBT benefits in the amount authorized through the applicable EBT service provider to the EBT customers at no cost to the EBT customers upon presentation by an EBT customer of his / her EBT Card. All manual voucher authorizations must be cleared on your POS terminal for payment of voucher to be made to you. In addition to any procedures set forth in the EBT Rules, the following limitations will apply to manual issuance of FS Benefits by Merchant:

i. An authorization number for the amount of the purchase must be received by you from the applicable EBT service provider while the respective EBT customer is present and before you provide such EBT customer with any FNS, SNAP and WIC Benefits, or Cash Benefits, as applicable. You must not attempt to voice authorize a manual EBT transaction if the EBT customer is not present to sign the voucher. The EBT customer must sign the voucher. A copy of the voucher should be given to the EBT customer at the time of authorization and you should retain one copy for your records.

ii. Specified EBT customer, clerk and sales information, including the telephone authorization number, must be entered properly and legibly on the manual sales draft.

iii. All manual voucher authorizations must be cleared on your Authorized Termina before payment of voucher will be made to you. Vouchers must be cleared within 10 Business Days after the date of applicable voice authorization. Vouchers cannot be cleared by any manner except by your Authorized Terminal therefore you should never mail vouchers requesting payment. If a voucher expires before it has been cleared by your Authorized Terminal for payment, no further action can be taken to obtain payment for the voucher.

iv. In the event that, due to EBT host failure, EBT benefit availability for an EBT customer cannot be determined at the time you request authorization, the maximum authorized manual transaction and benefit encumbrance will be $40.00 or such other state specific floor limit as set forth in the most current version of the applicable EBT Rules.

v. Except as specifically provided in the applicable EBT Rules, you will not be reimbursed and will be solely responsible for a manual transaction when you fail to obtain an authorization number from the applicable EBT service provider as set forth in this Section 29 or otherwise fail to process the manual transaction in accordance with the EBT Rules.

vi. If you have not received an authorization number in accordance with paragraph 29.1 above, you may not "re-submit" a manual sales draft for payment for the same transaction.

**30.3. Acceptance of Cash Benefits.** If you agree to accept EBT Cards and to provide Cash Benefits, you agree to maintain adequate cash on hand to issue EBT service provider authorized Cash Benefits and will issue such Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to your other customers. You may not require, and may not in your advertising suggest, that any EBT customers must purchase goods or services from you as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. You may not designate and direct EBT customers to special checkout lanes restricted to use by EBT customers unless you also designate and direct other customers to special checkout lanes for Debit Cards or Credit Cards and/or other payment methods such as checks other than cash.

**30.4. Interoperability.** If you accept EBT Cards and provide EBT benefits (FNS, SNAP and WIC Benefits and/or Cash Benefits), you must do so for EBT customers from all states.

**30.5. Required Licenses.** If you provide FNS, SNAP and WIC Benefits under this Agreement, you represent and warrant to us that you are a FNS authorized merchant and are not currently disqualified or withdrawn from redeeming food stamp coupons or otherwise disqualified or withdrawn by FNS. You agree to secure and maintain at your own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of EBT benefits under this Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenant that you will not accept EBT Cards or provide EBT benefits at any time during which you are not in compliance with the requirements of any EBT Rules.

**30.6. Term and Termination.** If you are disqualified or withdrawn from the Food Stamp Program, your authority to issue benefits will be terminated concurrently therewith. Such disqualification or withdrawal will be deemed a breach of this Agreement with respect to your authority to issue Cash Benefits and, in the event of such disqualification, we have the right to immediately terminate the provision of service under this Section 29 or the Agreement in its entirety. With respect to the issuance of Cash Benefits only, your authority to issue Cash Benefits may be suspended or terminated immediately at the sole discretion of us, the state or its EBT service provider, effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination if there will be (i) any suspension, injunction, cessation, or termination of the EBT service provider's authority to provide EBT services to the state; (ii) failure by you, upon not less than thirty (30) days' prior written notice, to cure any breach by you of these terms and conditions, including without limitation, your failure to support the issuance of EBT benefits during your normal business hours consistent with your normal business practices, your failure to comply with EBT benefit issuance procedures, your impermissible acceptance of an EBT Card, or your disqualification or withdrawal from the Food Stamp Program; or (iii) based on a state's or its EBT service provider's investigation of the relevant facts, evidence that you or any of your agents or employees are committing, participating in, or have knowledge of fraud or theft in connection with the dispensing of EBT benefits. If you fail to cure any breach as set forth above, you may appeal such suspension of termination to the applicable state for determination in its sole discretion.

In the event that your authority to accept benefits is suspended or terminated by a state or its EBT service provider, and you successfully appeal such suspension or termination to the state or its EBT service provider, we shall be under no obligation to reinstate the services previously provided under this Section 29 or the Agreement, as applicable.

The provision of services under this Section 29 shall terminate automatically if our agreement or our service provider's agreement with any applicable state's EBT service provider terminates for any reason.

You will give prompt notice to us if you plan to stop accepting EBT Cards and providing EBT benefits or if you are unable to comply with the terms of this Section 29.

**30.7. Confidentiality of EBT System Information.** All information related to EBT customers and/or the issuance of EBT benefits shall be considered confidential information.

Individually identifiable information relating to an EBT customer or applicant for EBT benefits will be held confidential and will not be disclosed by you or your directors, officers, employees or agents, without prior written approval of the applicable state.

You will: (a) implement appropriate measures designed to: (1) ensure the security and confidentiality of all non-public personal information or materials regarding customers ("NPPI"); (2) protect against any anticipated threats or hazards to the security or integrity of NPPI; (3) protect against unauthorized access to or use of NPPI that could result in substantial harm or inconvenience to any customer and (4) ensure the proper disposal of NPPI; and (b) take appropriate actions to address incidents of unauthorized access to NPPI, including notification to us as soon as possible.

The use of information obtained by you in the performance of your duties under this Section 29 will be limited to purposes directly connected with such duties.

**30.8. EBT Service Marks.** You will adequately display any applicable state's service Marks or other licensed marks, including the Quest Marks, and other materials supplied by us (collectively the "Protected Marks") in accordance with the standards set by the applicable state. You will use the Protected Marks only to indicate that EBT benefits are issued at your location(s) and will not indicate that we, any state or its EBT service provider endorse your goods or services. Your right to use such Protected Marks pursuant to this Agreement will continue only so long as this Section 29 remains in effect or until you are notified by us, any state or its EBT service provider to cease their use or display. You will not use the Marks of any EBT service provider without prior written approval from such EBT service provider.

**30.9. Miscellaneous.**

**30.9.1. Errors.** You will fully cooperate with us and any other participants in the EBT system in the resolution of errors and disputes regarding EBT transactions processed pursuant to this Section 29. You will promptly notify us of any such errors or disputes.

**30.9.2. Issuance Records.**

i. You agree to make available such informational materials as may be required by the state, its EBT service provider or any applicable regulations pertaining to the issuance of benefits.

ii. You will retain all EBT-related records (including but not limited to manual sales drafts or vouchers) in the manner required by the EBT Rules or otherwise reasonably requested by us for three (3) years following the date of the applicable EBT transaction, or for such additional period as may be required by the EBT Rules. Records involving matters in litigation will be kept by you for a period of not less than three (3) years following the termination of the applicable litigation. Copies of any documents in media other than paper (e.g., microfilm, etc.) related to this Section 29 may be substituted for the originals to the extent permitted under applicable EBT Rules and provided that legible paper copies can be reproduced within a reasonable time after such records are requested.

iii. You will make all EBT-related records available upon request to representatives of the state or its EBT service provider, or other authorized state or federal government agency during normal business hours.

iv. To assure compliance with this Agreement, including without limitation this Section 29, the state, its EBT service provider, or other authorized state or federal government agency, will at all times, upon advance notice except in the case of suspected fraud or other similar activity, have the right to enter, during normal business hours, your premises to inspect or evaluate any work performed under this Agreement, or to obtain any other information required to be provided by you or otherwise related to this Agreement.

**30.9.3. Training.** You will train and permit your employees to receive training regarding the issuance of EBT benefits.

**30.9.4. Amendments.** Notwithstanding anything to the contrary in this Agreement, if any of these terms and conditions are found to conflict with the EBT Rules or federal or state policy, these terms and conditions are subject to reasonable amendment by us, a state or its EBT service provider to address such conflict upon twenty (20) days' written notice to you provided that you may, upon written notice, terminate your obligation under this Section 29 upon receipt of notice of such amendment.

**30.9.5. State Action.** Nothing contained herein shall preclude a state from commencing a propriate administrative or legal action against you or for making any referral for such action to any appropriate federal, state, or local agency.

**30.9.6. Reference to State.** Any references to state herein will mean the state in which you accept EBT benefits pursuant to this Section 29. If you accept EBT benefit in more than one state pursuant this Section 29, then the reference will mean each such state severally, not jointly.

**30.9.7. Third Party Beneficiaries.** These terms and conditions, do not create, and will not be construed as creating, any rights enforceable by any person not having any rights directly under this Agreement, except that the state and its Issuer, as defined in the Quest Rules, will be deemed third party beneficiaries of the representations, warranties, covenants and agreements made by you under the Agreement, including without limitation this Section 29.

## 31. Special Provisions Regarding Wireless Service

If you elect to purchase the Wireless Services from us as indicated on the Application, then the following terms and conditions of this Section 30, referred to as the "**Wireless Services Terms**," shall apply. THE WIRELESS SERVICES ARE BEING SOLD TO YOU FOR USE IN BUSINESS AND ARE NOT BEING SOLD TO YOU FOR HOUSEHOLD OR PERSONAL USE. Sale of Wireless Services is made by Processor and not the Bank. The Services provided, transactions processed and other matters contemplated under this Section 30 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 30 directly conflict with another section of this Agreement, in which case the terms of this Section 30 will control; provided, however, that Bank is not a party to this Agreement insofar as it relates to Wireless Services, and Bank is not liable to you in any way with respect to such services. For the purposes of this section, the words "we", "our" and "us" refer only to the Processor and not to the Bank.

Through one or more third party vendors ("Wireless Vendor(s)") selected by us in our sole discretion, we have acquired the right to resell certain wireless data communication service that use radio base stations and switching offered by certain cellular telephone and data networks throughout the country (the "Wireless Networks") in order to allow you to capture and transmit to Processor and Bank certain wireless Card Authorization transactions or to transmit other communications to our system ("Wireless Services").

If you elect to purchase voice and/or data services directly from a third party provider for use with the Wireless Equipment as permitted by Processor, you acknowledge and agree that this Agreement does not address or govern those voice and/or data services or your relationship with that third party provider, and Servicers are in no way responsible for providing, maintaining, servicing or supporting such third party voice and/or data services.

**31.1. Purchase of Wireless Services.** The prices that you will pay for the Wireless Services are set forth on the Application. In connection with your purchase of Wireless Services, you will receive access to a certain Wireless Network(s).

- Licenses. You agree to obtain any and all licenses, permits or other authorizations required by the Federal Communications Commission ("FCC") or any other regulatory authority, if any, for the lawful operation of Wireless Equipment use by you in connection with your receipt of Wireless Services. You will promptly provide us with all such information as we may reasonably request with respect to matters relating to the rules and regulations of the FCC.

- Wireless Equipment. You agree that in order to access the Wireless Services, you must use wireless POS Terminals and accessories approved for use with the Wireless Services by Processor from time to time in its sole discretion (the "Wireless Equipment"). If Wireless Equipment is purchased by you from us as indicated on the Application, then the terms of this Agreement, including without limitation Section 32 of this Agreement, apply to your use of such Wireless Equipment.

- Improvements / General Administration. We and the Wireless Vendor(s) reserve the right to make changes, from time to time, in the configuration of the

Wireless Services, Wireless Networks, Wireless Equipment, Wireless Software, rules of operation, accessibility periods, identification procedures, type and location of equipment, allocation and quantity of resources utilized, programming languages, administrative and operational algorithms and designation of the control center serving you at the particular address. In addition, we reserve the right to schedule, from time to time, interruptions of service for maintenance activities.

- Suspension of Wireless Services. We or a Wireless Network may suspend the Wireless Services to: (a) prevent damages to, or degradation of, our or a Wireless Network's network integrity that may be caused by a third party; (b) comply with any law, regulation, court order or other governmental request which requires immediate action; or (c) otherwise protect us or a Wireless Network from potential legal liability. To the extent commercially reasonable, we shall give notice to you before suspending the Wireless Services to you. If not commercially reasonable to give prior notice, we will give notice to you as soon as commercially practicable thereafter. Availability of the Wireless Services may vary due to events beyond the control of us or our Wireless Vendors. In the event of a suspension of the Wireless Services, we or the applicable Wireless Vendor will promptly restore the Wireless Services after the event giving rise to the suspension has been resolved.

**31.2. Software Licenses.** Processor hereby grants to you a non-exclusive, non-transferable, revocable limited sublicense to use any wireless software (including any documentation relating to or describing the wireless software) downloaded by you or your designee from Processor's systems onto the Wireless Equipment in connection with your purchase and use of the Wireless Services in accordance with the terms of this Agreement, including this Section 30 and Section 32 ("Wireless Software"). anything in this Agreement to the contrary notwithstanding, we or certain third parties retain all ownership and copyright interest in and to all Wireless Software, related documentation, technology, know-how and processes embodied in or provided in connection with the Wireless Software, and you shall have only a nonexclusive, non-transferable license to use the Wireless Software in your operation of the Wireless Equipment for the purposes set forth in this Agreement. Nothing in this Agreement confers any title or ownership of any such Wireless Software to you or shall be construed as a sale of any rights in any such Wireless Software to you. You agree to accept, agree to and be bound by all applicable terms and conditions of use and other license terms applicable to such Wireless Software. You shall not reverse engineer, disassemble or decompile the Wireless Software. You shall not give any Person access to the Wireless Software without our prior written consent. Your obligations under this Section 30.2 shall survive the termination of this Agreement. You acknowledge that the only right you obtain to the Wireless Software is the right to use the Wireless Software in accordance with the terms in this Section.

**31.3. Limitation on Liability.** We shall have no liability for any warranties by any party with respect to uninterrupted Wireless Services, as set forth in Section 30.10, or for any Person's unauthorized access to Client's data transmitted through either the Wireless Equipment or Wireless Services (including the Wireless Software), or Wireless Networks, regardless of the form of action (whether in contract, tort (including negligence), strict liability or otherwise). The foregoing notwithstanding, for any other liability arising out of or in any way connected with these Wireless Services terms, including liability resulting solely from loss or damage caused by partial or total failure, delay or nonperformance of the Wireless Services or relating to or arising from your use of or inability to use the Wireless Services, Processor's, Bank's, and Wireless Vendor(s)' liability shall be limited to your direct damages, if any, and, in any event, shall not exceed the lesser of the amount paid by you for the particular Wireless Services during any period of failure, delay, or nonperformance of the Wireless Services or $50,000.00. In no event shall Servicers, Wireless Vendor(s) or our respective Affiliates be liable for any indirect incidental, special, consequential or punitive damages. The remedies available to you under these Wireless Services Terms will be your sole and exclusive remedies.

**31.4. Indemnification.** In addition to any other indemnifications as set forth in this Agreement, you will indemnify and hold Servicers, Wireless Vendor(s) and our respective officers, directors, employees, and Affiliates harmless from and against any and all losses, claims, liabilities, damages, costs or expenses arising from or related to: (a) the purchase, delivery, acceptance, rejection, ownership, possession, use, condition, liens against, or return of the Wireless Equipment or the Wireless Equipment (including the Wireless Software), as applicable; (b) your negligent acts or omissions; (c) any breach by you of any of your obligations under this Section 30; or (d) any Person's unauthorized access to Client's data and/or unauthorized financial activity occurring on your Merchant Account Number hereunder, except to the extent any loss is, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**31.5. Confidentiality.** All information or materials which could reasonably be considered confidential or competitively sensitive that you access from or relate to either Wireless Vendor(s) or Servicers related to the subject matter of these Wireless Services Terms will be considered confidential information. You will safeguard our confidential information with at least the same degree of care and security that you use for your confidential information, but not less than reasonable care.

**31.6. Termination.** In addition to any other provision in this Agreement, the Wireless Services being provided under this Section 30 may terminate:

a) Immediately upon termination of the agreement between us (or our Affiliates) and Wireless Vendor(s), provided that we will notify you promptly upon our notice or knowledge of termination of such agreement, provided further that if Wireless Vendor(s) loses its authority to operate less than all of the Wireless Services or if the suspension of any authority or non-renewal of any license relates to less than all of the Wireless Services, then these Wireless Services Terms will terminate only as to the portion of the Wireless Services affected by such loss of authority, suspension or non-renewal; or

b) Immediately if either we or our Affiliates or Wireless Vendor(s) are prevented from providing the Wireless Services by any law, regulation, requirement, ruling or notice issued in any form whatsoever by judicial or governmental authority (including without limitation the FCC).

**31.7. Effect of Termination.** Upon termination of these Wireless Services Terms for any reason, you will immediately pay to us all fees due and owing to us hereunder. If these Wireless Services terms terminate due to a termination of the agreement between us or our Affiliates and Wireless Vendor(s), then we may, in our sole discretion, continue to provide the Wireless Services through Wireless Vendor(s) to you for a period of time to be determined as long as you continue to make timely payment of fees due under these Wireless Services Terms.

**31.8. Third Party Beneficiaries.** Wireless Vendor(s) are third party beneficiaries of these Wireless Services Terms and may enforce its provisions as if a party hereto.

**31.9. Other Applicable Provisions.** You also agree to be bound by all other terms and conditions of this Agreement.

**31.10. Disclaimer.** Wireless Services use radio transmissions, so Wireless Services can't be provided unless your Wireless Equipment is in the range of one of the available Wireless Networks' transmission sites and there is sufficient network capacity available at that moment. There are places, particularly in remote areas, with no service at all. Weather, topography, buildings, your Wireless Equipment, and other conditions we don't control may also cause failed transmissions or other problems. PROCESSOR, BANK, AND WIRELESS VENDOR(S) DISCLAIM ALL REPRESENTATIONS AND WARRANTIES RELATING TO WIRELESS SERVICES. WE CAN NOT PROMISE UNINTERRUPTED OR ERROR-FREE WIRELESS SERVICE AND DO NOT AUTHORIZE ANYONE TO MAKE ANY WARRANTIES ON OUR BEHALF.

## 32. Special Provisions Regarding TransArmor Services

If you elect to utilize the TransArmor Service, the following additional terms and conditions of this Section 31 shall apply.

The TransArmor Service is provided to you by Processor and not Bank. Bank is not a party to this Agreement insofar as it applies to the TransArmor Service, and Bank is not liable to you in any way with respect to such services. For the purposes of this section, the words "we," "our" and "us" refer only to the Processor and not the Bank.

The TransArmor Service provided, transactions processed and other matters contemplated under this Section 31 are subject to the rest of this Agreement, as applicable, except to the extent the terms of this Section 31 directly conflict with another provision of this Agreement, in which case the terms of this Section 31 will control.

**32.1. Definitions.** Capitalized terms used herein shall have the meanings given to such terms as set forth in this Section 31 or as defined elsewhere in this Agreement.

**32.2. Grant of License.** Processor grants to you a non-transferable, non-assignable, non-exclusive, revocable sub-license during the term of this Section 31 to

use the TransArmor Service and the TransArmor Service Marks (as identified in the TransArmor Rules and Procedures) in the United States in accordance with this Section 31, including without limitation the TransArmor Rules and Procedures. Any rights with respect to the TransArmor Service not expressly granted by Processor in this Section 31 are deemed withheld.

**32.3. Services.** The TransArmor Service applies only to Card transactions sent from you to us for authorization and settlement pursuant to the Agreement, and specifically excludes electronic check and closed-loop gift card transactions. Processor will provide an encryption key to you to be used to encrypt (make unreadable) Card data during transport of the authorization request from your point of sale to Processor's systems. During the period when the transaction is being transmitted to Process or for authorization processing, all historical transaction data, including Card number and full magnetic stripe data (track data and expiration date), will be encrypted. Processor will then generate or retrieve a unique, randomly generated token assigned to the Card number that will be returned to you in the authorization response (the "Token").

**32.4. Responsibilities of Client.** You are responsible to comply with the following regarding your use of the TransArmor Service:

a) You are required to comply with the Card Organization Rules, including taking all steps required to comply with the Payment Card Industry Data Security Standards (PCI DSS). You must ensure that all third parties and software use by you in connection with your payment processing are compliant with PCI DSS. Use of the TransArmor Service will not, on its own, cau e you to be compliant or eliminate your obligations to comply with PCI DSS or any other Card Organization Rule. You must demonstrate and maintain your current PCI DSS compliance certification. Compliance must be validated either by a Qualified Security Assessor (QSA) with corresponding Report on Compliance (ROC) or by successful completion of the applicable PCI DSS Self-Assessment Questionnaire (SAQ) or Report on Compliance (RO ), as applicable, and if applicable to your business, passing quarterly network scans performed by an Approved Scan Vendor, all in accordance with Card Organization Rules and PCI DSS.

b) Use of the TransArmor Service is not a guarantee against an unauthorized breach of your point of sale systems or any facility where you process and/or store transaction data (collectively, "Merchant Systems").

c) You must deploy the TransArmor Service (including implementing any upgrades to such service within a commercially reasonable period of time after receipt of such upgrades) throughout your Merchant Systems including replacing existing Card numbers on your Merchant Systems with Tokens. Full Card numbers must never be retained, whether in electronic form or hard copy.

d) You must use the Token in lieu of the Card number for **ALL** activities subsequent to receipt of the authorization response associated with the transaction, including without limitation, settlement processing, retrieval processing, chargeback and adjustment processing and transaction reviews.

e) Any POS device, gateway and/or VAR you use in connection with the TransArmor Service must be certified by FDMS for use with the TransArmor Service.

f) If you send or receive batch files containing completed Card transaction information to/from Processor, you must use the service provided by Processor to enable such files to contain only Tokens or truncated information.

g) You must use truncated report viewing and data extract creation within reporting tools pr vided by Proces or.

h) You are require d to follow rules o procedures we may provide to you from time to time relate d to your use of the TransArmor Service ("TransArmor Rules and Procedures"). We will provide you with advance written notice of any such rules o procedures or c anges to such rles or procedures.

i) You have n right, title or int rest in or to the TransArmor Service, any related oftware, materials or documentation, or any derivative works thereof, and nothing in this Agreement assigns or transfers any such right, title or interes to you. You sha l not take any action inconsistent with the stated title and owners ip in this Sectio 31. You will not file any action, in any forum that challenges th ownership of the TransArmor Service, any related software, m terials or documentation. Failure to comply with this provision will constitute a mat rial breach of this Agreement. We have the right to immediately terminate this Section 31 and your access to and use of the TransArmor Service in th event of a challenge by you. No additional rights are granted by i pplication, estoppel or otherwise.

j) You will not: (i) distribute, lease, license, sublicense or otherwise disseminate th TransArmor Se vice or any portion of it to any third party; (ii) modify, enhance, tr nslate, supplement, create derivative works from, reverse engi eer, decompile or otherwise reduce to human-readable form the TransArmor Service or any p rtion of it; or (iii) sell, license or otherwise distribut the TransArmor Service or any portion of it; (iv) make any copies, or permit any copying, of the Tr nsArmor Service or any portion of it; or (v) use any portion of the TransArmor Service as a standalone program or in any way independently from the TransArmor Service. If any portion of the TransArm r Service contai s any copyright notice or any other legend denoting the proprietary interest of Pro essor or any third party, you will not remove, alter, modify, relocate or erase such notice or legend on such item.

k) You will only use the TransAr nor Service for your internal business purposes in a manner consistent with this Agreement.

l) You will use only unaltered v rsion(s) of the TransArmor Service and will not use, operate or combine the TransArmor Service or any related softwar , materials or documentation, or any derivative works thereof with other produ cts, materials or services in a manner inconsistent with the uses contemplated in this Section 1.

m) You will pro ptly notify us of breach of any terms of this Section 31.

**32. 5. Termination.** U less prohibited b applicable law, we may modify this Section 31 by providing written notice of such modifications to you. You may choose not to accept the requirements of any such modifications by notifying us in writing within thirty (30) days after receiving such notice that you are terminating this Section 31.

**32.6. Fees.** Client shall pay Processor the fees for TransArmor Service as set forth on the A plication.

**32.7. TransArmor Limited Warranty.** Processor warrants that the Token returned to you, as a result of usin the TransArmor Service, cannot be used to initiate a financial sale transaction by an unauthorized entity/person outside the Merchant Systems. This warranty by Processor is referred to herein as the "Limited Warranty" and is subj ct to the terms and conditions set forth in this Section 31. To b eligible for the Limited Warranty, you must maintain a processing relationship with Proce sor and be in co pliance with all the terms of the Agreement, including this Section 31, and any other agreement relating to Cards eligible for the TransArmor Se vice. Subject to the terms, conditions and limitations set forth in the Agreement, including the limitation of liability provisions, Processor agrees to indemnify and hold you harmless from direct damages, including third party claims, resulting from Processor's breach of the Limited Warranty. The express remedy for Processor's breach of the Limited Warranty set forth in this paragraph constitutes Pr cessor's entire liability and your sole and exclusive remedy for Processor's breach of the Li ited Warranty. The Limited Warranty is void if (i) y u use the Trans Armor Service in a manner not contemplated by, or in violation of, the Agree ent, including this Section 31, or any other agreement relating to Cards eligible for th TransArmor Service or (ii) you are grossly neglige t or engage in intentional misconduct.

**32.8. TransArmor Dis laimer.** IN ADDITION TO THE DISCLAIMERS SET FORTH IN THE AGREEMENT, THE FOLLOWING DISCLAIMER APPLIES TO THE TRANSARMOR SERVICE: EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 31, PROCESSOR M KES NO REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPR SS OR IMPLIED WITH REGARD TO THE TRANSARMOR SERVICE INCLUDING THE UNINTERRUPTED OR ERROR-FREE OPERATION OF THE TRANSARMOR SERVICE.

## 33. Choice of Law; Venue; Waiver of Jury Trial

**33.1. Choice of Law.** Our Agreement s all be governed by and construed in accordance w th the laws of th State of Georgia (without regard to its choice of law provisions).

**33.2. Venue.** We have substantial facilities in the State of Georgia and many of the services provided under this Agreement are provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appro riate state or federal court located in Cobb County, Georgia.

**33.3. Waiver of Jury Trial.** ALL PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM RELATING TO OR ARISING UNDER THIS AGREEMENT.

## 34. Other Terms

**34.1. Force Majeure.** No party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, b (i) fire, flood, earthquake, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a Person for any similar cause beyond the reasonable control of such party, including without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the non-performing party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable. Notwithstanding anything to the contrary in this paragraph, your failure to receive payment or funds from a Person shall not excuse the performance of your obligations to us under this Agreement.

**34.2. Compliance with Laws.** In performing its obligations under this Agreement, each party agrees to comply with all laws and regulations applicable to it. You further agree to coop rate and provid information requested by Servicers, as Service s determine ne essary, to facilitate Servicers compliance with any applicable law including without limitatio the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury. You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time. It is your sole responsibility to comply with all laws and regulations r garding data se urity and card number/expiration date truncation, including, without limitation, the Fair and Accurate Credit Transactions Act (FACTA).

**34.3. Notices.** Except as otherwise specifically provided, all notices and other communications required or p rmitted hereunder (other than those involving normal operational matters relating to the processing of Card transactions) shall be in writing, if to you at your address appearing in the Application or by any electronic means, including but not limited to the e-mail address you have provided on the Application, and if to us at our address appearing in Section A.4 of Part III of this Agreement, with a copy to Attention: General Counsel's Office, Priority Payment Systems, P.O. Box 246, Alpharetta, GA 30009-0246, and shall be deemed to have been given (i) if s nt by mail or courier, upon the earlier of five (5) days after mailing or when actually received or, in the case of courier, when delivered, and (ii) if sent by facsimile machine, when the courier confirmation copy is actually received. Notice given in any other manner shall be effective when actually received. Notices sent to the Merchant's last known address (including e-mail address), as indicated in our re cords, shall constitute effective notice to the Merchant under this Agreement.

**34.4. Headings.** The headings contained in this Agreement are for convenience of reference only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**34.5. Severability.** Th parties intend e ery provision of this Agreement to be severable. If any part of this A reement is not enforceable, the remaining provisions shall remain valid and enforceable.

**34.6. Entire Agreem nt; Waiver.** This Agreement constitutes the entire Agreement between the parties with respect to the subject matter thereof, and supersedes any previo s agreements and understandings. A party's waiver of a breach of a y term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or a other term or condition.

**34.7. Amendment.** W may modify an provision of this Agreement by providing notice to you. You may choose not to accept the requirements of any such change by terminating the Agreement within twenty (20) days of receiving notice. If you ch ose to do so, no ify us that you are terminating for this reason so th t we may waive any early termination fe that might otherwise apply. Your submission of a Card transactio after notice of any amendment, or an electronic or "click-wrap" notice inte ded to modify or amend this Agreement and which you check "I A cept" or "I Agree" or otherwise accept through an electronic process, shall constitute accept nce of the amended Agreement required herein. This Section 33.7 does not apply to fee changes, which are governed by Sections 18.4 and 18.5.

**34.8. Third Party Beneficiaries.** Our r spective Affiliates and any Persons we use in providing the Services are third party beneficiaries of this Agreement and each of them may enforce its provisions as it was a party hereto. Except as expressly provided in this Agreement, nothing in this Agreement is intended to confer upon any Person any rights or remedies, and the parties do not intend for any Persons to be third-party beneficiaries of this Agreement.

**34.9. Card Organizati n Rules.** The p rties acknowledge that the Visa, MasterCard and Discover Network Card Organization Rules give Visa, MasterCard and Discover Network certain rights to require termination or modification of his Agreement ith respect to tr nsactions involving Visa, MasterCard and Discover Network Cards and the Visa, MasterCard and Discover Network Card systems and to inve tigate you. The arties also acknowledge that issuers of other Cards, for which we perform s rvices on your behalf, may have similar rights under their applicable Card Organization Rules with respect to this Agreement's applicabili y to transactions involvin g such other Cards.

**34.10. Publicity.** Client may not use the logo, name, trademark, or service mark of Processor and/or Bank in any manner, including without limitation, in any advertisements, displays, or press releases, without the prior written consent of Processor a d Bank.

## 35. Glossary

As used in this Agreement, the following terms mean as follows:

**Acquirer:** Bank in the case of MasterC rd, Visa and certain debit transactions or Processor in the case of iscover Network and American Express transactions that acquire Card sale transactions from merchants such as yourself.

**Address Verification:** A service provided through which the merchant verifies the Cardholder's address, in whole or in part. Primarily used by Mail / Telephone / Internet order merchants, Address verification is intended to deter fraudulent transactions. H wever, it is not a guarantee that a transaction is valid.

**Affiliate:** A person that, directly or indi ectly, (i) owns or controls a party to this Agreement or (ii) is und r common ownership or control with a party to this agreement.

**Agreement:** The Agre ments among Client, Processor, and Bank, contained in the Application, the Program Guide and the Schedules thereto and documen s incorporated therein, e ch as amended from time to time, which collectively constitute the A reement among the parties.

**Application:** See Merchant Processing Application

**Authorization:** Approval by, or on behalf of, the Issuer to validate a transaction. An Authorization indicates only the availability of the Cardholder's Credit Limit or funds at the time the A thorization is requested.

**Authorization Approval Code:** A number issued to a participating merchant by the Authorization Center whi h confirms the Authorization for a sale or service.

**Authorization Center:** A department t at electronically communicates a merchant's request for Authorization on Credit Card transactions to the Cardholder's bank and transmits such Authorization to the merchant via electronic equipment or by voice Authorization.

**Bank:** The bank identified on the Applic tion signed by you, and in Part IV, Duplicate Confirmation Page, below.

**Bankruptcy Code:** Title 11 of the United States Code, as amended from time to time.

**Batch:** A single Submission to us of a group of transactions (sales and Credits) for settleme t. A Batch usually represents a day's worth of transactions.

**Business Day:** Monda through Friday, excluding Bank holidays.

**Card:** See either Credit Card or Debit C rd.

**Cardholder:** Sometimes referred to as "Card Member" in certain Card Organization materials, means the Person whose name is embossed on a Card (or Debit Card, as applicable) and any authorized user of such Card.

**Card Not Present Sale/Transaction:** A transaction that occurs when the Card is not present at the point-of-sale, including Internet, mail-order and telephone-order Card sales.

**Card Organization:** Any entity formed to administer and promote Cards, including without limitation MasterCard Worldwide ("MasterCard"), Visa U.S.A., Inc.("Visa"), DFS Services LLC ("Discover Network"), American Express Travel Related Services Company, Inc. ("American Express") and any applicable debit networks.

**Card Organization Rules:** The rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Card Organization and related authorities, including without limitation, those of the PCI Security Standards Council, LLC and the National Automated Clearing House Association (including, with respect to EBTs, the Quest Operating Rules).

**Card Validation Codes:** A three-digit value printed in the signature panel of most Cards and a four-digit value printed on the front of an American Express Card. Visa's Card Validation Code is known as CVV2; MasterCard's Card Validation Code is known as CVC2; Discover Network's Card Validation Code is known as a CID. Card Validation Codes are used to deter fraudulent use of an account number in a non-face-to-face environment, (e.g., mail orders, telephone orders and Internet orders).

**Card Verification Value (CVV)/Card Validation Code (CVC):** A unique value encoded on the Magnetic Stripe of a Card used to validate Card information during the Authorization process.

**Cash Benefits:** An EBT account maintained by an Issuer that represents pre-funded or day-of-draw benefits, or both, administered by one or more government entities, and for which the Issuer has agreed to provide access under the EBT program. Multiple benefits may be combined in a single cash benefit account.

**Cash Over Transaction:** Dispensing of cash by a merchant in connection with a Card sale, other than a PIN Debit Card transaction, for the purchase of goods or services.

**Chargeback:** A Card transaction (or disputed portion) that is returned to us by the Issuer. Client is responsible for payment to us for all Chargebacks.

**Client:** The party identified as "Client" on the Application. The words "Subscriber," "you" and "your" refer to Client. Also, sometimes referred to as "Merchant."

**Credit:** A refund or price adjustment given for a previous purchase transaction.

**Credit Card:** A device bearing a valid Organization Mark of Visa, MasterCard, Discover Network or American Express and authorizing the Cardholder to buy goods or services on credit and, to the extent the Schedules so provide, a valid device authorizing the Cardholder to buy goods or services on credit and issued by any other Card Organization specified on such Schedules.

[1] MasterCard Credit or Debit Card, Cirrus Card, or Maestro Card.

**Credit Draft:** A document evidencing the return of merchandise by a Cardholder to a Client, or other refund or price adjustment made by the Client to the Cardholder, whether electronic, paper or some other form, all of which must conform to Card Organization Rules and applicable law.

**Credit Limit:** The credit line set by the Issuer for the Cardholder's Credit Card account.

**Customer Activated Terminal (CAT):** A magnetic stripe terminal or chip-reading device (such as an automatic dispensing machine, Limited Amount Terminal, or Self-Service Terminal) that is not an ATM.

**Data Usage Charge:** Charged to you for our processing of Sales Data sent to us.

**Debit Card:** See either PIN Debit Card or Non-PIN Debit Card.

**Dial-Up Terminal:** An Authorization device, which, like a telephone, dials an Authorization Center for validation of transactions.

**Discount Rate:** A percentage rate and/or amount charged a merchant for processing its qualifying daily Credit Card and Non-PIN Debit Card transactions, as set forth in the Application. Transactions that fail to meet applicable interchange requirements will be charged additional amounts as set forth in Section 18.1.

**Discover International Processing Fee:** Charged per Discover settled sale (including Cash Over amounts and Cash Advance transactions) when the Card is issued in a country other than the country that the merchant is located in, excluding JCB and China Unionpay Cards.

**Discover International Service Fee:** Charged per Discover settled sale (excluding Cash Over amounts) on transactions when the Card is not issued in the U.S. but the transaction occurs in the U.S., excluding JCB and China Unionpay Cards.

**Electronic Benefit Transfer (EBT):** An Electronic Benefits Transfer system used to deliver certain government delivered benefits, including without limitation Cash Benefits and FNS, SNAP and WIC Benefits, to EBT customers.

**Electronic Draft Capture (EDC):** A process which allows a merchant's Dial-Up Terminal to receive Authorization and capture transactions, and electronically transmit them to the Processor. This eliminates the need to submit paper for processing.

**Factoring:** The submission of authorization requests and/or Sales Drafts by a merchant for Card sales or cash advances transacted by another business.

**General Terms:** Section of the Program Guide, including any amendments or modifications.

**Gross:** When referred to in connection with transaction amounts or fees, refers to the total amount of Card sales, without set-off for any refunds or Credits.

**Imprinter:** A manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on Sales Drafts.

**Issuer:** The financial institution or Card Organization which has issued a Card to a Person.

**Limited Amount Terminal:** A Customer Activated Terminal that has data capture only capability, and accepts payment for items such as parking garage fees, road tolls, motion picture theater entrance, or magnetic-stripe telephones.

**Magnetic Stripe:** A stripe of magnetic information affixed to the back of a plastic Credit or Debit Card. The Magnetic Stripe contains essential Cardholder and account information.

**Marks:** Names, logos, emblems, brands, service marks, trademarks, trade names, tag lines or other proprietary designations.

**MC Cross Border Fee (USD):** Assessed on any MasterCard[1] settled sale processed in USD Currency in which the country code of the merchant differs from the country code of the Cardholder (i.e., U.S. Merchant, Non U.S. Issued Card).

**Media:** The documentation of monetary transactions (i.e., Sales Drafts, Credit Drafts, computer printouts, etc.)

**Merchant Account Number (Merchant Number):** A number that numerically identifies each merchant location, outlet, or line of business to the Processor for accounting and billing purposes.

**Merchant Identification Card:** A plastic embossed card supplied to each merchant to be used for imprinting information to be submitted with each Batch of paper Sales Drafts. Embossed data includes Merchant Account Number, name and sometimes merchant ID code and terminal number.

**Merchant Processing Application:** The Merchant Processing Application and Agreement executed by Client, Processor and Bank, which is one of the documents comprising the Agreement.

**Merchant Provider:** Any Person engaged by you to provide services to you involving or relating to (i) access to Cardholder data, transaction data or information related to either Cardholder data or transaction data or (ii) PIN encryption, including without limitation, Encryption Service Organizations (ESOs).

**Non-PIN Debit Card:** A device with a Visa, MasterCard or Discover Network Mark that is tied to a Cardholder's bank account or a prepaid account and which is processed without the use of a PIN.

**Non-Qualified Interchange Fee:** The difference between the interchange fee associated with the Anticipated Interchange Level and the interchange fee associated with the more costly interchange level at which the transaction actually processed.

**Non-Qualified Surcharge:** A surcharge applied to any transaction that fails to qualify for the Anticipated Interchange Level and is therefore downgraded to a more costly interchange level. The Non-Qualified Surcharge (the amount of which is set forth on the Service Fee Schedule) is in addition to the Non-Qualified

Interchange Fee, which is also your responsbility (see above, Section 18.1)

**Operating Procedures:** The manual prepared by Processor, containing operational procedures, instructions and other directives relating to Card transactions. The current Operating Procedures are set forth in the Program Guide.

**Other Services:** Other Services include all services related to JCB Card, PIN Debit Card, and EBT Transactions, Loyalty Services and Transactions involving Cards from other Non-Bank Card Card Organizations such as Voyager Fleet Systems, Inc., Wright Express Corporation and Wright Express Financial Services Corporation.

**PAN Truncation:** A procedure by which a Cardholder's copy of a Sales Draft or Credit Draft, or as required by applicable law, the Sales Draft or Credit Draft you retain, will only reflect the last four digits of the Card account number.

**Person:** A third party individual or entity, other than the Client, Processor or Bank.

**PIN:** A Personal Identification Number entered by the Cardholder to submit a PIN Debit Card transaction.

**PIN Debit Card:** A device bearing the Marks of ATM networks (such as NYCE or Star) used at a merchant location by means of a Cardholder-entered PIN in the merchant PIN Pad.

**PIN Debit Sponsor Bank:** The PIN Debit Sponsor Bank(s) identified on the Application signed by you that is /are the sponsoring or acquiring bank(s) for certain PIN Debit networks.

**Point of Sale (POS) Terminal:** A device placed in a merchant location which is connected to the Processor's system via telephone lines and is designed to authorize, record and transmit settlement data by electronic means for all sales transactions with Processor.

**Processor:** The entity identified on the Application (other than the Bank), which provides certain services under the Agreement.

**Program Guide (also known as the Merchant Services Program Terms and Conditions):** The booklet which contains Operating Procedures, General Terms, Third Party Agreements and Confirmation Page, which together with the Application and the Schedules thereto and documents incorporated therein, constitute your Agreement with Processor and Bank.

**Recurring Payment Indicator:** A value used to identify transactions for which a Cardholder provides permission to a merchant to bill the Cardholder's Card account at either a predetermined interval or as agreed by the Cardholder for recurring goods or services.

**Referral:** A message received from an Issuer when an attempt for Authorization requires a call to the Voice Authorization Center or Voice Response Unit (VRU).

**Reserve Account:** An account established and funded at our request or on your behalf, pursuant to Section 24 of the Agreement.

**Resubmission:** A transaction that the Client originally processed as a Store and Forward transaction but received a soft denial from the respective debit network or Card Organization. The resubmission transaction allows the merchant to attempt to obtain an approval for the soft denial, in which case Client assumes the risk that the transaction fails.

**Retrieval Request/Transaction Documentation Request:** A request for documentation related to a Card transaction such as a copy of a Sales Draft or other transaction source documents.

**Sales/Credit Summary:** The identifying form used by a paper Submission merchant to indicate a Batch of Sales Drafts and Credit Drafts (usually one day's work). Not a Batch header, which is used by electronic merchants.

**Sales Draft:** Evidence of a purchase, rental or lease of goods or services by a Cardholder from, and other payments to, Client using a Card, including preauthorized orders and recurring transactions (unless the context requires otherwise); regardless of whether the form of such evidence is in paper or electronic form or otherwise, all of which must conform to Card Organization Rules and applicable law.

**Schedules:** The attachments, addenda and other documents, including revisions thereto, which may be incorporated into and made part of this Agreement concurrently with or after the date of this Agreement.

**Self-Service Terminal:** A Customer Activated Terminal that accepts payment of goods or services such as prepaid cards or video rental, has electronic capability, and does not accept PINs.

**Servicers:** Bank and Processor collectively. The words "we," "us" and "our" refer to Servicers, unless otherwise indicated in this Program Guide.

**Services:** The activities undertaken by Processor and/or Bank, as applicable, to authorize, process and settle all United States Dollar denominated Visa, MasterCard, Discover Network and American Express transactions undertaken by Cardholders at Client's location(s) in the United States, and all other activities necessary for Processor to perform the functions required by this Agreement for all other Cards covered by this Agreement.

**Settlement Account:** An account or account(s) at a financial institution designated by Client as the account to be debited and credited by Processor or Bank for Card transactions, fees, Chargebacks and other amounts due under the Agreement or in connection with the Agreement.

**Split Dial:** A process which allows the Authorization terminal to dial directly to different Card processors (e.g., American Express) for Authorization. In this instance, the merchant cannot be both EDC and Split Dial. Split Dial is also utilized for Check Guarantee companies.

**Split Dial/Capture:** Process which allows the Authorization terminal to dial directly to different Card processors (e.g., Amex) for Authorization and Electronic Draft Capture.

**Store and Forward:** A transaction that has been authorized by a merchant when the merchant cannot obtain an Authorization while the customer is present, typically due to a communications failure. The merchant will store the transaction electronically in their host system and retransmit the transaction when communications have been restored.

**Submission:** The process of sending Batch deposits to Processor for processing. This may be done electronically or by mail.

**Summary Adjustment:** An adjustment to your Submission and/or Settlement Accounts in order to correct errors. (See Sections 10.3 and 10.4).

**Telecommunication Card Sale:** Individual local or long-distance telephone calls, for which the telephone service provider is paid directly by use of a Card. These do not include, however, calls paid for with pre-paid telephone service cards. Telecommunication Card Sales are considered Card Not Present Sales.

**Transaction Fees:** Service costs charged to a merchant on a per transaction basis.

**Us, We and Our:** See Servicers.

**Visa International Service Fee:** Assessed on any Visa settled sale where the merchant is located in the U.S. and the Card is issued outside of the U.S. (i.e., U.S. Merchant, Non U.S. Issued Card).

**Visa Misuse of Auth:** Charged to Visa authorized transactions that are not followed by a matching Visa settled transaction (or in the case of a canceled transaction, not properly reversed). The fee can be avoided by settling your transactions within 10 days for Non Travel and Entertainment (T&E) Merchants Segments and 20 days for T&E merchants. If an authorization is not needed, the authorization must be electronically reversed within 24 hours for face to face authorizations and reversed within 72 hours for Card Absent authorizations.

**Visa Zero $ Verification:** Charged for Visa Card verification requests (without an actual dollar authorization). This fee can be avoided by obtaining an authorization request for the amount of the sale. If the authorization is not needed, the authorization request must be electronically reversed within 24 hours for face to face authorizations and reversed within 72 hours for Card Absent authorizations (to avoid the Visa Misuse of Authorization System fee).

**Visa Zero Floor Limit:** Charged when a Visa sale is settled without the required authorization (transaction ID is used to match the authorization to settled sale). All transactions above zero dollars require an authorization approval. This fee can be avoided by only settling transactions that have been approved. If an authorization is declined, the merchant must request another form of payment.

**You, Your:** See Client.

## PART II: THIRD PARTY AGREEMENTS

The following Agreements are Third Party Agreements entered into between Client and the Third Parties identified in the Third Party Agreements.

If Client desires to receive the products and/or services offered under a Third Party Agreement, Client must check the appropriate box or otherwise indicate such desire in the Merchant Processing Application, in which case the terms and conditions of the Third Party Agreement shall be binding upon Client. The Signature page in the Merchant Processing Application or any Schedule thereto shall also serve as a signature page to the Third Party Agreements.

Client acknowledges that the Third Parties are relying upon the information contained on the Merchant Processing Application and the Schedules thereto, all of which are incorporated by reference into the Third Party Agreements.

## Equipment Lease Agreement

This Equipment Lease Agreement ("Lease Agreement") is being entered into by and between Priority Payment Systems, LLC (through its business unit First Data Global Leasing), and the Lessee identified on the signature panel of this Merchant Processing Application ("MPA"). In this Lease Agreement, the words "we," "our" and "us" refer to Priority Payment Systems, LLC and its successors and assigns and the words "you" and "your" refer to Lessee and its permitted successors and assigns.

Lessee hereby authorizes us or our designees, successors or assigns (hereinafter "Lessor") to withdraw any amounts including any and all sales taxes now due or hereinafter imposed, owed by Lessee in conjunction with this Lease Agreement by initiating debit entries to the bank account designated by Lessee on the MPA (the "Settlement Account"). In the event of default of Lessee's obligation hereunder, Lessee authorizes debit of its account for the full amount due under this Lease Agreement. Further, Lessee authorizes its financial institution to accept and to charge any debit entries initiated by Lessor to Lessee's account. In the event that Lessor withdraws funds erroneously from Lessee's account, Lessee authorizes Lessor to credit Lessee's account for an amount not to exceed the original amount of the debit. This authorization is to remain in full force and effect until Lessor has received written notice from Lessee of its termination in such time and in such manner as to afford Lessor a reasonable opportunity to act. Lessee also authorizes Lessor from time to time to obtain investigative credit reports from a credit bureau or a credit agency concerning Lessee.

**1.1. Equipment.** We agree to lease to you and you agree to lease from us the equipment identified on the MPA or such other comparable equipment we provide you (the "Equipment"), according to the terms and conditions of this Lease Agreement. We are providing the Equipment to you "as is" and make no representations or warranties of any kind as to the suitability of the Equipment for any particular purpose. The term Equipment includes the Equipment initially deployed under the Lease Agreement and/or any additions, replacements, substitutions, or additions thereto.

**1.2. Effective Date, Term and Interim Rent.**

a) This Lease Agreement becomes effective on the earlier of the date we deliver any piece of Equipment to you (the "Delivery Date") or acceptance by us. This Lease Agreement remains in effect until all of your obligations and all of our obligations under it have been satisfied. We will deliver the Equipment to the site designated by you.

b) The term of this Lease Agreement begins on a date designated by us after receipt of all required documentation and acceptance by us (the "Commencement Date"), and continues for the number of months indicated on the MPA. THIS IS A NON-CANCELLABLE LEASE FOR THE TERM INDICATED.

c) You agree to pay an Interim Lease Payment in the amount of one-thirtieth (1/30th) of the monthly lease charge for each day from and including the Delivery Date until the date preceding the Commencement Date.

d) YOU ACKNOWLEDGE THAT THE EQUIPMENT AND/OR SOFTWARE YOU LEASE UNDER THIS LEASE AGREEMENT MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS AND THAT WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH SOFTWARE AND/OR EQUIPMENT COMPATIBLE IN THE EVENT THAT YOU ELECT TO USE ANOTHER SERVICE PROVIDER. UPON TERMINATION OF YOUR MERCHANT PROCESSING AGREEMENT, YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE EQUIPMENT AND/OR SOFTWARE LEASED UNDER THIS LEASE AGREEMENT WITH SAID SERVICE PROVIDER.

**1.3. Site Preparation.** You will prepare the installation site(s) for the Equipment, including but not limited to the power supply circuits and phone lines, in conformance with the manufacturer's and our specifications and will make the site(s) available to us by the confirmed shipping date.

**1.4. Payment of Amounts Due.**

a) The monthly lease charge is due and payable monthly, in advance. You agree to pay all assessed costs for delivery and installation of Equipment.

b) In addition to the monthly lease charge, you shall pay, or reimburse us for, amounts equal to any taxes, assessments on or arising out of this Lease Agreement or the Equipment, and related supplies or any services, use or activities hereunder, including without limitation, state and local sales, use, property, privilege and excise tax, tax preparation, compliance expenses, but exclusive of taxes based on our net income. Property taxes are calculated and charged based on the average of the estimated annual property taxes over the course of the term of the lease. You will also be charged an annual Tax Handling Fee, as set forth in the MPA and/or applicable Fee Schedule.

c) Your lease payment will be due despite dissatisfaction with the Equipment for any reason.

d) Whenever any payment is not made by you in full when due, you shall pay us as a late charge, an amount equal to ten percent of the amount due but no less than $5.00 for each month during which it remains unpaid (prorated for any partial month), but in no event more than the maximum permitted by law. You shall also pay to us an administrative charge of $10.00 for any debit we attempt to make against your Settlement Account that is rejected.

e) In the event your account is placed into collections for past due lease amounts, you agree that we can recover a collection expense charge of $50.00 for each aggregate payment requiring a collection effort.

**1.5. Use and Return of Equipment; Insurance.**

a) You shall cause the Equipment to be operated by competent and qualified personnel in accordance with any operating instructions furnished by us or the manufacturer. You shall maintain the Equipment in good operating condition and protect it from deterioration, normal wear and tear excepted.

b) You shall not permit any physical alteration or modification of the Equipment, or change the installation site of the Equipment, without our prior written consent.

c) You shall not create, incur, assume or allow to exist any consensually or judicially imposed liens or encumbrances on, or part with possession of, or sublease the Equipment with out our prior written consent.

d) You shall comply with all governmental laws, rules, and regulations relating to the use of the Equipment. You are also responsible for obtaining all permits required to operate the Equipment at your facility.

e) We or our representatives may, at any time, enter your premises for purposes of inspecting, examining or repairing the Equipment.

f) The Equipment shall remain our personal property and shall not under any circumstances be considered to be a fixture affixed to your real estate. You shall permit us to affix suitable labels or stencils to the Equipment evidencing our ownership.

g) You shall keep the Equipment adequately insured against loss by fire, theft, and all other hazards.

h) You shall provide proof of insurance as evidenced by a certificate naming First Data Merchant Services Corporation as a loss payee under your insurance policy. The loss, destruction, theft, or damage of or to the Equipment shall not relieve you from your obligation to pay the full purchase price or total monthly leases charge s hereunder.

i) If you do not provide such proof of insurance, you may be charged a fee, on which we may make a profit, as set forth on your fee schedule in connection with insuring the Equipment.

**1.6. Title to Equipment.** The Equipment is, and shall at all times be and remain, our sole and exclusive property, and you shall have no right, title or interest in or

to the Equipment except as expressly set forth in this Lease Agreement or otherwise agreed in writing. Except as expressly provided in Section 8, no transference of intellectual property rights is intended by or conferred in this Lease Agreement. You agree to execute and deliver to us any statement or instrument that we may request to confirm or evidence our ownership of the Equipment, and you irrevocably appoint us as your attorney-in-fact to execute and file the same in your name and on your behalf. If a court determines that the leasing transaction contemplated by this Lease Agreement does not constitute a financing and is not a lease of the Equipment, then we shall be deemed to have a first lien security interest on the Equipment as of the date of this Lease Agreement, and you will execute such documentation as we may request to evidence such security interest. If this Lease Agreement is deemed a loan despite the intention of the parties, then in no contingency or event whatsoever shall interest deemed charged hereunder, however such interest may be characterized or computed, exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.

**1.7. Return or Purchase of Equipment at End of Lease Period.** Upon the completion of your lease term or any extension thereof, you will have the option to (a) return the Equipment to us; (b) purchase the Equipment from us for its then fair market value, calculated as a percentage of the aggregate lease payments in accordance with the following: If the term of this Lease is forty-eight (48) months or more, the buyout option as a percentage of the aggregate lease payments shall be ten percent (10%). If the term of this lease is thirty-six (36) to forty-seven (47) months, the buyout option as a percentage of the aggregate lease payments shall be fifteen percent (15%). If the term of this lease is twenty-four (24) to thirty-five (35) months, the buyout option as a percentage of the aggregate lease payments shall be twenty percent (20%); or (c) after the final lease payment has been received by FDGL, the Agreement will revert to a month by month rental at the existing monthly lease payment. If Client does not want to continue to rent the Equipment, then Client will be obligated to provide FDGL with 30 day written notice to terminate and return the equipment to FDGL. If we terminate the lease pursuant to Section 1.11(b) due to a default by you, then you shall immediately return the Equipment to us no later than the tenth business day after termination, or remit to us the fair market value of the Equipment as determined in good faith by us. We may collect any amounts due to us under this Section 1.7 by debiting your bank account, and to the extent we are unable to obtain full satisfaction in this manner, you agree to pay the amounts owed to us promptly upon our request.

**1.8. Software License.** We retain all ownership and copyright interest in and to all computer software, related documentation, technology, know-how and processes embodied in or provided in connection with the Equipment other than those owned or licensed by the manufacturer of the Equipment (collectively "Software"), and you shall have only a non-exclusive license to use the Software in your operation of the Equipment.

**1.9. Limitation on Liability.** We are not liable for any loss, damage or expense of any kind or nature caused directly or indirectly by the Equipment, including any damage or injury to persons or property caused by the Equipment. We are not liable for the use or maintenance of the Equipment, its failure to operate, any repairs or service to it, or by any interruption of service or loss of use of the Equipment or resulting loss of business. Our liability arising out of or in any way connected with this Lease Agreement shall not exceed the aggregate lease amount paid to us for the particular Equipment involved. In no event shall we be liable for any indirect, incidental, special or consequential damages. The remedies available to you under this Lease Agreement are your sole and exclusive remedies.

**1.10. Warranties.**
    a) All warranties, express or implied, made to you or any other person are hereby disclaimed, including without limitation, any warranties regarding quality, suitability, merchantability, fitness for a particular purpose, quiet enjoyment, or non-infringement.
    b) You warrant that you will only use the Equipment for commercial purposes and will not use the Equipment for any household or personal purposes.

**1.11. Indemnification.** You shall indemnify and hold us harmless from and against any and all losses, liabilities, damages and expenses resulting from (a) the operation, use, condition, liens against, or return of the Equipment or (b) any breach by you of any of your obligations hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**1.12. Default; Remedies.**
    a) If any debit of your Settlement Account initiated by us is rejected when due, or if you otherwise fail to pay us any amounts due hereunder when due, or if you default in any material respect in the performance or observance of any obligation or provision of this Lease Agreement or any agreement with any of our affiliates or joint ventures, any such event shall be a default hereunder. Without limiting the foregoing, any default by you under a processing agreement with us or with an affiliate or joint venture to which we are a party will be treated as a default under this Lease Agreement. Such a default would include a default resulting from early termination of the MPA.
    b) Upon the occurrence of any default, we may at our option, effective immediately without notice, either (i) terminate this lease and our future obligations under this Lease Agreement, repossess the Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable, or (ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us), not as a penalty but as liquidated damages for our loss of the bargain. Upon any such termination for default, we may proceed in any lawful manner to obtain satisfaction of the amounts owed to us and, if applicable, our recovery of the Equipment, including entering onto your premises to recover the Equipment. In any case, you shall also be responsible for our costs of collection, court costs, as well as applicable shipping, repair and refurbishing costs of recovered Equipment. You agree that we shall be entitled to recover any amounts due to us under this Lease Agreement by charging your Settlement Account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates or joint ventures, or by setting off amounts that you owe to us against any amounts we may owe to you, in any case without notifying you prior to doing so. Without limiting the foregoing, you agree that we are entitled to recover amounts owed to us under this Lease Agreement by obtaining directly from an affiliate or joint venture to which we are a party and with which you have entered into an MPA any funds held or available as security for payment under the terms of the MPA, including funds available under the "Reserve Account; Security Interest" section of the MPA, if applicable.

**1.13. Assignment.** You may not assign or transfer this Lease Agreement, by operation of law or otherwise, without our prior written consent. For purposes of this Lease Agreement, any transfer of voting control of you or your parent shall be considered an assignment or transfer of this Lease Agreement. We will assign this Lease Agreement after its execution to First Data Global Leasing (FDGL), a business unit of First Data Merchant Services Corporation. After such assignment, Priority Payment Systems, LLC shall have no further obligation under the Lease Agreement.

**1.14. Lease Guaranty.** No guarantor shall have any right of subrogation to any of our rights in the Equipment or this Lease Agreement or against you, and any such right of subrogation is hereby waived and released. All indebtedness that exists now or arises after the execution of this Lease Agreement between you and any guarantor is hereby subordinated to all of your present and future obligations, and those of your guarantor, to us, and no payment shall be made or accepted on such indebtedness due to you from a guarantor until the obligations due to us are paid and satisfied in full.

**1.15. Governing Law; Venue; Miscellaneous.** This Lease Agreement shall be governed by and will be construed in accordance with the laws of the State of New York (without applying its conflicts of laws principles). The exclusive venue for any actions or claims arising under or related to this Lease Agreement shall be in the appropriate state of federal court located in Suffolk County, New York. If any part of this Lease Agreement is not enforceable, the remaining provisions will remain valid and enforceable.

**1.16. Notices.** All notices must be in writing, and shall be given (a) if sent by mail, when received, and (b) if sent by courier, when delivered; if to you at the address appearing on the MPA, and if to us at 4000 Coral Ridge Drive, Coral Springs, Florida 33065. Attn: Lease Department. Customer Service toll free number 1-877-257-2094.

**1.17. Entire Agreement.** This Lease Agreement constitutes the entire Agreement between the parties with respect to the Equipment, supersedes any previous agreements and understandings and can be changed only by a written agreement signed by all parties. This Lease Agreement may be executed in any number of counterparts and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Lease Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Lease Agreement.

| SCHEDULE B | SCHEDULE C |
|---|---|
| Initially Omitted | Initially Omitted |

## PART III: ADDITIONAL IMPORTANT INFORMATION FOR CARDS

### A.1. Electronic Funding Authorization

All payments to Client shall be through the Automated Clearing House ("ACH") and shall normally be electronically transmitted directly to the Settlement Account you have designated or any successor account designated to receive provisional funding of Client's Card sales pursuant to the Agreement. Client agrees that any Settlement Account designated pursuant to the preceding sentence will be an account primarily used for business purposes. Neither Bank nor Priority Payment Systems, LLC can guarantee the time frame in which payment may be credited by Client's financial institution where the Settlement Account is maintained.

Client hereby authorizes Bank and its authorized representative to access information from the DDA and to initiate credit and/or debit entries by bankwire or ACH transfer and to authorize your financial institution to block or to initiate, if necessary, reversing entries and adjustments for any original entries made to the DDA and to authorize your financial institution to provide such access and to credit and/or debit or to block the same to such account. This authorization is without respect to the source of any funds in the DDA, is irrevocable and coupled with an interest. This authority extends to any equipment rental or purchase agreements which may exist with Client as well as to any fees and assessments and Chargeback amounts of whatever kind or nature due to Priority Payment Systems, LLC or Bank under terms of this Agreement whether arising during or after termination of the Agreement. This authority is to remain in full force and effect at all times unless and until Priority Payment Systems, LLC and Bank have consented to its termination at such time and in such a manner as to afford them a reasonable opportunity to act on it. In addition, Client shall be charged twenty-five dollars ($25.00) for each ACH which cannot be processed, and all subsequent funding may be suspended until Client either (i) notifies Priority Payment Systems, LLC that ACH's can be processed or (ii) a new electronic funding agreement is signed by Client. Client's Settlement Account must be able to process or accept electronic transfers via ACH.

### A.2. Funding Acknowledgement

Automated Clearing House (ACH). Your funds for MasterCard, Visa and Discover Network transactions will ordinarily be processed and transferred to your financial institution within two (2) Business Days from the time a batch is received by Processor if your financial institution is the Bank. If your financial institution is not the Bank, your MasterCard, Visa and Discover Network transactions will ordinarily be processed via the Federal Reserve within two (2) Business Days from the time a batch is received by Processor. The Federal Reserve will transfer such amounts to your financial institution.

### A.3. Additional Fees and Early Termination

If Client's MasterCard, Visa and Discover Network transaction(s) fail to qualify for the discount level contemplated in the rates set forth in the Application, Client will be billed the fee indicated in the Mid-Qualified Discount field or Non-Qualified Discount field . If you are utilizing the Enhanced Billback Discount option, the Client will be charged the Enhanced Billback Rate on the volume of said transaction that failed to qualify, in addition to the difference between the MasterCard / Visa / Discover Network Qualified Rate agreed to in Section 9 of the Service Fee Schedule and the actual interchange rate assessed to the downgraded transaction.

Your initial MasterCard, Visa and Discover Network rates are stated on your Application and may be adjusted from time to time including to reflect:

**a.** Any increases or decreases in the interchange and/or assessment portion of the fees;

**b.** The appropriate rate change level as is consistent with the qualifying criteria of each transaction submitted by Client;

**c.** Increases in any applicable sales or telecommunications charges or taxes levied by any state, federal or local authority related to the delivery of the services provided by Priority Payment Systems, LLC when such costs are included in the Service or other fixed fees.

The discount fees shown in Section 9, Service Fee Schedule, shall be calculated based on the gross sales volume of all Visa, MasterCard and Discover Network volume.

A Monthly Minimum Processing Fee will be assessed immediately after the date Client's application is approved. (Refer to Section 9, Service Fee Schedule, if applicable.)

In addition to the PIN Debit Card transaction fees set forth on the Application, Client shall be responsible for the amount of any fees imposed upon a transaction by the applicable debit network.

The parties further agree and acknowledge that, in addition to any remedies contained herein or otherwise available under applicable law and, if (a) Client breaches this Agreement by improperly terminating it prior to the expiration of the applicable term of the Agreement, or (b) this Agreement is terminated prior to the expiration of the applicable term of the Agreement due to an Event of Default, then Servicers will suffer a substantial injury that is difficult or impossible to accurately estimate. Accordingly, the parties have agreed that the amount described below is not a penalty but rather a reasonable pre-estimate of Servicers' probable loss or financial harm cause by such termination of this Agreement. Notwithstanding the foregoing, if Merchant is located in an individual state that limits, restricts, alters or affects the amount of this fee, the Damages shall not exceed that individual limit. Such amount shall be paid to Servicers within 15 days after Client's receipt of Servicers' calculation of the amount due.

In the event that Client terminates this Agreement within three (3) years from the date of approval by Priority Payment Systems, LLC and Bank due to an Event of Default, Client will be charged a fee for such early termination, if so indicated on the Application in Section 9, Service Fee Schedule. Client's obligation with respect to the Monthly Minimum Processing Fee will end simultaneously with Priority Payment Systems, LLC's receipt of Termination Fee.

Pursuant to Section 6050W of the Internal Revenue Code, merchant acquiring entities and third party settlement organizations are required to file an information return for each calendar year beginning January 1, 2011 reporting all payment card transactions and third party network transactions with payees occurring in that calendar year. Accordingly, you will receive a Form 1099 reporting your gross transaction amounts for each calendar year beginning with transactions processed in calendar year 2011. In addition, amounts reportable under Section 6050W are subject to backup withholding requirements. Payors are required to perform backup withholding by deducting and withholding income tax from reportable transactions if (a) the payee fails to provide the payee's taxpayer identification number (TIN) to the payor, or (b) if the IRS notifies the payor that the TIN (when matched with the name) provided by the payee is incorrect. Accordingly, to avoid backup withholding, it is very important that you provide us with the correct name and TIN that you use when filing your tax return that includes the transactions for your business.

### A.4. Addresses for Notices

Priority Payment Systems, LLC:
P.O. Box 246
Alpharetta, GA 30009-0246
Attn: Chief Operating Officer

Bank: Snovus Bank
1111 Bay Avenue
Columbus, GA 31901
(706) 649-4900

Important Phone Numbers: (See also Sections 3.3 and 5.4) Customer Service 1-855-813-5293

If this application for business credit is denied you may obtain a written statement of the specific reasons for denial. To obtain the statement, please contact Credit Initiation, P.O. Box 246, Alpharetta, GA 30009-0246, within sixty (60) days from the date you are notified of our decision. We will send you a written statement of reasons for the denial within thirty (30) days of receiving your request.

33

## PART IV: DUPLICATE CONFIRMATION PAGE

DUPLICATE

**PROCESSOR** Name: ___**Priority Payment Systems**___

**INFORMATION:** Address: ___P.O. Box 206, Alpharetta, GA 30009-0246___

URL: ___www.prioritypaymentsystems.com/manuals/PPS0714programguide.pdf___ Customer Service #: 1-855-813-5293

Please read the Program Guide in its entirety. It describes the terms under which we will provide merchant processing Services to you.

From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

_____ _____ _____

**1. Your Discount Rates are assessed** on transactions that qualify for certain reduced interchange rates imposed by MasterCard and Visa. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 18 of the Program Guide).

**2. We may debit your bank account** from time to time for amounts owed to us under the Agreement.

**3. There are many reasons why a Chargeback may occur.** When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargebacks see Section 10 of Card Processing Operating Guide.

**4. If you dispute any charge or funding,** you must notify us within 60 days of the date of the statement where the charge or funding appears for Card Processing.

**5. The Agreement limits our liability to you.** For a detailed description of the limitation of liability see Section 20 of the Card Processing General Terms.

**6. We have assumed certain risks** by agreeing to provide you with Card processing or check services. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Card Processing General Terms in Section 23, Term; Events of Default and Section 24, Reserve Account; Security Interest), under certain circumstances.

**7. By executing this Agreement with us** you are authorizing us and our Affiliates to obtain financial and credit information regarding your business and the signers and guarantors of the Agreement until all your obligations to us and our Affiliates are satisfied.

**8. The Agreement contains a provision** that in the event you terminate the Agreement early, you will be responsible for the payment of an early termination fee as set forth in Part III, A.3 under "Additional Fee Information."

**9. If you lease equipment from Processor,** it is important that you review Section 1 in Third Party Agreements. Bank is not a party to this Agreement. **THIS IS A NON-CANCELABLE LEASE FOR THE FULL TERM INDICATED.**

**10. For questions regarding your Merchant Processing Application and Agreement, please contact Customer Service at 1-855-813-5293, and / or refer to Important Phone Numbers on the Additional Important Information Page, Part III, Section A.4.**

**11. Card Organization Disclosure**

**Visa and MasterCard Member Bank Information: Synovus Bank**

The Bank's mailing address is 1111 Bay Avenue, Columbus, Georgia 31901, and its phone number is (706) 649-4900.

**Important Member Bank Responsibilities:**

a) The Bank is the only entity approved to extend acceptance of Card Organization products directly to a Merchant.

b) The Bank must be a principal (signer) to the Merchant Agreement.

c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may be provided to you by Processor.

d) The Bank is responsible for and must provide settlement funds to the Merchant.

e) The Bank is responsible for all funds held in reserves that are derived from settlement.

**Important Merchant Responsibilities:**

a) Ensure compliance with Cardholder data security and storage requirements. b) Maintain fraud and Chargebacks below Card Organization thresholds.

c) Review and understand the terms of the Merchant Agreement.

d) Comply with Card Organization rules.

e) Retain assigned copy of this Disclosure Page.

f) You may download "Visa Regulations" from Visa's website at: http://usa.visa.com/merchants/operations/op_regulations.html

g) You may download "MasterCard Regulations" from MasterCard's website at: http://www.mastercard.com/us/merchant/support/rules/htm

**Print Client's Business Legal Name:** ___ _____ _____

**By its signature below, Client acknowledges that it has received (either in person, by facsimile, or by electronic transmission) the complete Program Guide [version PPS0714(ia)] consisting of 50 pages (including this confirmation).**

**Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed.**

**Client understands that a copy of the Program Guide is also available for downloading from the Internet at:**

___www.prioritypaymentsystems.com/manuals/PPS0714programguide.pdf___

**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED.**

**Client's Business Principal:**

**Signature (Please sign below):**

X _____ _____

_____ _____ _____ _____

**Please Print Name of Signer** Title Date